# Group Exhibit C

1   STATE OF ILLINOIS )
                  ) SS:
2   COUNTY OF C O O K )

3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
          COUNTY DEPARTMENT - CRIMINAL DIVISION
4

5   THE PEOPLE OF THE STATE    )
   OF ILLINOIS              )
6                        )
      vs.            )  No.  06-CR-23138-01
7                        )
   ANTIONE WILLIS         )
8

9

10          REPORT OF PROCEEDINGS had at the

11  hearing in the above-entitled cause before

12  the HONORABLE MARCUS R. SALONE, Judge of said court,

13  on the 25th day of February 2008.

14    <u>PRESENT</u>:

15    HONORABLE RICHARD A. DEVINE,
     STATE'S ATTORNEY OF COOK COUNTY, by:
16    MS. HEATHER WEBER and MS. LORNA AMADO-CHEVLIN,
     ASSISTANT STATE'S ATTORNEYS,
17       appeared on behalf of the People;

18    MR. EDWIN BURNETTE,
     PUBLIC DEFENDER OF COOK COUNTY, by:
19    MS. LAKSHMI JHA and MR. VICTOR ERBRING,
     ASSISTANT PUBLIC DEFENDERS,
20       appeared on behalf of the Defendant
       Antione Willis.
21

22  Annette M. Golab
   Official Court Reporter
23  License No. 084-001693

24



1

I N D E X

Date of Hearing:  February 25, 2008

Pages:  1 to 86

PROCEEDINGS

| WITNESS | PAGE | DX | CX | RDX | RCX |
|---------|------|-----|-----|------|------|
| Jury Waiver | 6 | | | | |
| Opening Statement<br>   By Mr. Erbring | 7 | | | | |
| Joseph Wagner | | 7 | 25 | 54 | |
| James Triantafillo | | 55 | 65 | 82 | |

2

1    THE COURT:  Antione Willis.

2    MS. JHA:  For the record, Assistant Public Defender

3    Lakshmi Jha on behalf of Mr. Antione Willis, who is

4    present in custody.  I am waiving his appearance at this

5    time.

6        Mr. Haggert was subpoenaed to come to court

7    today as a witness on behalf of Mr. Willis.  It looks

8    like we are not going to be able or the State is not

9    going to be able to finish their case in chief today.  We

10   worked out April 2nd as the date this will be entered and

11   continued to.

12   THE COURT:  On April 2nd we should be in a jury

13   trial.  It's an '05 case that I would desperately like to

14   go to trial on it.  Off the record.

15       (Discussion had off the record.)

16   MS. JHA:  March 31st, Judge.

17   THE COURT:  What is your name, sir?

18   THE WITNESS:  Haggert, Ivan.

19   THE COURT:  Mr. Haggert, I am going to ask that you

20   return on Monday, March 31st at 9:00.  If you need a

21   subpoena for work or anything of that sort Ms. Jha will

22   provide that document for you.  But whether she gives you

23   one or not, I am directing that you return here on

24   Monday, March 31st.  Your failure to do so could result

3

1     in your being held in contempt of court, for which you

2     could be incarcerated for six months.  I know that you

3     have been here all day.  I do sincerely apologize.  Some

4     things have occurred today that I had no control over.

5     On the 31st I fully expect that we will hear your

6     testimony on that date, okay?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  Pass the case.

9                    (Whereupon, the case was passed.)

10                    *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1          THE COURT:  Antione Willis.  Bring out Mr. Antione

 2    Willis.  Have a seat over there, Mr. Willis.  The record

 3    should reflect that the defendant Antione Willis is

 4    present in open court and represented by Counsel, who is?

 5          MS. JHA:  Assistant Public Defender Lakshmi Jha on

 6    behalf of Mr. Willis along with --

 7          MR. ERBRING:  Assistant Public Defender Victor

 8    Erbring.

 9          THE COURT:  State?

10          MS. WEBER:  Assistant State's Attorney Heather

11    Weber, W-e-b-e-r.

12          MS. AMADO-CHEVLIN:  Assistant State's Attorney Lorna

13    Chevlin.

14          THE COURT:  Is this a bench or a jury trial?

15          MS. JHA:  This is a bench, your Honor.  The State I

16    believe may not be going on all of the counts as listed

17    in the indictment.

18          THE COURT:  State, which counts are we going to

19    nolle?

20          MS. AMADO-CHEVLIN:  Judge, I am going to nolle

21    Count 3, Count 4 -- I'm sorry.  Actually Counts 5 and 6

22    we will nolle.  I will stay with Counts 3 and 4.  1, 2, 3

23    and 4, 5 and 6 could go, nolle 7.  I will nolle Counts 5

24    all the way through 21, including Count 21.  We will
```

1    continue with 22 through 28.  So the charges I will nolle

2    are charges 5 through 21.

3         THE COURT:  How do you plead to the remaining

4    counts?

5         THE DEFENDANT:  Not guilty.

6         THE COURT:  You previously indicated this is a bench

7    trial?

8         THE DEFENDANT:  Yes.

9         THE COURT:  Tell me what would a jury trial be, sir.

10        THE DEFENDANT:  I would be judged by twelve, your

11   Honor.

12        THE COURT:  When you say you would be judged by

13   twelve, twelve what?

14        THE DEFENDANT:  Twelve jurors, twelve people.

15        THE COURT:  Twelve people would determine what?

16        THE DEFENDANT:  If I am innocent or guilty.

17        THE COURT:  I have observed the defendant execute a

18   jury waiver in my presence.  I find the waiver is given

19   knowingly and voluntarily, and it shall be accepted.

20   Opening statements?

21        MS. WEBER:  The State would waive.

22        THE COURT:  Defense?

23        MR. ERBRING:  Judge, very briefly.

24

```
 1                    OPENING STATEMENT

 2                    BY MR. ERBRING:

 3              Judge, you are going to hear testimony about

 4    what happened on the late evening of 9/22/2006 in the

 5    northeast area in Chicago, Illinois where officers

 6    responded to a call of shots fired.  They eventually

 7    found somebody that they ended up shooting, and that

 8    person was subsequently charged with the remaining

 9    counts.

10              I believe the State will be unable to meet its

11    burden of proof beyond a reasonable doubt in this case,

12    and I am confident you are going to find Mr. Willis not

13    guilty after this trial.

14         THE COURT:  State, please call your first witness.

15         MS. JHA:  Motion to exclude.

16         MS. WEBER:  We join in that.

17                    (Witness duly sworn.)

18                    JOSEPH WAGNER,

19    called as a witness on behalf of the People of the State

20    of Illinois, after having been first duly sworn, was

21    examined and testified as follows:

22                    DIRECT EXAMINATION

23                    BY MS. WEBER:

24         Q.    Officer, would you please state your name, star
```

7

1    number and current unit of assignment?

2         A.    Officer Wagner, W-a-g-n-e-r, Star 14796,

3    Chicago Police Department, currently assigned to

4    Unit 193.

5         THE COURT:  May I have the first name?

6         THE WITNESS:  Joseph.

7    BY MS. WEBER:

8         Q.    Officer Wagner, how long have you been with the

9    Chicago Police Department?

10        A.    Approximately six and a half years.

11        Q.    And are you -- you stated you are currently

12   assigned to 183.  Back on September 22, 2006 what unit

13   were you assigned to?

14        A.    The 11th District.

15        Q.    Were you working on that date?

16        A.    Yes, I was.

17        Q.    And what shift were you working?

18        A.    Afternoon, evening shift, third watch.

19        Q.    Were you working by yourself or with a partner?

20        A.    With a partner.

21        Q.    What was your partner's name?

22        A.    Officer Triantafillo, T-r-i-a-n-t-a-f-i-l-l-o.

23        Q.    How were you and your partner dressed that

24   evening?

8

1     A.   In Chicago Police Department BDU uniforms.

2     Q.   Would you describe those uniforms, please?

3     A.   It's a black tactical uniform, black pants

4 black shirt.  The shirt has embroidered our star numbers

5 and have Chicago Police patches engraved.

6     Q.   Were you wearing your badge that night?

7     A.   Yes, on my belt.

8     Q.   Was it visible?

9     A.   Yes, it was.

10    MR. ERBRING:  Objection, speculation.

11 BY MS. WEBER:

12     Q.   Was it visible on the outside of your uniform,

13 Officer?

14     A.   Yes.

15     Q.   Were you in a marked or an unmarked squad car

16 that evening?

17     A.   Unmarked crown Victoria.

18     Q.   Where actually -- at approximately 11:30 that

19 evening did you respond to a call?

20     A.   Yes.

21     Q.   What was the nature of that call?

22     A.   There was a call of a man with a gun and a

23 description on the 800 block of North Keystone.

24     Q.   Did you and your partner respond to that call?

1      A.    Yes.

2      Q.    Who was driving?

3      A.    Officer Triantafillo.

4      Q.    Did that call include any additional

5   information?

6      A.    Yes, it did.

7      Q.    What information did it include?

8      A.    The description was a male black, black

9   baseball hat, white T-shirt, blue jeans with a silver

10  handgun.

11     THE COURT:  Jeans with what?

12     THE WITNESS:  With a silver handgun.

13  BY MS. WEBER:

14     Q.    How soon after you received that call did you

15  proceed to that address?

16     A.    We immediately proceeded to that location.  It

17  took approximately four to five minutes.

18     Q.    When you arrived on the 800 block of North

19  Keystone, where did you go?

20     A.    Upon approach myself and Officer Triantafillo

21  decided to go -- drive up to the alley and then proceed

22  on foot onto the 800 block of Keystone.

23     Q.    Where did you park your car?

24     A.    In the east alley of the 800 block of Keystone,

1    approximately 841 to 843.

2        Q.    Could you please describe for the Judge the 800

3    block of North Keystone?

4        A.    800 Keystone is a residential block.  It's a

5    one-way street going northbound, houses and vehicles on

6    both sides of the street.

7        Q.    After you and your partner proceeded down that

8    alley did you go anywhere?

9        A.    Yes.

10       Q.    Where did you go?

11       A.    We proceeded to an open gangway, which ended up

12   being 839 North Keystone.

13       Q.    As you walked up the gangway of 839 North

14   Keystone who proceeded down that gangway first?

15       A.    I proceeded first.

16       Q.    Where was your partner in relation to you?

17       A.    Behind me.

18       Q.    As you approached the front of that gangway did

19   you make any observations?

20       A.    Yes.

21       Q.    What did you observe?

22       A.    I heard some voices, individuals that were just

23   outside the gangway.

24       Q.    And upon exiting the gangway what did you see?

11

1    A.    I saw a male black individual standing on the

2    sidewalk just north of the gangway I was at facing --

3    Q.    I'm sorry, facing?

4    A.    Facing westbound.

5    Q.    Was that individual who was standing on the

6    sidewalk doing anything?

7    A.    He was standing there talking to a female who

8    was facing eastbound.  They were facing each other

9    talking on the sidewalk.

10   Q.    Did you make any other observations?

11   A.    There were two male individuals on the porch of

12   839 North Keystone.

13   Q.    As you exited the gangway and observed these

14   individuals did you or your partner say anything?

15   A.    Yes, myself and my partner were yelling police.

16   Q.    Did you do anything in addition to that?

17   A.    We illuminated our flashlights and just yelled

18   police.

19   Q.    After you did this, Officer Wagner, what

20   occurred?

21   A.    I observed the individual that was standing on

22   the sidewalk pull a revolver, blue steel revolver, from

23   his waistband and begin to run northbound.

24   Q.    And do you see this individual that you

12

1    observed pull that gun from his waistband here in court

2    today?

3         A.   Yes.

4         Q.   Could you please point him out and identify him

5    by an article of clothing?

6         A.   The gentleman sitting at the table to my left

7    in the tan Department of Corrections uniform known to me

8    as Antione Willis.

9         MS. WEBER:   Your Honor, may the record reflect the

10   in-court identification of the defendant?

11        THE COURT:   It shall.

12   BY MS. WEBER:

13        Q.   Officer Wagner, prior to the defendant pulling

14   out that handgun did you make observations of any sort of

15   trash bags in his hand?

16        A.   No.

17        Q.   Did you see any trash bags near him?

18        A.   No.

19        Q.   After the defendant fled northbound -- well,

20   actually as the defendant pulled out that revolver, what

21   view of the defendant did you have?

22        A.   I had his right side, his rear and then right

23   side.

24        Q.   What were the lighting conditions like when you

                              13

1    made this observation?

2         A.    It was dark with artificial lighting.    There

3    are street lights, and then at 841 North Keystone there

4    is kind of a globe light in the middle of the front yard.

5         Q.    Where was the defendant standing in relation to

6    841 North Keystone?

7         A.    He was standing on the sidewalk in front of

8    that globe.

9         Q.    Approximately how far away from the defendant

10   were you when you made these observations?

11        A.    Approximately ten to twelve feet.

12        Q.    After you observed the defendant pull out the

13   gun and flee northbound, what did you and your partner

14   do?

15        A.    Immediately gave chase and verbal direction to

16   stop, drop the gun and just said Chicago Police.

17        Q.    After you called this out did the defendant

18   follow your instructions?

19        A.    No.

20        Q.    And what did the defendant do?

21        A.    As he was running at approximately 851 North

22   Keystone he turned, he slowed his running, he turned to

23   his left side and he raised the handgun with his right

24   hand.

14

1       Q.   Could you please demonstrate for the Judge

2   exactly what it was the defendant did?

3       A.   Yes.  As he was running he turned to his left,

4   with his right hand he raised the gun towards my

5   direction.

6       MS. WEBER:  May the record reflect that the witness

7   stood up and he turned slightly to the left and then he

8   raised his right hand above his left shoulder.

9       THE COURT:  So noted.

10  BY MS. WEBER:

11      Q.   Officer Wagner, where were you in relation to

12  the defendant when the defendant made this action and

13  pointed that gun?

14      A.   Approximately 30 feet away in front of 847

15  North Keystone.

16      Q.   Let's back up for a second.  As you were

17  pursuing the defendant where was your partner in relation

18  to you and the defendant?

19      A.   I know he was behind me and he was to the right

20  of me, but I don't know exactly where he was because he

21  was behind me.

22      Q.   Approximately how far away were you from the

23  defendant when he took these actions?

24      A.   Approximately 30 feet.  30, 35 feet.

15

1    Q.   What did you do in response to the defendant

2    turning in your direction and pointing a gun at you?

3    A.   For fear for myself and my partner's safety I

4    fired a round with my weapon at Mr. Willis.

5    Q.   How many times did you fire your gun?

6    A.   One time.

7    Q.   And what occurred after you fired that shot?

8    A.   Mr. Willis then spun facing northbound and the

9    gun hit the fence to his right and fell into the yard.

10   Q.   And what did the defendant do?

11   A.   He kind of jogged and stumbled for a few more

12   feet and then laid down on his back.

13   Q.   Was the defendant subsequently placed under

14   arrest?

15   A.   Yes.

16   Q.   And by whom?

17   A.   Myself, and at that time Beat 1111, Officers

18   Granato and Coleman were approaching to assist.

19   Q.   Was the weapon which you observed the defendant

20   in possession of recovered?

21   A.   Yes.

22   Q.   Who was that recovered by?

23   A.   Officer Triantafillo.

24   Q.   Were you able to determine whether or not that

16

1    weapon was loaded?

2        A.    Yes.

3        Q.    And was it?

4        MR. ERBRING:  Objection, foundation.

5        THE COURT:  Who is going to -- are you going to

6    cross this witness?

7        MR. ERBRING:  Yes.

8        THE COURT:  Okay.

9    BY MS. WEBER:

10       Q.    Did you have an opportunity to examine that

11   weapon?

12       A.    Briefly, yes.

13       Q.    That was after your partner Triantafillo

14   recovered it on scene?

15       A.    Correct.

16       Q.    What did you observe inside of the chamber, if

17   anything?

18       A.    I observed there was mud on the handgun and

19   there was -- you could see the front of the bullet, the

20   bullets in the cycle, the wheel of the revolver.

21       THE COURT:  Hold it.  Read back the answer.

22                    (Answer read.)

23       MS. WEBER:  May I have a moment?

24       Q.    Your partner Triantafillo is the one who

17

1    actually recovered that gun, correct?

2         A.    Yes.

3         Q.    He was the one who handled it?

4         A.    Yes.

5         MS. WEBER:  May I have a moment, your Honor?

6         THE COURT:  Okay.

7    BY MS. WEBER:

8         Q.    Officer Wagner, what sort of weapon do you

9    carry?

10        A.    A semi-automatic Sig Saur nine-millimeter.

11        Q.    Did you subsequently turn your weapon over to

12   anyone?

13        A.    Yes, at Area 4 I turned my weapon over to an

14   evidence technician.

15        Q.    Officer Wagner, what occurred after the

16   defendant was placed under arrest with the defendant?

17        A.    Handcuffs were placed on him.  Immediately

18   after that my partner Officer Triantafillo got on the

19   radio and notified shots fired by the police and

20   immediately called for an ambulance.

21        Q.    Why did you call for an ambulance?

22        MR. ERBRING:  Objection, speculation.

23        THE COURT:  No.

24

1    BY MS. WEBER:

2         Q.    Why was an ambulance called at that time?

3         A.    Because Mr. Willis was injured.

4         MS. WEBER:  May I approach, your Honor?

5         THE COURT:  Sure.

6         MS. WEBER:  Thank you.

7         Q.    Officer Wagner, showing you what was marked

8    previously as People's Exhibit 1 for identification, do

9    you recognize that?

10        A.    Yes.

11        Q.    What is depicted in that photo?

12        A.    This is a picture of the east alley of the 800

13   block of North Keystone.  This is our vehicle.

14        Q.    Does that photo accurately depict where you

15   parked your vehicle on the night that this incident

16   occurred?

17        A.    Yes.

18        Q.    Showing you now what was previously marked

19   People's Exhibit 2 for identification, do you recognize

20   that?

21        A.    Yes.

22        Q.    What is depicted in that photo?

23        A.    It is a closer picture of myself and Officer

24   Triantafillo's vehicle.

19

1        THE COURT:  Close up of what?

2        THE WITNESS:  Closer picture of myself and Officer

3   Triantafillo's vehicle on that night in that alley.

4   BY MS. WEBER:

5        Q.   Now, showing you what was previously marked

6   People's Exhibit 3 for identification, do you recognize

7   what is depicted in that photo?

8        A.   Yes.

9        Q.   What is depicted in this photo?

10       A.   A northbound view of that alley and my vehicle.

11       Q.   People's Exhibit 4 for identification, do you

12  recognize that?

13       A.   Yes.  I believe this is the garage of 839 North

14  Keystone.

15       Q.   Is anything depicted to the right of that

16  garage?

17       A.   Yes, there is an open gate and garbage cans.

18       Q.   I now show you what was previously marked

19  People's Exhibit 15 for identification, do you recognize

20  what is depicted in that photo?

21       A.   This is a picture of the front of 847 North

22  Keystone.

23       MS. AMADO-CHEVLIN:  That's No. 5.

24       THE COURT:  You jumped to 15.

                          20

1      MS. WEBER:  I apologize.  That was No. 5.

2      THE COURT:  What is it?

3      THE WITNESS:  It is a picture of the front of 847

4  North Keystone.

5      Q.   Officer Wagner, what if anything occurred in

6  the front of 847 North Keystone?

7      MR. ERBRING:  Objection.  Asked and answered.

8      THE COURT:  You can answer.

9  BY THE WITNESS:

10     A.   This is the approximate location of where I was

11  standing when this incident occurred.  In this picture it

12  also shows a number two, a number police marker showing

13  where my spent casing landed.

14     Q.   Showing you now what was previously marked as

15  People's Exhibit 6 for identification, do you recognize

16  that?

17     A.   Yes, this is approximately 847, the front of

18  847 North Keystone with a northbound view of the

19  sidewalk.

20     Q.   And does that depict the sidewalk in which you

21  chased the defendant down prior to the defendant pointing

22  that gun at you?

23     A.   Yes.

24     Q.   I am showing you now what was previously marked

21

1    as People's Exhibit 7 for identification, do you

2    recognize what is depicted in that?

3         A.    Yes.

4         Q.    What is depicted in that photo?

5         A.    This is a picture of the residence at 839 North

6    Keystone and part of 841 North Keystone with the gangway

7    I approached from in the middle.

8         Q.    Could you just circle, place a circle around

9    the gangway which you approached from?

10        A.    (Witness complies.)

11        MS. WEBER:   If the record may reflect the witness

12   has complied with my request?

13        THE COURT:   Okay.

14   BY MS. WEBER:

15        Q.    Showing you, Officer Wagner, what was

16   previously marked as People's Exhibit 8 for

17   identification, do you recognize what is depicted in

18   that?

19        A.    Yes.

20        Q.    What is depicted in that photo?

21        A.    This photo is the same address 839-841 North

22   Keystone.  It depicts the globe light in front of 841

23   North Keystone.  There is also a vehicle, a red vehicle,

24   with what appears to be a broken window and a police

                              22

1    marker on the top of the vehicle.

2        Q.    Officer Wagner, could you please place an X

3    where the defendant was standing when you saw him as you

4    came out of the gangway?

5        A.    (Witness complies.)

6        MS. WEBER:  Your Honor, if the record will reflect

7    that the witness has complied?

8        THE COURT:  It shall.

9    BY MS. WEBER:

10       Q.    Showing you now what was marked People's

11   Exhibit 9 for identification, Officer Wagner, do you

12   recognize what is depicted in that photo?

13       A.    Yes.

14       Q.    What is depicted in that photo?

15       A.    A picture of the gangway and house of 839 North

16   Keystone.

17       Q.    Showing you People's Exhibit 10 for

18   identification, do you recognize what is depicted in

19   that?

20       A.    Yes.

21       Q.    What is depicted in that photo?

22       A.    This is eastbound look of the gangway of 839

23   North Keystone.

24       Q.    People's Exhibit 11 for identification, do you

23

1  recognize what is depicted in that photo?

2      A.   Yes.

3      Q.   What is depicted in that photo?

4      A.   This is the gangway of 839 North Keystone.

5  This is a westbound view.

6      Q.   People's Exhibit 12 for identification, do you

7  recognize what is depicted in that photo?

8      A.   Yes.

9      Q.   What is depicted in that photo?

10     A.   This is the alley entrance westbound into the

11  gangway of 839 North Keystone.

12     Q.   And People's Exhibit 13 for identification, do

13  you recognize what that depicts?

14     A.   Yes.  The numbers 839 affixed to the top of the

15  garage.

16     Q.   People's Exhibit 14 for identification, do you

17  recognize that?

18     A.   Yes.

19     Q.   What is depicted in that photo?

20     A.   The handgun that Mr. Willis was holding.

21     Q.   And People's Exhibit 15 for identification, do

22  you recognize that?

23     A.   Yes.

24     Q.   What is depicted in that photo?

24

1       A.   A different view of the handgun Mr. Willis was

2  holding.

3       Q.   Officer Wagner, do People's Exhibits 1

4  through 13 truly and accurately depict the way that the

5  location on the 800 block of North Keystone appeared on

6  the night of the incident?

7       THE COURT:  What numbers?

8       MS. WEBER:  1 through 13, your Honor, depict the

9  scene.

10      Q.   Do they truly and accurately depict the scene

11 as it occurred on the night of September 22, 2006?

12      A.   Yes.

13      Q.   Do People's Exhibits 14 and 15, Officer Wagner,

14 truly and accurately depict the way the gun appeared to

15 you on the night of September 22, 2006 which was

16 recovered from the defendant?

17      A.   Yes.

18      MS. WEBER:  I have no further questions.

19      THE COURT:  Cross?

20      MR. ERBRING:  Thank you, Judge.

21                    CROSS EXAMINATION

22                    BY MR. ERBRING:

23      Q.   Officer, let's go back to how you were dressed

24 that evening.  You said you were wearing something called

                            25

1   BDUs?

2       A.   Yes.

3       Q.   What does that stand for?

4       A.   I'm not sure.

5       Q.   And you described that as being a type of

6   Chicago Police uniform, is that right?

7       A.   Correct.

8       Q.   That's different from the normal Chicago Police

9   uniform that's a light blue in color?

10      A.   That's correct.

11      Q.   Would you describe that as essentially being a

12  black uniform?

13      A.   Yes.

14      Q.   Black covering through your chest?

15      A.   Yes.

16      Q.   Black pants?

17      A.   Correct.

18      Q.   Were you wearing a bullet-proof vest that

19  night?

20      A.   Yes.

21      Q.   What color was that?

22      A.   That was black.

23      Q.   You also described that it had an insignia on

24  it or a series of insignias that were gray, is that

26

1     right?

2         A.    Yes.

3         Q.    Tough to see at night?

4     MS. AMADO-CHEVLIN:  Objection, speculation.

5     THE COURT:  Rephrase the question.

6     MR. ERBRING:  Actually, I will stand with the facts

7     as they came in.

8         Q.    You received a radio call of a man with a gun,

9     is that right?

10        A.    Yes, we monitored the call.

11        Q.    As part of that call you got a description?

12        A.    Correct.

13        Q.    And that description was of a male, right?

14        A.    Yes.

15        Q.    Black male?

16        A.    Yes.

17        Q.    Wearing a black baseball cap?

18        A.    Yes.

19        Q.    A white T-shirt?

20        A.    Yes.

21        Q.    And blue jeans?

22        A.    Correct.

23        Q.    When you saw Mr. Willis he was not wearing a

24    baseball cap, is that right?

27

1    A.    No, he was wearing a black do-rag.

2    Q.    That's not a baseball cap, is that correct?

3    A.    That's correct.

4    Q.    This do-rag did not have a bill on it, correct?

5    A.    Correct.

6    Q.    He was wearing black jeans, is that right?

7    A.    Yes, they were dark gray to black jeans.

8    Q.    Well, you had a conversation with the

9    detectives some time after this incident, is that right?

10    A.    Yes.

11    Q.    And you told that detective all the things that

12    you remember about what happened on this evening?

13    A.    Yes.

14    Q.    And you told the detective that Mr. Willis was

15    wearing black jeans, is that right?

16    MS. WEBER:  Objection.

17    THE COURT:  Satisfy foundation.

18    BY MR. ERBRING:

19    Q.    You had a conversation with the detective after

20    this incident occurred, is that right?

21    A.    Yes.

22    Q.    Was that Detective David March?

23    A.    Yes.

24    Q.    And where did this conversation occur?

28

1      A.    On scene of the 800 block of North Keystone.

2      Q.    He asked you questions about what happened, is

3    that right?

4      A.    Yes.

5      Q.    And when he was having this conversation with

6    you was anybody else around?

7      A.    My partner who was in area.

8      Q.    And besides the three of you, nobody else was

9    around having this conversation with that detective,

10   right?

11     A.    No.   There were various times where my sergeant

12   would be around or other bosses.

13     Q.    You told that detective that Mr. Willis was

14   wearing black jeans, isn't that right?

15     MS. WEBER:   Objection.   Not impeaching.   The officer

16   said he recalled the defendant wearing gray or black

17   jeans I believe his testimony was.

18     THE COURT:   He can answer.

19   BY THE WITNESS:

20     A.    I don't remember if I told him what color his

21   jeans were.   I remember his jeans being dark gray to

22   black.

23     Q.    Officer, did you prepare a report in this case?

24     A.    No, I did not.

29

1      Q.   Did you review any reports in this case?

2      A.   Yes.

3      Q.   Did you review a detective's supplemental

4 report in this case authored by David March?

5      A.   Yes.

6      Q.   And when you saw that report did you notice

7 there being mistakes, any mistakes in that report based

8 upon your recollection of the evening was?

9      A.   No, I did not notice any mistakes.

10      Q.   And essentially you adopted that report as

11 well, is that correct?

12      A.   Yes.

13      MS. WEBER:  Objection to adopted the report.

14      THE COURT:  Do you understand the question?

15      THE WITNESS:  I believe so.

16      THE COURT:  The answer will stand.

17 BY MR. ERBRING:

18      Q.   In that report it indicates that Willis was

19 wearing black jeans, isn't that right?

20      MS. WEBER:  Objection.  Not impeaching.  Improper

21 impeachment.

22      THE COURT:  He can answer.

23 BY THE WITNESS:

24      A.   I would have to review the report.

1          MR. ERBRING:  May I approach, Judge?

2          THE COURT:  Sure.

3    BY MR. ERBRING:

4          Q.   Officer, showing you Defendant's Exhibit 1.

5    Take a look at that.  And I am referring you to a line

6    that I will point out to you, and let me know if that

7    refreshes your recollection.

8          A.   Yes.

9          Q.   Officer, did you indicate that Mr. Willis was

10   wearing black jeans?

11         A.   That sentence reflects what Mr. Willis was

12   wearing, not what I -- he was wearing a white T-shirt,

13   black do-rag and black jeans.

14         Q.   The question was, he was wearing black jeans,

15   is that right?

16         A.   Correct.

17         Q.   You told us that you and your partner got out

18   of the car in the alley behind 839 North Keystone, is

19   that right?

20         A.   A little further north than 839.

21         Q.   You eventually went through an alley gangway

22   that happened to be the alley gangway of 839 North

23   Keystone, is that correct?

24         A.   Yes.

31

1      Q.   You were in front?

2      A.   Yes.

3      Q.   Your partner was behind you?

4      A.   Yes.

5      Q.   At this point you had your flashlight out,

6 right?

7      A.   It was not on, but yes.

8      Q.   And you walked through this gangway, right?

9      A.   Yes.

10     Q.   About how far was it from the alley entrance of

11 that gangway to the front of the house at 839 North

12 Keystone?

13     A.   Approximately a standard city lot.

14     Q.   50 feet?

15     A.   Approximately 100 feet.

16     Q.   And as you approached the front of the house of

17 839 North Keystone you testified earlier that you heard

18 voices, is that correct?

19     A.   Yes, as I was walking through the gangway I

20 heard voices.

21     Q.   And did those voices get louder as you

22 approached the front of that house at 839 North Keystone?

23     A.   I could make out more voices.  They weren't

24 getting louder.  They were becoming more clear as I was

1   approaching.

2       Q.   Right when you reached the front of 839 North

3   Keystone with respect to the gan way you still had not

4   turned on your flashlight, is that right?

5       A.   I am sorry, at what point?

6       Q.   At the point in which the gangway meets the

7   front of the house at 839 North Keystone, had you turned

8   on your flashlight?

9       A.   That is when my flashlight was turned on.

10      Q.   Right when you reached the front of that

11  intersection of the front house and the gan way, is that

12  right?

13      A.   No.  As I was coming out of the gan way into

14  the front yard.

15      Q.   And the entry to that home would at that point

16  be to your left, is that correct?

17      A.   That's correct.

18      Q.   And that would be up a short flight of stairs?

19      A.   Yes.

20  MR. ERBRING:  May I approach the witness?

21  THE COURT:  Sure.

22  BY MR. ERBRING:

23      Q.   Showing you Defendant's Exhibit 1 for

24  identification.  Take a look at that and let me know if

                          33

1     you recognize that?

2         MS. JHA:   No. 2.

3   BY MR. ERBRING:

4         Q.   No. 2 for identification.

5         A.   Yes.

6         Q.   Is that a picture of the front of the house at

7   839 North Keystone?

8         A.   Yes, it is.

9         Q.   Does that fairly and accurately depict the area

10  the way that it looked on the night in question?

11        A.   Yes.

12        Q.   Other than the snow on the ground?

13        A.   Correct.

14        Q.   Now, when you reached the gangway where it

15  meets the front of the house, did you look to your left

16  to see where the voices were coming from?

17        A.   Yes.  As I exited the corner of the house I did

18  look up to the left because I did hear voices.

19        Q.   And you saw somebody there, is that right?

20        A.   Yes.

21        Q.   You saw two people there?

22        A.   Correct.

23        Q.   You described those as being two male blacks?

24        A.   Yes, they were.

34

1     Q.   Just put two Xs in Defendant's Exhibit 2 where

2  you saw those two people.

3     A.   They were standing somewhere on this landing.

4  I can't recall exactly.

5     Q.   To your best ability.

6     A.   They were standing on this landing.

7     Q.   Take this red marker.  It might be easier to

8  see.

9     A.   (Witness complies.)

10    MR. ERBRING:  Let the record reflect the witness

11  made two Xs in compliance with my request.

12    THE COURT:  All right.

13  BY MR. ERBRING:

14     Q.   When you saw those people there you didn't ask

15  them to come off that porch, did you?

16     A.   No.

17     Q.   You didn't ask them anything about whether or

18  not they had seen anybody with a gun, did you?

19     A.   No.

20     Q.   You didn't ask them whether or not they lived

21  at this address?

22     A.   No.

23     Q.   You didn't ask them to come down off there, off

24  that landing, did you?

35

1      A.    No.

2      Q.    You didn't handcuff them?

3      A.    No.

4      Q.    You didn't tell them to go back inside?

5      A.    No.

6      Q.    You walked past them, is that right?

7      A.    Yes.

8      Q.    And when you walked past them you continued

9   down this gangway, correct?

10     A.    Yes.

11     Q.    After you walked past them -- strike that.

12     MR. ERBRING:  May I approach the witness?

13     THE COURT:  Sure.

14  BY MR. ERBRING:

15     Q.    Officer, showing you what was marked

16  Defendant's Exhibit 3 for identification, let me know if

17  you recognize what is in that picture?

18     A.    Yes.

19     Q.    Is that a picture also of the front of the

20  house at 839 North Keystone with a view also down the

21  gangway that you went through?

22     A.    Correct.

23     Q.    Can you take this red pen and put two Xs if you

24  can see in this picture where the two people were

36

1    standing when you saw them.

2        A.   Somewhere on this landing.

3        MR. ERBRING:  Thank you.  And let the record reflect

4    that the witness has complied.

5        THE COURT:  Okay.

6    BY MR. ERBRING:

7        Q.   Does what is shown in Exhibit 3 fairly and

8    accurately depict the way the front of 839 North Keystone

9    and the gangway looked on the night in question?

10       A.   Yes, other than the snow.

11       Q.   You continued to walk down this alley, is that

12   right -- strike that.  Were you walking, running, how

13   quickly were you moving at this point?

14       A.   At which point?

15       Q.   At the point in which you were going through

16   this gangway from the alley to the front landing at 839

17   North Keystone?

18       A.   I was walking slowly.

19       Q.   Would it be fair to say that you were obviously

20   looking for a man with a gun, right?

21       A.   Correct.

22       Q.   That's because that's what the radio call was

23   about, right?

24       A.   Yes.

                              37

1     Q.    Calls of a man with a gun, you are familiar

2   with those types of radio calls, aren't you?

3     A.    Yes.

4     Q.    And you had training with respect to how to

5   respond to these types of calls, right?

6     A.    Yes.

7     Q.    Would it be fair to say you respond differently

8   to a call of a man with a gun to a different type of

9   police call where no weapon is mentioned?

10    MS. AMADO-CHEVLIN:  Objection.  Beyond the scope.

11    THE COURT:  Not based on that objection.

12    MS. AMADO-CHEVLIN:  Relevance.

13    THE COURT:  That's not the one that comes to my

14  mind.  You can answer.

15  BY THE WITNESS:

16    A.    I believe it's a judgment issue on most of your

17  calls on how you respond to them.

18    Q.    When you got this call -- strike that.  Now,

19  did you stop walking when you reached that front landing

20  area of 839 North Keystone and saw that there were two

21  people on the landing or porch?

22    A.    Yes, I stopped, looked, I didn't observe any

23  weapons in their hands.  And the reason I proceeded out

24  of that past them was because I knew my partner was

38

1    behind me and I also knew there was more people on the

2    sidewalk.  So I didn't want to turn my back on them.

3         Q.   What were the two people on the porch wearing?

4         A.   I can't recall.

5         Q.   After you looked at the people on the porch you

6    then looked around the area again?

7         A.   Yes.  I briefly looked up to the porch as I was

8    yelling police.  I then looked back at the people.

9         Q.   Let me stop you right there.  You said you

10   looked at the people on the porch and then you turned

11   after yelling police, is that right?

12        A.   As I exited the front of the house of the

13   gangway I began yelling police.  I briefly looked to my

14   left, observed the individuals on the porch.  I then

15   focused my attention at the individuals on the sidewalk.

16        Q.   At this point you weren't yelling at anybody,

17   were you?

18        A.   No.  I was just announcing to everyone in the

19   area that I was the police.

20        Q.   Did your partner yell anything at this point?

21        A.   Yes, he was yelling police as well.

22        Q.   He was still behind you, right?

23        A.   Yes.

24        THE COURT:  What was your last question?

39

1        MR. ERBRING:  My last question was, he was still

2  behind you.

3        THE COURT:  Partner was still behind you?

4        MR. ERBRING:  Correct.

5        Q.   The front of the house at 839 North Keystone

6  has a fence in front of it, is that right?

7        A.   Yes, I believe so.

8        Q.   A black what could be described as a wrought

9  iron fence?

10       A.   Yes.

11       Q.   And that has a gate in it, is that right?

12       A.   I don't know if there is a gate or not.

13       MR. ERBRING:  Judge, if I can approach?

14       Q.   And that's shown in People's Exhibit 9 that I

15  am showing you right now, the fence and the gate?

16       A.   Correct.

17       Q.   The door or the gate doorway when you

18  approached it on the evening in question, was that open

19  or closed?

20       A.   That was open.

21       Q.   When you say open it means that the door itself

22  was ajar or just that you could turn the handle and open

23  it yourself?

24       A.   It was wide open.

1    THE COURT:  You said door.  Are you making reference

2 to a gate?

3    MR. ERBRING:  A gate door, correct, Judge.

4    THE COURT:  Okay.

5 BY MR. ERBRING:

6    Q.   Now, at this point that you are yelling police

7 you still have not spotted somebody with a gun, is that

8 right?

9    A.   That's correct.

10    Q.   And your attention is drawn to the two people

11 slightly further north of you, is that right?

12    A.   It's first drawn to the individuals to the left

13 on the porch, and then it's drawn --

14    Q.   Once your observation of those people was

15 complete, then the next thing that you look -- let me go

16 back and strike that.

17    After you saw the people on the porch you

18 continued to look around, right?

19    A.   Yes.

20    Q.   As you are looking for somebody who could match

21 the description of the person you got the call on?

22    A.   Yes.

23    Q.   Did you look south on Keystone?

24    A.   I was still in the gangway.  Yeah, I looked to

41

1    my left, which is south.

2         Q.    And you didn't see anybody south?

3         A.    No.

4         Q.    You then looked west, is that right?

5         A.    Yes.

6         Q.    You didn't see anybody west?

7         A.    Mr. Willis and an unknown female were standing

8    west and just a little north of me.

9         Q.    And that's the little bit to your right from

10   your vantage point at the front of the house at 839 North

11   Keystone at that time, is that right?

12        A.    That's correct.

13        Q.    You see that and you said they were about 30

14   feet away from you, is that right?

15        A.    No.

16        Q.    How far away from you were they at the point

17   that you saw them from 839 North Keystone?

18        A.    Approximately 10 to 12 feet.

19        Q.    You said that Mr. Willis was speaking to a

20   female individual?

21        A.    Yes.

22        Q.    What was she wearing?

23        A.    I recall a red shirt.

24        Q.    Did you give a description of this female to

                              42

1    Detective March that you spoke to after the incident in

2    this case?

3        MS. WEBER:  Objection, relevance.

4        THE COURT:  You can answer.

5    BY THE WITNESS:

6        A.   I don't think so.

7        Q.   You said that it is roughly at this point right

8    when you are in the front of 839 North Keystone after you

9    saw the people on the porch that you yelled police,

10   right?

11       A.   Yes, I'm yelling police.

12       Q.   And is it at this point that you turn on your

13   flashlight?

14       A.   Yes, as I am yelling police and exiting the

15   break of the building and the gangway.

16       Q.   That would be before you actually get to that

17   gate that's at the fence to the sidewalk, is that right?

18       A.   Yes.

19       Q.   And you turn on your flashlight?

20       A.   Yes.

21       Q.   Do you have that flashlight with you today?

22       A.   No.

23       Q.   Do you have a similar version with you today?

24       A.   No.

43

1      Q.   What model flashlight was that?

2      A.   It's a Stinger.  I believe the brand is

3  Stinger.  It is a departmental required flashlight.

4      Q.   And how do you turn this flashlight on?

5      A.   There is a rubber button near the top of the

6  flashlight.

7      Q.   And that would be on the barrel of the

8  flashlight instead of at the rear?

9      A.   That's correct.

10      Q.   Who is the first person you shined this

11  flashlight at?

12      A.   I don't recall.

13      Q.   And you are holding this flashlight out in

14  front of you like this, or demonstrate to the Court how

15  you were holding that flashlight?

16      A.   I was holding it with my left hand, just --

17      Q.   Would it be fair to say in your left hand the

18  front of the flashlight that emits the beam would be

19  closest to your index finger knuckle?

20      A.   Can you repeat that?

21      Q.   Would it be fair to say that the front of the

22  flashlight would be closest to your index finger first

23  knuckle?

24      A.   I don't understand.

1        MR. ERBRING:  Well, if I can approach the witness?

2        THE COURT:  Sure.

3  BY MR. ERBRING:

4        Q.  I ask you to take this pen which for purposes

5  of demonstration I am marking as Defendant's Exhibit 4 I

6  believe, could you just demonstrate to the Court where

7  the front of the flashlight was by pointing to it?

8        A.  This would be the front of the flashlight.

9        Q.  And how you were holding it on the evening in

10  question?

11        A.  With my thumb depressing the button to

12  illuminate the flashlight in this manner.

13        Q.  Would it be fair to say the front of the

14  flashlight was in line with your thumb if it's pointed

15  forward?

16        MS. WEBER:  Objection to relevance as to whether or

17  not the officer's thumb was in line.

18        THE COURT:  He can answer.

19  BY THE WITNESS:

20        A.  I believe so, yes.

21        Q.  Now, when you first see Mr. Willis he is not

22  holding anything in his hands either, right?

23        A.  Correct.

24        Q.  And the female that he is with is also not

1    holding anything in her hands, is that right?

2         A.    Correct.

3         Q.    After you turn on your flashlight and shout

4    police, it is at that point that you see him do something

5    with his hands, is that your testimony?

6         A.    Yes.

7         Q.    And from the vantage point that you have you

8    see mostly his back and his left side, is that fair to

9    say?

10        A.    No.

11        Q.    He is facing west, right?

12        A.    Yes.

13        Q.    He is a little north of you, correct?

14        A.    Correct.

15        Q.    And a little bit in front of you or west from

16   where you are at that point, right?

17        A.    Correct.

18        Q.    You say that he -- well, you shout this and he

19   turns to his left?

20        A.    He turns to his right.

21        Q.    So he turns to his right.  And at that point he

22   is facing which direction?

23        A.    Northbound.

24        Q.    Is it at this point that he finishes his turn

                              46

1   that you see this gun in his hand?

2       A.   It is as he is turning he reached with his

3   right hand to remove the weapon as he is beginning to

4   run.

5       Q.   So he turns, removes the weapon and runs

6   essentially in one motion?

7       A.   All at the same time he is doing this.

8       Q.   He then runs northbound?

9       A.   Correct.

10      Q.   You finish coming out of the gangway and run

11  after him?

12      A.   Yes.

13      Q.   And you are continuously shouting stop, police,

14  is that right?

15      A.   Drop the gun.  At this point I'm yelling drop

16  the gun, stop, police.

17      Q.   You then engaged in what could be described as

18  a short foot chase?

19      A.   Yes.

20      Q.   And the person in front of you is roughly at

21  851 North Keystone?

22      A.   Mr. Willis was at 851 North Keystone.

23      Q.   And it is at this point that you testified

24  earlier that he slows down, is that right?

1      A.   Yes.

2      Q.   Before that he was running quickly?

3      A.   Yes.

4      Q.   Is it fair to say in your experience you would

5   describe that as a sprint?

6      A.   Yes.

7      Q.   He wasn't just jogging away from you, right?

8      MS. WEBER:   Objection.   Asked and answered.

9      THE COURT:   Sustained.

10   BY MR. ERBRING:

11      Q.   You testified that he slows down and then he

12   turns to his right?

13      A.   He turns to his left.

14      Q.   And at this point it is your belief that he was

15   pointing or about to point his gun at you, is that right?

16      A.   I observed him point the gun at me.

17      Q.   When you saw him point the gun at you was he

18   still in motion?

19      A.   Yes.

20      Q.   What direction was he moving at that point?

21      A.   He was still moving northbound, not as fast as

22   when he was running prior.

23      Q.   Now, you didn't tell Detective March when you

24   had this conversation with him that Mr. Willis or this

48

1   person running away from you ever slowed down, did you?

2       A.   I don't remember.

3       Q.   Pardon me?

4       A.   I don't recall.

5       MR. ERBRING:   Can I approach the witness?

6       THE COURT:   Sure.

7   BY MR. ERBRING:

8       Q.   Showing you what has been marked as Defendant's

9   Exhibit 1 I believe for identification.   Read that and

10  let me know if it refreshes your recollection.

11      A.   Yes.

12      Q.   You didn't tell Detective March that Mr. Willis

13  or the person you were chasing slowed down, did you?

14      MS. WEBER:   Objection.   Asked and answered.   The

15  officer stated he didn't recall.

16      THE COURT:   So the question now is if his memory is

17  refreshed.

18  BY MR. ERBRING:

19      Q.   Is your memory refreshed?

20      A.   Yes.   You asked me to read a line.

21      Q.   I am asking you whether or not your memory is

22  refreshed.   It is, isn't it?

23      A.   Is my memory refreshed?   Yes.

24      Q.   You didn't tell Detective March that Mr. Willis

49

1    slowed down, did you?

2         A.    I may have.  I don't recall.  I believe I did.

3         Q.    When you were running after this person did you

4    see any other police cars at that time?

5         A.    No, I did not.

6         Q.    As you were walking through the gangway from

7    the alley at 839 North Keystone to the front area of

8    839 North Keystone, you hadn't drawn your weapon at that

9    point, correct?

10        A.    My weapon was out.

11        Q.    Your weapon was out?

12        A.    Yes.

13        Q.    In your right hand or in your left hand?

14        A.    Right hand.

15        Q.    And you are right handed, correct?

16        A.    Yes.

17        Q.    And that was a judgment call that you made

18   based on the radio call that you received?

19        A.    Yes.

20        Q.    And you draw your gun in situations where you

21   feel that your safety could be in danger, is that right?

22        MS. WEBER:  Objection to the form of the question.

23        THE COURT:  Do you understand the question?

24        THE WITNESS:  Yes, I do.

50

1          THE COURT:  You can answer.

2     BY THE WITNESS:

3          A.   Yes, I believe if my life is in danger, the

4     very situation, my gun is drawn, yes.

5          Q.   And you did that in this case?

6          A.   Yes.

7          Q.   You said that your partner was the one that

8     actually first recovered the gun that was dropped in this

9     case, is that right?

10         A.   Yes.

11         Q.   Do you know if that gun was ever submitted for

12    fingerprint analysis?

13         A.   I'm not sure.

14         Q.   Shortly after you fired your weapon you

15    testified earlier that you placed Mr. Willis under

16    arrest?

17         A.   Yes.

18         Q.   And that was with the help of your partner

19    Officer Triantafillo?

20         A.   That was with the help of assisting Beat 1111.

21         Q.   Beat 1111 consisted of which police officers?

22         A.   Officer Coleman and Officer Granato.

23         Q.   So the four of you are the ones that placed

24    Mr. Willis in custody?

51

1      MS. WEBER:  Objection.  That misstates the testimony

2  of the officer.  The officer just stated it was Coleman

3  and Granato who assisted, not four officers.  It was in

4  fact three.

5      THE COURT:  Rephrase the question.

6  BY MR. ERBRING:

7      Q.   You, your partner and Beat 1111 placed

8  Mr. Willis in custody?

9      A.   No.

10     Q.   Who placed Mr. Willis in custody?

11     A.   I was placing Mr. Willis in custody and

12 Beat 1111 approached to assist me, which was Officers

13 Granato and Coleman.

14     Q.   At that point it is a total of three officers?

15     A.   That's correct.

16     Q.   And Officer Triantafillo was also helping in

17 the arrest?

18     A.   Officer Triantafillo was returning, was coming

19 to our location after recovering the weapon.

20     Q.   But four of you are immediately around

21 Mr. Willis as he is being placed in custody, is that fair

22 to say?

23     A.   The three of us were, myself, Officer Granato

24 and Officer Coleman.

52

1      Q.   At this time how far away was Officer

2  Triantafillo?

3      MS. WEBER:  Objection, relevance.

4      THE COURT:  He can answer.

5  BY THE WITNESS:

6      A.   I was not looking at Officer Triantafillo, but

7  I would estimate he was approximately 30 to 50 feet away.

8      Q.   You didn't see where the other assisting

9  officers came from, did you?

10     A.   They came from north of my location and west

11 from the street, north of 853.

12     Q.   When you first saw them were they on foot, in a

13 car, how were they when you first saw them?

14     A.   They were jogging towards me.

15     Q.   When you placed or when Mr. Willis was placed

16 into custody did you search him?

17     A.   I patted him down and asked him if he had any

18 more weapons.

19     Q.   Did you see anybody else search him at the

20 scene?

21     A.   No.

22     Q.   You never went into his pockets?

23     MS. WEBER:  Objection.  Asked and answered.

24     THE COURT:  He can answer.

53

```
1    BY THE WITNESS:

2        A.   No, I didn't.  I felt his pockets for a

3    handgun.  I patted him down for weapons.

4        Q.   You didn't find any?

5        MS. WEBER:  Objection.  Asked and answered.

6        THE COURT:  Sustained.

7    BY MR. ERBRING:

8        Q.   Did you find any other weapons on my client

9    after he was placed into custody?

10       A.   No.

11       MR. ERBRING:  Thank you.  I have nothing else.

12       THE COURT:  Go ahead.

13       MS. WEBER:  I am sorry, your Honor.  One moment.

14                    REDIRECT EXAMINATION

15                     BY MS. WEBER:

16       Q.   Officer Wagner, how soon after you came out of

17   the gangway to the front area of the house did you

18   announce your office?

19       A.   As I was coming out of the gangway I was

20   announcing my office.

21       Q.   And how soon after you announced your office

22   did you observe the defendant remove this handgun from

23   his waistband?

24       A.   Seconds.
```

54

1    Q.   Officer Wagner, how much time transpired if any

2   from the time you made these observations of these two

3   individuals standing on the porch until the time you

4   observed the defendant on the sidewalk?

5    A.   A second or two.

6    MS. WEBER:  I have no further questions for officer.

7    MR. ERBRING:  Nothing else.  Thank you.

8    THE COURT:  Thank you, sir.

9                                   (Witness excused.)

10   THE COURT:  Who's next?

11   MS. WEBER:  Officer Triantafillo.

12             (Witness duly sworn.)

13             JAMES TRIANTAFILLO,

14   called as a witness on behalf of the People of the State

15   of Illinois, after having been first duly sworn, was

16   examined and testified as follows:

17             DIRECT EXAMINATION

18             BY MS. WEBER:

19    Q.   Officer, would you please state and spell your

20   name and give us your star number and unit of assignment?

21    A.   Officer James Triantafillo,

22   T-r-i-a-n-t-a-f-i-l-l-o, Star No. 14298, currently

23   assigned to the Gang Intelligence Section, Unit 193.

24    Q.   Officer Triantafillo, how long have you been

55

1      with the Chicago Police Department?

2          A.    Approximately six and a half years.

3          Q.    And back on the date of September 22, 2006 were

4      you assigned to the 11th District?

5          A.    Yes, ma'am.

6          Q.    And were you working on that particular day?

7          A.    I was working tactical unit 1162 Charles.

8          Q.    What shift were you working?

9          A.    Third watch.

10         Q.    And were you working by yourself or with a

11     partner?

12         A.    I was working with Officer Wagner, 14796.

13         Q.    How were you dressed?

14         A.    I was in our BDU uniform.  It's a black outfit,

15     shirt and pants, utility outfit with Chicago Police

16     patches, the flag, our name and star number embroidered

17     on the front.

18         Q.    Were you wearing your badge at that time?

19         A.    My badge was on my belt.

20         Q.    Was the badge visible outside the clothing you

21     were wearing?

22         MS. JHA:  Objection.

23         THE COURT:  You can answer.

24

56

1    BY THE WITNESS:

2         A.    Yes.

3         Q.    At approximately 11:30 that evening, Officer

4    Triantafillo, did you respond to a call?

5         A.    I did.

6         Q.    What was the nature of that call?

7         A.    It was a call of a man with a gun.  I believe

8    the description was a male black with a black hat on,

9    white shirt and dark jeans with a shiny -- shiny or shiny

10   silver weapon, firearm, handgun.

11        Q.    Was there any particular location that you were

12   given?

13        A.    839 North Keystone.

14        Q.    After receiving this call did you respond to

15   that location?

16        A.    I did.

17        Q.    And that was with your partner?

18        A.    It was.

19        Q.    And approximately how long after receiving this

20   call did it take you to relocate?

21        A.    Around maybe four or five minutes.

22        Q.    And after you arrived at the location of 839

23   North Keystone where did you and your partner go?

24        A.    We parked our car in the alley of that location

57

1     a few houses or a few garages north of 839 and we exited

2     the vehicle.

3          Q.   After you and your partner exited the vehicle

4     where did you go?

5          A.   Officer Wagner and I proceeded into the rear

6     gangway of 839 North Keystone and proceeded from the rear

7     alley of that location towards the front.

8          Q.   Who proceeded down that gangway first?

9          A.   My partner Officer Wagner was in front of me.

10         Q.   And as you exited the gangway what if anything

11    was said by you and your partner?

12         MS. JHA:   Objection to the leading.

13         THE COURT:   You can answer.

14    BY THE WITNESS:

15         A.   Once I exited the gangway, announced my office

16    and began, I turned my flashlight on and announced my

17    office.

18         Q.   Did you make any observations as you exited the

19    gangway?

20         A.   As I was exiting the gangway I observed an

21    individual standing just north of 839 on the sidewalk.   I

22    believe he was engaged in conversation with a female.

23    And then there were two male blacks on the porch of 839.

24         Q.   Where were these individuals on the porch in

                              58

1   relation to where you were standing?

2       A.   Once I exited the gangway they were just south

3   of me up a few stairs, they were on the porch.

4       Q.   After you announced your office did you make

5   any observations of the individual who was standing on

6   the sidewalk?

7       A.   I announced my office, I turned on my

8   flashlight.  As I panned from the porch towards the

9   individual on the sidewalk I observed that individual as

10  he turned, simultaneously as he was turning remove a

11  large blue steel revolver from his waistband and begin to

12  run northbound.

13      Q.   Officer Triantafillo, do you see that

14  individual you observed with that handgun in his

15  waistband here in court today?

16      A.   I do, the gentleman sitting to the immediate

17  right of female defense counsel in the beige Department

18  of Corrections outfit known to me as Mr. Willis.

19      MS. WEBER:  May the record reflect the in-court

20  identification of the defendant?

21      THE COURT:  So noted.

22  BY MS. WEBER:

23      Q.   After the defendant removed this handgun from

24  his waistband where did he go?

59

1       A.   He ran north down the sidewalk of Keystone.

2       Q.   As the defendant pulled out this handgun what

3  view of him did you have?

4       A.   I had a side profile of him at that time.

5       Q.   And what were the lighting conditions like as

6  you were making your observations?

7       A.   It was later in the evening, it was dark out,

8  but there was artificial lighting from the street lights

9  as well as a large bulb globe style light which was in

10  front of 841 North Keystone where that individual was

11  standing.

12       Q.   And approximately how far away were you when

13  you made these observations of the defendant?

14       A.   In between maybe 10 to 15 feet.

15       Q.   After you observed the defendant flee

16  northbound what did you and your partner do?

17       A.   We gave chase from the gangway onto the

18  sidewalk and then northbound.  I was yelling at the

19  defendant at that time.

20       Q.   What were you yelling?

21       A.   I was ordering him to stop, drop the weapon,

22  announced my office a few more times and continued

23  northbound on the sidewalk.

24       Q.   When you say you announced your office, what

1    did you say?

2        A.    Police.

3        Q.    As you were chasing the defendant where were

4    you in relation to your partner Officer Wagner?

5        A.    I was to the right of Officer Wagner.  I was

6    trailing a little bit.  He was a little bit in front of

7    me, and I was to the right of him.  I would have been to

8    the east and a little south of Officer Wagner.  We were

9    going down the sidewalk.  I was on the side closest to

10   the houses.  He was on the side closest to the street.

11       Q.    What observations did you make as you were

12   chasing the defendant down the sidewalk?

13       A.    As we are going northbound the offender, I

14   could see Mr. Willis running north with a gun in his

15   right hand.  We continued running northbound.  There was

16   a point where Mr. Willis slowed down a little bit.  He

17   was running, and he turned with his right hand over his

18   left shoulder.

19       MS. WEBER:  Your Honor, for the record, the record

20   should indicate that Officer Triantafillo has taken his

21   right hand, turned slightly to his left side and put his

22   hand over his shoulder area.

23       THE COURT:  Okay.

24

61

BY THE WITNESS:

    A.    As we continued north, as I said with the

weapon in his right hand, he turned and the weapon was

then pointed over his left shoulder in our direction.  I

then tried to step close to the fence for cover.  As I

was beginning to pull my weapon at the defendant I heard

a shot, a gunshot ring out.  Officer Wagner had fired his

weapon one time.  I observed the defendant --

    Q.    After Officer Wagner fired his weapon, Officer

Triantafillo, what occurred with the defendant, was he

shot?

    A.    I observed him take or receive the shot, and it

appeared to spin him kind of back northbound, at which

time the gun fell from his right hand and hit a

chain-link fence which was surrounding the front yard.  I

believe it was 851 I believe there is a chain-link fence

in the front yard.  It hit that chain-link fence and fell

into the front yard on the other side of the sidewalk

into the front yard on the lawn area.

    Q.    What occurred with the defendant?

    A.    He ran a few more feet forward, and then he

either fell or placed himself on the ground.  He laid

down.  And Officer Wagner approached him and placed him

in handcuffs as I recovered the firearm which fell.

1    Q.   This firearm which you recovered, Officer

2    Triantafillo, what type of firearm was it?

3    A.   It was a large I believe it was a Smith &

4    Wesson .357 blue steel revolver.

5    Q.   Officer, were you able to determine whether or

6    not there was any ammunition in that gun?

7    A.   Yes, I was able to visibly see live rounds in

8    that gun.

9    Q.   After you recovered the loaded weapon what did

10   you do?

11   A.   I immediately got on the radio and requested an

12   ambulance to come to attend to Mr. Willis.  I had given a

13   description of the event of shots fired by the police, I

14   gave my location and what unit we were.

15   Q.   And did an ambulance arrive on the scene?

16   A.   It did and rendered aid to Mr. Willis.

17   Q.   Officer Triantafillo, did anyone arrive to

18   assist your partner Officer Wagner who was placing the

19   defendant under arrest?

20   A.   Beat 1111.  By the time I recovered the weapon

21   they, officer I believe -- I can't think of his name.

22   Steve Coleman, Officer Coleman, had approached and was

23   with Officer Wagner as I approached.  Beat 1111, I

24   believe Officer Granato was also with Officer Coleman.

63

1    MS. WEBER:   May I approach, your Honor?

2    THE COURT:   Sure.

3  BY MS. WEBER:

4    Q.   Officer Triantafillo, I am showing you what has

5  been previously marked People's Exhibit 11 for

6  identification, do you recognize that?

7    A.   I do.

8    Q.   What is depicted in that?

9    A.   It's the gangway of 839 North Keystone.  It

10  depicts from the rear of the location towards the front.

11  So it would be an east to west view in the gangway.

12    Q.   Now showing you what was previously marked

13  People's Exhibit 9 for identification, do you recognize

14  what is depicted in that?

15    A.   Yes.  It's the same gangway and front location

16  of 839 North Keystone.  This is a picture from west to

17  east.

18    Q.   Showing you People's Exhibits 14 and 15 for

19  identification, do you recognize what is depicted in

20  these two photos?

21    A.   This is the firearm which I recovered once it

22  fell from Mr. Willis' hand.  It's a Smith & Wesson .357

23  blue steel revolver.

24    Q.   Officer Triantafillo, do these photos which I

64

1    showed you truly and accurately depict the scene as you

2    observed it on the night of September 22nd as well as the

3    gun that you recovered from the defendant?

4        A.   Yes, ma'am.

5        MS. WEBER:  I have no further questions.

6        THE COURT:  Go ahead.

7        MS. JHA:  Thank you.

8                     CROSS EXAMINATION

9                     BY MS. JHA:

10       Q.   Officer Triantafillo, you mentioned that you

11   were wearing a special sort of uniform on that evening?

12       A.   That is correct.

13       Q.   You described it as a BDU?

14       A.   Yes, ma'am.

15       Q.   That's referred to as a battle dress uniform?

16       A.   I don't know what the letters BDU stand for.

17       Q.   You don't know what it stands for?

18       A.   No.

19       Q.   When did you specifically put on the BDU

20   uniform as opposed to your regular uniform when you have

21   an assignment?

22       A.   The order comes down from command.  Sometimes

23   when we are going to saturate an area with high level

24   violence and we want to be visible a lot of times the

1    bosses will put us in that uniform.  I don't decide when

2    to put that uniform on.  I'm just told to.

3         Q.   So under the orders of someone in the Police

4    Department that's why you were wearing that particular

5    uniform that day?

6         A.   Yes.

7         Q.   Physically it is black pants and a black shirt?

8         A.   Yes.

9         Q.   The embroidery or the insignia of the Chicago

10   Police Department appears on the sleeve area?

11        A.   As with our blue uniforms there is a Chicago

12   Police patch I believe that's on the left shoulder and

13   there's the Chicago flag on the right shoulder.

14        Q.   So it is on the sleeve area and all the

15   embroidery either appears on the left or right sleeve?

16        A.   And then on our chest is our name and then our

17   star number over each breast area.

18        Q.   In addition to this uniform, you had on a

19   bullet-proof vest?

20        A.   I did.

21        Q.   Now, the description you talked about, the

22   description you actually received on the call over the

23   radio was of a black male?

24        A.   Yes.

66

1     Q.   And in a black baseball cap?

2     A.   Yes.

3     Q.   And blue jeans?

4     A.   I believe jeans.  It might have been blue

5  jeans.

6     Q.   And a white T-shirt?

7     A.   That is correct.

8     Q.   And Antione Willis was not wearing a black

9  baseball cap?

10     A.   No, he had a black do-rag on.

11     Q.   He was not wearing a black baseball cap?

12     A.   Right, yes.

13     Q.   He was not wearing blue jeans?

14     A.   He had on dark jeans.  I'm not sure of the

15  color.  They were dark.

16     Q.   There is a difference between blue jeans and

17  black jeans, correct?  They are not the same color?

18     A.   He was wearing dark jeans.  Whether they were

19  dark blue, black or dark gray, I don't recall.

20     Q.   Now, Officer, when you came to the location of

21  839 you went from the back?

22     A.   Yes.

23     Q.   You went through a back alley?

24     A.   I did.

67

1    Q.    And you guys were sort of creeping along the

2    side of the building to get to the front of 839?

3    A.    Yes.

4    Q.    And the call of where the man with the gun was

5    was at the address of 839?

6    A.    Yes.

7    Q.    Would it be safe to say that the reason that

8    you were coming through the gangway up to the front of

9    839 was in part for an element of surprise?

10    A.    That is correct.

11    Q.    When you got through the gangway at 839 you

12    said you observed two individuals on the porch?

13    A.    Yes.

14    Q.    Okay.  And you observed those two individuals.

15    Those were the first individuals you observed when you

16    came out of the gangway?

17    A.    When I -- the gangway obviously goes to the

18    edge of the building and then there is a porch.  As I am

19    coming out of the gangway the first individuals I am

20    viewing is Mr. Willis and a female.  Once I exit the

21    gangway I immediately look to the left on the porch for

22    my safety and I see two males.

23    Q.    When you say when you first exited the gangway

24    and observed Mr. Willis and a female, can you approximate

68

1    for us where down that gangway you were?  Using, for

2    example, like had you made it to the stairs that go up to

3    the porch on the side of the house or were you further

4    back in the gangway when you first observed Mr. Willis?

5        A.    When I first observed him I believe I was still

6    in the gangway.  I hadn't reached the stairs yet.

7        Q.    Approximately how many feet were you away from

8    the stairs that lead up to the porch where the other two

9    people were?

10       A.    How far from the porch was I?  I don't

11   understand the question.

12       Q.    If I am describing 839 correctly, and please

13   correct me if I am wrong, if you are coming through the

14   gangway up to the front of 839, when you get to the end

15   of that gangway there are some stairs that lead up to the

16   porch area, is that correct?

17       A.    That is correct.

18       Q.    From that area where the stairs lead up to the

19   porch area, how far back were you in the gangway?  How

20   many feet back from where those stairs were when you

21   first allegedly observed Mr. Willis?

22       A.    Maybe five to ten feet, and I was moving in his

23   direction.

24       Q.    And Officer Wagner was in front of you at this

                                69

1    point?

2        A.    He was.

3        Q.    And you had in terms of equipment with you that

4    evening, did you have a flashlight?

5        A.    I did have a flashlight.  I didn't use it at

6    that time.

7        Q.    Okay.  Was your gun drawn at that point?

8        A.    It was.

9        Q.    Now, it was your testimony a few minutes ago

10   that Mr. Willis was the first person that you allegedly

11   observed?

12       A.    As I was coming down the gangway, Mr. Willis

13   and the female.

14       Q.    And at the time that you first observed

15   Mr. Willis you didn't see anything in his hands?

16       A.    No.

17       Q.    What was he doing when you first observed him?

18       A.    He was standing just north of the sidewalk

19   which led on to 839, he was just north of it, which was

20   kind of more in front of 841.

21       Q.    You said you saw a female?

22       A.    Yes.

23       Q.    What was the female wearing?

24       A.    I believe she had on a maroon or like dark

70

1   reddish shirt I believe.

2       Q.   You didn't see anything in her hands?

3       A.   No.

4       Q.   You didn't hear any conversation between the

5   two of them?

6       A.   No.

7       Q.   And you then said that you turned to your left

8   to the porch of 839 North Keystone?

9       A.   As I exited the gangway first where I put my

10  eyes once I exited the gangway was left towards the

11  porch.

12      Q.   And there were two individuals on that porch?

13      A.   Yes.

14      Q.   You didn't stop the two individuals on the

15  porch?

16      A.   No.

17      Q.   You didn't detain them?

18      A.   No.

19      Q.   You didn't question them?

20      A.   No.

21      Q.   What were the two individuals on the porch

22  wearing?

23      A.   One had a dark colored shirt on, and the other

24  one I believe might have been striped, but I'm not sure.

71

1        Q.    Officer, on the date of this incident you met

2    with a Detective March?

3        A.    I did.

4        Q.    And you related to him the events as you recall

5    them happening that evening?

6        A.    Yes.

7        Q.    And at no time did you tell Detective March

8    that you saw a subject in a black shirt or in a striped

9    shirt on the porch of that location?

10       A.    I don't recall specifically the conversation in

11   regards to those individuals and Detective March.

12       Q.    Officer Triantafillo, did you prepare any

13   reports in this case?

14       A.    I don't believe I did.

15       Q.    Before you testified today you reviewed some

16   reports, is that correct?

17       A.    I did.

18       Q.    Detective supplemental reports?

19       A.    No, I myself did not.

20       Q.    You did not read the detectives' supps?  What

21   reports did you review before testifying today?

22       A.    The arrest report and the general offense case

23   report, and I spoke with the State's Attorney who asked

24   me questions.

1      Q.   And you didn't see any inaccuracies in the

2  arrest report or the general offense case report?

3      A.   Not to my knowledge, no.

4      Q.   Now, at what point is it that you first yell

5  police?

6      A.   Once I exit the gangway I look on the porch.

7  There are two individuals.  I put my flashlight, I turn

8  it on, point it at them, and then I pan from left to

9  right, at which time Mr. Willis retrieved the weapon from

10  his waistband and began running.

11      Q.   Let's talk about that.  Did you say police?  My

12  question was when did you say police?

13      A.   When I exited the gangway and turned on my

14  flashlight I said police.

15      Q.   That was before you shined the light on these

16  individuals?

17      A.   As I was shining the light I said police.  I

18  didn't want to -- I did it for safety.  I didn't want to

19  be shot or anything, so I turned on the light and said

20  police, announced my office and secured mine and Officer

21  Wagner's left side.

22      Q.   Prior to that, did you hear Officer Wagner say

23  police prior to you saying police?

24      A.   I don't remember who said it first, but both

73

1    him and I were very vocal when we came out of that

2    gangway.

3        Q.    Approximately how many feet was Officer Wagner

4    in front of you when you reached the end of that gangway?

5        A.    A few feet.

6        Q.    Now, you said when you first observed

7    Mr. Willis he was at the approximate address of 841 North

8    Keystone?

9        A.    Yes.

10       Q.    And Mr. Willis at the time that you first

11   observed him was facing westbound?

12       A.    He was.

13       Q.    Which would mean that his back was facing

14   towards you and his face was facing towards Keystone?

15       A.    Yes.

16       Q.    And he is also a little bit to the south -- I'm

17   sorry -- to the north of your location?

18       A.    Yes, visible through the wrought iron fence.

19       Q.    Officer, approximately how many feet were you

20   away from him when you allegedly see a weapon in

21   Mr. Willis' hand or him pulling this weapon out of his

22   waistband?

23       A.    About 10 to 15 feet.

24       Q.    And he is 10 to 15 feet north of your location?

74

1     A.   He is more west of me than he is north of me,

2   but he is about 10 to 15 feet away.

3     Q.   And by west of you, that would be more sort of

4   in your line of sight, which would mean his back would be

5   towards you?

6     MS. WEBER:  Objection.  Asked and answered.

7     THE COURT:  It has been.  Sustained.

8   BY MS. JHA:

9     Q.   In which direction did he turn when you

10  allegedly saw this weapon?

11    A.   He turned northbound, so then I had a side, his

12  side right profile of him.  He pulled the weapon.  He

13  turned and as he was turning he was pulling the weapon

14  and he then proceeded to run northbound.

15    Q.   When he proceeded to run, he was running pretty

16  fast?

17    A.   He was trying to get away.  He was running.

18    Q.   Would you describe it as a sprint?

19    A.   Yes.

20    Q.   Now, Officer Wagner followed or was immediately

21  after Mr. Willis?

22    A.   We both were.

23    Q.   And you were a little bit behind Officer Wagner

24  to his right?

75

1          A.    I was to Wagner's right side, yes.

2          Q.    And when you say Antione turned, so Antione is

3     I guess he and Officer Wagner are directly in front of

4     you, right, northbound, is that fair for me to say?

5          A.    No.

6          Q.    Antione Willis was originally running

7     northbound, correct?

8          A.    Yes.

9          Q.    Officer Wagner is approximately 10 to 12 feet

10    behind him or more?

11         A.    It was probably more than that when we came out

12    of the gangway.

13         Q.    20 feet behind him, 30 feet behind him?

14         A.    When he turned the weapon towards us he was

15    maybe 30 to 40 feet away from me.  At that time Officer

16    Wagner was in my peripheral.  I was staring at his right

17    hand with that gun.

18         Q.    So prior to the time that Willis supposedly

19    turns with his left shoulder, at this time he is about 30

20    to 40 feet away from you?

21         A.    Mr. Willis is, yes.

22         Q.    And before he turns, his back is facing you?

23         A.    That's correct.

24         Q.    And then you have Officer Wagner a few feet

                              76

1   away from you to your left and you are right behind?

2       A.   Officer Wagner is on my left.  Peripherally he

3   is a little ahead of me.

4       Q.   Antione Willis you said turned to his left,

5   that being Mr. Willis' left?

6       A.   Yes.

7       Q.   And allegedly points a weapon?

8       A.   The weapon was pointing back towards us.

9       Q.   So at that time his left hip and his right arm

10  were facing you?

11      A.   I know the gun was facing me.

12      Q.   Well, he was turned to his left and his right

13  arm was pointed, is that correct?

14      A.   All I remember is he turned over his shoulder

15  and this weapon was pointed at me.  That's what I

16  remember seeing.  As to where his hips and his feet and

17  that was, I don't know.  I know that weapon was pointed

18  at me over his left shoulder.

19      Q.   It was pointed over his left shoulder and you

20  know he turned to his left to point it?

21      A.   That is correct.

22      Q.   It is safe for me to say he wasn't directly

23  facing you?

24      A.   Yes, he was not standing in my direction.

77

```
 1        Q.    He wasn't facing you directly?

 2        A.    That's correct.

 3        Q.    And his back wasn't towards you at that time.

 4   He had turned somewhat, you can't say to what extent, to

 5   his left?

 6        A.    Right.

 7        Q.    At that time you observed what you believed to

 8   be a weapon.  You didn't see any gloves on Antione

 9   Willis' hands at that time?

10        A.    No, I did not.

11        Q.    What happened to the female that was talking to

12   Mr. Willis when this chase allegedly ensued?

13        A.    I don't know.

14        MS. JHA:  May I have a moment, your Honor?

15        Q.    At the time after you say Mr. Willis either

16   fell or went to the ground, did you assist at all in

17   placing him in custody?

18        A.    Officer Wagner had him handcuffed by the time I

19   recovered the gun and went there.

20        Q.    So you did have an opportunity to see

21   Mr. Willis again while he was still out on the ground at

22   the scene?

23        A.    Yes.

24        Q.    Before the ambulance took him away?
```

1    A.   Yes, ma'am.

2    Q.   There weren't any gloves on him at that time?

3    You didn't see any gloves on his hands?

4    A.   I believe I did.  He had rubber gloves on.  I

5    don't recall what shade of rubber gloves they were, but

6    he had gloves on his hands.

7    THE COURT:  Hold it.  Read back the last question

8    and answer.

9         (Question and answer read.)

10   BY MS. JHA:

11   Q.   Officer, you just testified a moment ago that

12   you said that you saw plastic gloves allegedly on

13   Mr. Willis, never mind the color, at the time that he was

14   laying on the ground in front of approximately 851 North

15   Keystone?

16   A.   Yes.

17   Q.   And on the date of the incident you met with a

18   Detective March to give him your account of what happened

19   on that evening?

20   A.   I did.

21   Q.   And you were specifically asked on that

22   occasion by Detective March about gloves, as to whether

23   or not Willis was wearing any gloves, and you told him

24   that you did not recall Willis wearing any gloves at any

79

1    time during this incident, is that correct?

2        A.    Again, I don't remember specific questions that

3    Detective March and I discussed.

4        Q.    So would it be your testimony then that you

5    told Detective March that he was wearing gloves?

6        A.    Again, I don't remember a specific conversation

7    with Detective March.  I know I had a conversation with

8    Detective March.  I remember explaining to him the

9    details of the event.  As to specific questions in

10   regards to the gloves, I don't recall.

11       Q.    Did you tell him whether he was wearing gloves

12   or not?

13       MS. WEBER:  Objection.  Asked and answered.

14       THE COURT:  Third time.

15   BY MS. JHA:

16       Q.    How long have you been partners with Officer

17   Wagner?

18       MS. WEBER:  Objection, relevance.

19       THE COURT:  No. You can answer.

20   BY THE WITNESS:

21       A.    Four and a half years, maybe five.

22       Q.    And the pictures that the State showed you I

23   believe in Exhibits 14 and 15 of the weapon that you say

24   that was recovered at 851 North Keystone, there were no

80

1    pictures documenting the weapon as it was recovered on

2    the scene, is that correct?

3        MS. WEBER:  Objection, speculation.

4        THE COURT:  If you know.

5    BY MS. JHA:

6        Q.   If you know.

7        A.   I recovered the firearm and turned it over to

8    the crime lab, who took pictures of it on scene.

9        MS. JHA:  Just a moment.

10       Q.   Did you see where Officers Coleman and Granato,

11   where they came from?

12       A.   I believe they came from in front of me, which

13   would have been north.  But as to where they parked their

14   vehicle, I don't know.  I don't recall.

15       Q.   When you saw them they were on foot?

16       A.   Yes.

17       Q.   Officer Triantafillo, with respect to these

18   gloves that you are testifying to today, did you see

19   anybody take those gloves off of Mr. Willis' hands?

20       A.   No.

21       Q.   At the time that you saw these gloves that you

22   testified to today allegedly on Mr. Willis was he cuffed

23   on the ground at that time?

24       MS. WEBER:  Objection.  Beyond the scope.

1      THE COURT:  You can answer.

2   BY THE WITNESS:

3      A.   Could you rephrase the question?

4      Q.   You testified today that when you approached

5   Mr. Willis when he was on the ground after he had been

6   shot that you had seen some type of plastic or latex

7   gloves on him.  Was he cuffed at the time that you made

8   this observation?

9      A.   Yes.

10     MS. JHA:  I have nothing further.

11     THE COURT:  Redirect?

12                    REDIRECT EXAMINATION

13                    BY MS. WEBER:

14     Q.   Officer Triantafillo, this weapon which you

15  stated that you recovered on scene, how soon after you

16  observed the defendant drop that did you recover that

17  item, the weapon?

18     A.   It was about 30 to 40 feet when the weapon was

19  dropped.  I was running towards him.  I ran.  He had

20  fallen.  Officer Wagner ran towards him, and I went and

21  recovered the gun.  So just a few seconds.  It wasn't on

22  the ground long at all.

23     Q.   You recovered that item -- I'm sorry.  You

24  recovered the gun exactly where you observed the

                            82

1    defendant drop it?

2        A.    Yes.

3        Q.    And there were no other weapons in that area

4    aside from that which the defendant dropped?

5        A.    No.

6        Q.    Officer Triantafillo, after the defendant is

7    arrested you state that you called for EMS?

8        A.    I did.

9        Q.    And you stated they also arrived?

10       A.    They did.

11       Q.    And after EMS arrived was the defendant handed

12   over to them in order to --

13       MS. JHA:  Objection.  Beyond the scope.

14       THE COURT:  Finish the question.

15   BY MS. WEBER:

16       Q.    Was the defendant then handed over to them for

17   them to render medical aid to the defendant?

18       A.    Yes.

19       Q.    You were not in the ambulance with the

20   defendant at that time, were you?

21       A.    No.

22       MS. JHA:  Objection.  Beyond the scope.

23       THE COURT:  It is.

24

1    BY MS. WEBER:

2        Q.    Do you see the defendant after he is taken by

3    EMS?

4        MS. JHA:  Objection.  Beyond the scope.

5        THE COURT:  Sustained.

6        MS. WEBER:  Your Honor, could I ask a question?

7        THE COURT:  Sure.

8        MS. WEBER:  When I previously asked whether or not

9    the defendant was turned over to EMS for medical

10   treatment that answer was allowed in, correct?

11       THE COURT:  Yes.

12       MS. WEBER:  And the answer was yes I believe.

13       THE COURT:  That was a gratuity at a quarter to

14   6:00.  But we are not going to --

15       MS. WEBER:  I'm sorry.  My partner and I had

16   differing recollections as to what had actually come in.

17       THE COURT:  Next you will want to know which knuckle

18   on which finger of which hand was closest to the beam on

19   the flashlight.

20       MS. WEBER:  Exactly, your Honor.

21       THE COURT:  I am sure that had some far reaching and

22   very deep meaning that will be made known at the

23   appropriate time.  I hope not to be in the area when it

24   happens.

84

1       MR. ERBRING:  Judge, I guarantee that you will not.

2       MS. WEBER:  We have no further questions.

3       MS. JHA:  Nothing further.

4       THE COURT:  Thank you, sir.

5                                    (Witness excused.)

6       MS. AMADO-CHEVLIN:  We are trying to figure out

7   scheduling.

8       THE COURT:  Off the record.

9           (Discussion had off the record.)

10      THE COURT:  Antione Willis.

11      MS. JHA:  Judge, I believe the State will be calling

12  their remaining witnesses on the 31st, which is the date

13  we previously agreed to enter and continue this case

14  until.

15      THE COURT:  So that's it for this evening?

16      MS. AMADO-CHEVLIN:  Yes, Judge.

17      THE COURT:  March 31st.

18                          (Whereupon, the above-entitled cause

19                           was continued to March 31, 2008.)

20

21

22

23

24

1   STATE OF ILLINOIS  )
                       )
2   COUNTY OF C O O K  )

3

4        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
            COUNTY DEPARTMENT - CRIMINAL DIVISION
5

6             I, Annette M. Golab, an Official Court

7   Reporter for the Circuit Court of Cook County, Criminal

8   Division, do hereby certify that I reported in shorthand

9   the proceedings had at the hearing of the above-entitled

10  cause; that I thereafter caused the foregoing to be

11  transcribed into typewriting, which I hereby certify to

12  be a true and accurate transcript of the proceedings

13  before the Honorable MARCUS R. SALONE, Judge of said

14  court.

15

16

17                    _Annette M. Golab_
                      Official Court Reporter
18                    License No. 084-001693

19

20

21  Dated this 21st day

22  of January 2009.

23

24

                         86

```
 1   STATE OF ILLINOIS      )
                            )  SS:
 2   COUNTY OF C O O K      )

 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT - CRIMINAL DIVISION
 4
     THE PEOPLE OF THE STATE
 5   OF ILLINOIS,

 6
        vs.                        No.  06 CR 23138-01
 7

 8   ANTOINE WILLIS,

 9              Proceedings before
               MARCUS R. SALONE,
10             Judge of said Court
          on the 31st day of March, 2008.
11
     APPEARANCES OF COUNSEL:
12   For the State:   Lorna Chevlin,
                      Assistant State's Attorney,
13
     For the Defense: Lakshmi Jha,
14                    Victor Erbring,
                      Assistant Public Defenders.
15

16

17

18

19

20

21   LADONNA GRAY
     Official Court Reporter
22   License No. 084-1558

23

24

25
```

—1—

1                           I N D E X

2

3    Date of Hearing: 3/31/08

4    Pages: 111

5

6

7                         PROCEEDINGS

8    Bench Trial

9

10   Stephen Coleman

11   Direct Examination  State -3

12   Cross Examination  Defense -10

13   Redirect Examination  State -19

14

15   James Shader

16   Direct Examination  State -24

17   Cross Examination  Defense -48

18

19   Chris Matias

20   Direct Examiation  State -55

21   Cross Examination  Defense -63

22

23   Stipulations

24   State -68

25

                              —2—

```
 1    Motion Directed Finding   Defense -75

 2    Motion Denied -75

 3    Stipulations   Defense -75

 4

 5    Closing Arguments

 6    State -80

 7    Defense -94

 8    State -101

 9

10    Finding  -108

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  We will start in the State's
 2  case.  Both sides ready?
 3              MS. CHEVLIN:  Yes, Judge.  State calls
 4  Officer Coleman.
 5                     STEPHEN COLEMAN
 6  called as a witness on behalf of the People of the State
 7  of Illinois, after having been first duly sworn, was
 8  examined and testified as follows:
 9                    DIRECT EXAMINATION
10              BY MS. CHEVLIN:
11  Q.   Officer Coleman, if you could please introduce
12  yourself giving your first and your last name and give
13  your star number?
14  A.   Officer Stephen Coleman, star number 8619.
15  Q.   Now, Mr. Coleman, where are you assigned?
16  A.   11th District.
17  Q.   How long have you been with the 11th District?
18  A.   Going on three years now.
19  Q.   How long have you been a Chicago police officer?
20  A.   Going on three years now.
21  Q.   I'd like to now turn your attention to September
22  22, 2006, approximately, 11:40 in the evening.  Did you
23  respond to the vicinity of 839 North Keystone?
24  A.   Yes.
25  Q.   What was the nature of the call to which you were
```

—4—

1  responding?

2      A.  We were responding to a "man with a gun" call.

3      Q.  Who were you working with?

4      A.  Officer Granado.

5      Q.  Is that G-R-A-N-A-D-O, for the record?

6      A.  Correct.

7      Q.  Were you in a marked or unmarked vehicle?

8      A.  Marked.

9      Q.  Were you in uniform or plain clothes?

10      A.  Uniform.

11      Q.  Now, where were you responding from?

12      A.  We were responding directly from the station,

13  3151 West Harrison.

14      Q.  And approximately how long did it take you to

15  arrive from receiving that call to the vicinity of 839

16  North Keystone?

17      A.  About four to five minutes; four to five.  Sorry

18  about that.

19      Q.  And what direction are you traveling to get   to

20  -- onto -- to get to the vicinity?

21      A.  Northbound.

22      Q.  As you were traveling northbound on Keystone,

23  what if anything did you observe?

24      A.  We observed a male fitting that description.

25            MS. JHA:  Objection.

-5-

```
1                    THE COURT:  Okay.  All right.  Tell us what
2       you observed.
3                    THE WITNESS: I observed a male fitting the
4       description of the male with the gun, being that a male
5       with dark jeans, a white shirt and something black on
6       his head.
7       BY MS. CHEVLIN:
8          Q.  And where did you see this individual?
9          A.  He was standing by 839 Keystone.
10         Q.  Okay.  And standing on the street, or where was
11      he standing?
12         A.  Sidewalk.
13         Q.  Do you see that person in court today that you
14      saw standing on the sidewalk of 839 North Keystone?
15         A.  Yes.
16         Q.  Can you please identify that person by an article
17      of clothing that he or she is wearing?
18         A.  He's over there in the tan IDOC suit.
19                   MS. CHEVLIN:  Your Honor, if the record may
20      reflect an in court identification of the defendant.
21                   THE COURT:  It shall.
22      BY MS. CHEVLIN:
23         Q.  And, what if anything drew your attention to the
24      defendant when you -- aside from him matching the
25      description?
```

—6—

1    A.   It was him matching the description.   Also, as we

2    were pulling up, we saw him starting to take off.

3               MS. JHA:   Objection.

4               THE WITNESS: I saw him starting to take off

5    from the location as officers were exiting the gangway.

6    BY MS. CHEVLIN:

7    Q.   And who were the officers that were exiting the

8    gangway?

9    A.   Officer Waggoner and Officer Triantifillo.

10   Q.   Which gangway or which residence was that gangway

11   attached to?

12   A.   839 North Keystone.

13   Q.   And approximately how far away were you from the

14   defendant and the officers when you saw the defendant

15   fleeing down the sidewalk?

16   A.   Maybe a house.

17   Q.   And can you describe the lighting conditions?

18   A.   It was dark with artifical lighting.

19   Q.   Now, as you saw the defendant and the officers,

20   emerging from 839, what if anything did you see?

21   A.   As the officers were exiting the gangway, saw the

22   male, who is sitting here in the courtroom, I saw him

23   fleeing.  As he was fleeing, I saw him reach into his

24   waistband, saw a shiny object in his waistband as he was

25   turning towards the officer.

—7—

1    Q.   And where is it that you see him -- the shiny

2  object you saw, it was coming from his waistband area;

3  is that correct?

4    A.   Correct.

5    Q.   When you saw the defendant reaching into his

6  waistband for that shiny object, what if anything did

7  you do?

8    A.   Told my partner he's got a gun.

9    Q.   And who was driving at that time?

10    A.   Granado, Officer Granado.

11    Q.   After you notified your partner, what did Officer

12  Granado do?

13    A.   He drove northbound to cut off the offender.

14    Q.   As you are traveling northbound with your partner

15  to cut off the offender, what if anything occurred?

16    A.   We hear a shot.

17    Q.   What do you -- what kind of shot?

18    A.   We hear a gunshot.

19    Q.   And what do you do when you hear that gunshot?

20           THE COURT:  You missed that?

21           MS. JHA:  I heard it, but --

22           THE COURT:  Oh, okay.  It's I.

23           THE WITNESS:  Okay.  I'm sorry about that.

24  I heard the gunshot.

25  BY MS. CHEVLIN:

1    Q.   And what did you do at that point?

2    A.   At that time, my partner Officer Granado stopped

3    the car, we exited the vehicle to see Officer Waggoner

4    going towards the offender who was now on the ground.

5    Q.   And the person that you see on the ground is

6    whom?

7    A.   Can you repeat that?

8    Q.   Who is it that you see on the ground with Officer

9    Waggoner?

10   A.   The guy who is in the courtroom now, Mr. Willis.

11   Q.   And have you ever lost sight of the defendant

12   from the time you saw him fleeing until you -- well, let

13   me just rephrase -- rephrase that question.  When you

14   saw Officer Waggoner and the defendant on the ground,

15   what did you do?

16   A.   We went over -- I went over to help Officer

17   Waggoner in the cuffing procedure.

18   Q.   Do you see any other officers in the vicinity

19   aside from yourself or your partner, Officer Granado and

20   Officer Waggoner?

21   A.   Officer Triantifillo.

22   Q.   Approximately how far away was he from the --

23   A.   He is still in eyesight, he's maybe a house away.

24   Q.   Now, if you could -- if I could just take you

25   back, approximately how much time would you say passed

—9—

1   from the time that you initially saw the defendant on

2   the sidewalk, until you actually see the defendant on

3   the ground with Officer Waggoner?

4       A.   This all happened in under a minute, I would say,

5   in under a minute or two.

6             MS. CHEVLIN: So may the record reflect

7   showing to counsel People's Exhibit Number 16.

8             MS. CHEVLIN:  May I approach?

9             THE COURT:  Sure.

10  BY MS. CHEVLIN:

11      Q.   Officer Coleman, showing you People's Exhibit

12  Number 16, do you recognize what that's a photograph of?

13      A.   Yes, I do.

14      Q.   What is that a photograph of?

15      A.   It's a photograph of 839 North Keystone.

16      Q.   Does it show the gangway that you said you saw

17  the officers coming out of?

18      A.   Yes, it does.

19      Q.   Does it show the vicinity of where you saw the

20  defendant standing on the sidewalk?

21      A.   Yes, it does.

22      Q.   If you could just take this black marker, and

23  just mark the area where you saw the defendant standing

24  in when you first observed him.

25            MS. CHEVLIN:  Your Honor, if the record will

—10—

1    reflect that the officers has complied?

2              THE COURT:  Sure.

3              MS. CHEVLIN:  Thank you.

4    BY MS. CHEVLIN:

5    Q.  You say that you saw the defendant pull an object

6    from his waistband; is that correct?

7    A.  Correct.

8    Q.  And what is it about when you saw that, that made

9    you notify your partners that --

10   A.  The color.  It was the color and the shape.  It

11   looked like it was the shape of a gun handle.  It was

12   shiny as though it was a pistol.

13             MS. CHEVLIN: Okay.  I have nothing further,

14   Judge.  I would tender the witness.  Sorry, just a

15   follow-up question.

16   BY MS. CHEVLIN:

17   Q.  This photograph People's Exhibit Number 16, does

18   it truly and accurately depict the front of 839 North

19   Keystone as you observed it on September 22nd, 2006?

20   A.  Correct.

21             MS. CHEVLIN: Nothing further, Judge.

22                   CROSS EXAMINATION

23                   BY MS. JHA

24   Q.  Officer Coleman, you said that you worked in the

25   1th District for the three years that you have been a

—11—

1    police officer.  Have you worked with Officer Waggoner

2    and Triantifillo for that entire time?

3      A.  No, I haven't worked with Officer Waggoner and

4    Triantifillo for that entire time, not specifically in

5    their car.

6              THE COURT:  Okay.  It's really the question

7    -- did you -- you said no.  The question was vague.  He

8    elaborated to clarify.  I don't know.  If you're in the

9    same district, do you work together?  I think so.  You

10   respond to the same calls and this and that.  I think

11   so.  But that's not -- or is it?  Is that the question

12   that you were asking?

13   BY MS. JHA:

14     Q.  How long have you known Officers Waggoner and

15   Triantifillo?

16     A.  For the three years I have been in the 11th

17   District.

18     Q.  Now, Officer, you said that you were responding

19   to a call of shots fired?

20     A.  Responding to a call of man with a gun.

21     Q.  Okay.  And you received a description?

22     A.  Correct.

23     Q.  Now, that description was of an individual in

24   blue jeans?

25     A.  Correct.

—12—

```
 1      Q.   A white T-shirt?

 2      A.   Correct.

 3      Q.   And a black baseball cap?

 4      A.   Correct.

 5      Q.   And Mr. Willis was not wearing a black baseball

 6  cap.

 7      A.   No, but he was wearing a black do-rag.

 8      Q.   Okay.  So he had on a black do-rag?

 9      A.   Correct.

10      Q.   And Mr. Willis was wearing black jeans not blue

11  jeans?

12      A.   In the nature of the job, when someone says dark

13  jeans, that can be a dark blue, it can be black.

14      Q.   That's not my question, Officer.  The description

15  you received was for blue jeans and Mr. Antoine Willis

16  was wearing black jeans; is that correct?

17      A.   Black blue jeans, correct.

18           MS. CHEVLIN:  Objection, Judge.  ^ Don't

19  hear.  it was not impeaching.

20           THE COURT:  I'll allow the answer to stand.

21  BY MS. JHA:

22      Q.   When you were coming to the location of 839 North

23  Keystone, did you turn off of Chicago Avenue onto

24  Keystone?  How did you get to the block of Keystone?

25      A.   Correct.
```

```
 1      Q.   Okay.  And you were then heading northbound?

 2      A.   Correct.

 3      Q.   And, you saw officers Triantifillo and Waggoner

 4  coming out of the alley?

 5      A.   Coming out of the gangway.

 6      Q.   Out of the gangway and their guns were drawn?

 7      A.   Correct.

 8      Q.   Did you see anything else in their hands?

 9      A.   Flashlight.

10      Q.   In whose hand?

11      A.   Waggoner.

12      Q.   And how was he holding that?

13      A.   Like you would hold a flashlight.

14      Q.   In which hand, left or right?

15      A.   I am not sure which hand he held it in.

16      Q.   Did you see his gun?

17           MS. CHEVLIN:  Objection.  Asked and

18  answered.

19           THE WITNESS: Yes.

20  BY MS. JHA:

21      Q.   What hand was his gun in?

22           THE COURT:  Sorry.  Sustained.

23           THE WITNESS:  Not sure which hand his gun

24  was in.

25  BY MS. JHA:
```

—14—

1    Q.   Okay.  So from your perspective, at this point

2  when you're viewing Triantifillo and Waggoner, you're

3  behind them?  You're further south than their location?

4    A.   Correct, approaching their location.

5    Q.   Okay.  And Antoine Willis is also north of your

6  location?

7    A.   Correct.

8    Q.   And when you initially see the person that you've

9  identified as Mr. Willis, he's in front of you, correct?

10   A.   Correct.

11   Q.   And you say that he is running?

12   A.   Correct.

13   Q.   So his back is towards you?

14   A.   Correct.

15   Q.   When -- how long was it before you overtook Mr.

16  Willis?  You eventually passed him, right?

17   A.   Correct.

18   Q.   Your partner was driving the vehicle?

19   A.   Correct.

20   Q.   Approximately what speed was your partner driving

21  the vehicle?

22         MS. CHEVLIN:  Objection.

23         THE WITNESS:  Not sure.

24         MS. CHEVLIN:  Speculation.

25         THE COURT:  Answer will stand, I'm not sure.

—15—

```
1    I think, case law permits for the estimation of speed by

2    the layperson.

3               MS. JHA:  That is correct.

4               THE COURT:  So, if he had answered, I think

5    the case law permits that, but he said I'm not sure.

6    BY MS. JHA:

7       Q.  Would you say he was going over ten miles an

8    hour?

9               MS. CHEVLIN:  Objection.

10              THE WITNESS:  Yes.

11              MS. CHEVLIN:  He already stated he --

12              THE COURT:  All right.  I'll allow the

13   answer.

14   BY MS. JHA:

15      Q.  Was he going over 20 miles an hour?

16      A.  Not sure how fast he was going.  Car was moving

17   that's all I can tell you.

18      Q.  Somewhere after ten?

19              MS. CHEVLIN:  Objection.

20              THE COURT:  He can answer.

21              THE WITNESS:  Correct.

22   BY MS. JHA:

23      Q.  Somewhere over ten miles an hour?

24      A.  Correct.

25      Q.  And how many seconds did it take before you
```

1   passed the location of 839 North Keystone?

2     A.  Not many.

3     Q.  Could you approximate how many seconds it took

4   before you passed that location?

5     A.  Maybe three, four seconds.

6     Q.  Okay.  And how many seconds was it before you

7   overtook Antoine Willis?

8          MS. CHEVLIN:  Judge, objection as to the --

9   objection, characterization and it misstates his

10  testimony.

11          THE COURT:  You mean past Mr. Willis?

12          MS. JHA:  Yes, that is what I mean.

13          THE COURT:  Okay.

14          MS. JHA:  I can change --

15          THE COURT:  Yeah, please.

16          MS. JHA:  Okay.

17  BY MS. JHA:

18     Q.  Officer Coleman, at some point you passed Antoine

19  Willis; is that correct?

20     A.  Correct.

21     Q.  Drove past him?

22     A.  Correct.

23     Q.  And how many seconds was it before you passed

24  Antoine Willis from when you arrived or from when you

25  turned onto the 839 block of Keystone?

1      A.   Well, again --

2      Q.   Maybe another couple of seconds?

3      A.   Something like that.  Yeah, maybe another couple

4   seconds.

5      Q.   Where did you stop your vehicle, or where did

6   your partner stop the vehicle?

7      A.   Partner stopped the vehicle, towards -- it was

8   further than 839, it was north of 839.  Couldn't give

9   you an exact location.  All I can tell you is it was

10  north of 839.

11     Q.   Well, when you got out of your vehicle, Mr.

12  Willis was on the ground?

13     A.   Correct.

14     Q.   When you walked over to Mr. -- where Mr. Willis

15  was and where Officer Waggoner was, did you have to walk

16  southbound?

17     A.   Yes.

18     Q.   Approximately how far did you have to walk

19  southbound?

20     A.   Not far.

21     Q.   And by "not far" do you mean ten feet, twenty

22  feet, thirty feet?  Could you estimate?

23     A.   Can't estimate, not sure how many feet.  It

24  wasn't far though.

25     Q.   Now, you testified that Mr. Willis at some point,

1   was allegedly turning towards the officers in which

2   direction?

3     A.  He is making a circular motion towards the

4   officers.  I'm not sure what you mean "in which

5   direction".

6     Q.  Well, you said he was turning --

7     A.  The officers are south of him as he is running

8   northbound.  He is turning southbound towards the

9   officers.

10     Q.  And, would he be turning to his left or to his

11   right?

12     A.  Turning to his right.

13     Q.  And, where did you allegedly observe that shiny

14   object?

15     A.  His waistband.

16     Q.  And at what point?

17     A.  As he was reaching to grab it.

18     Q.  But Officer Coleman, he is in front of you?

19     A.  Correct.  He is also moving and reaching at the

20   same time.

21     Q.  And his back is towards you?

22     A.  But as he is reaching and moving and turning at

23   the same time.  It can be done.

24     Q.  Reaching, moving and turning to his right?

25     A.  Correct.

1     Q.  So --

2          MS. JHA: Just a moment, your Honor.

3          THE COURT:  Sure.

4          (Short Pause.)

5          MS. JHA:  I have no further questions,

6  Judge.

7          MS. CHEVLIN:  Just have a couple questions.

8          THE COURT:  Sure.

9                REDIRECT EXAMINATION

10          BY MS. CHEVLIN:

11    Q.  Officer Coleman, you and your partners were

12  attempting to cut off the defendant; is that correct?

13    A.  Yes.

14    Q.  And you just testified that there was a period

15  where you actually went past the defendant?

16    A.  Correct.

17    Q.  So, was there a period of time, even if it's

18  seconds, that you actually lost sight of the defendant?

19    A.  Correct.

20    Q.  Okay so, in that period of time, that you may

21  have lost sight of the defendant, you don't know if at

22  all, he turned toward his left?

23          MS. JHA:  Objection.

24  BY MS. CHEVLIN:

25    Q.  During those times, is that correct?

1          THE COURT:  What is the objection?

2          MS. JHA:  Form of the question to start.

3          THE COURT:  Do you understand the question?

4          THE WITNESS:  Yes, I do.

5          THE COURT:  You can answer.

6          THE WITNESS:  As we lost sight of him, I am

7    not sure which way he was turning.

8    BY MS. CHEVLIN:

9       Q.  Okay.  And, you stopped when you heard the

10   gunshot, right?

11      A.  Correct.

12      Q.  Now, Counsel asked you about when you first saw

13   the defendant in front of 839 North Keystone; is that

14   correct?

15      A.  Correct.

16      Q.  When you saw the defendant in front of 839 North

17   Keystone did you see any individual in his immediate

18   vicinity?

19      A.  There was a female around him.

20      Q.  And where was she in relation to the defendant?

21      A.  She was standing off to the side of him as though

22   they were having a conversation.

23      Q.  On the sidewalk?

24      A.  Correct.

25          MS. CHEVLIN:  I nothing further.

—21—

1           MS. JHA:  No, nothing further.

2           THE COURT:  Okay, thank you, sir.  You can

3   step down.  How much more do we have?

4           MS. CHEVLIN:  Judge, what I have left, I

5   have my forensic investigator.  Judge, I would just ask

6   if Officer Coleman could be released at this point.

7           THE COURT:  Are we going to need the

8   officer.

9           MS. JHA:  I can't imagine why we would.

10          THE COURT:  Okay.  Thank you, sir.

11          MS. CHEVLIN:  I have a forensic

12  investigator, Judge.  He shouldn't be that long.

13          THE COURT:  We will be back in an hour.

14          (The lunch recess was had.)Willis, Antoine

15          MS. CHEVLIN:  Judge, over the lunch break

16  there is --

17          THE COURT:  You lost somebody?

18          MS. CHEVLIN:  Well, no we didn't, but there

19  was there is one witness that I thought we were going to

20  be able to stip to although the ISP stuff but there is

21  one witness that we cannot -- we cannot stip to you.

22          THE COURT:  Is the person here?

23          MS. CHEVLIN:  No, because I thought the

24  subpoena included everybody but that's, I think, when

25  Ms. Jha and I spoke.  I was --

—22—

```
 1                THE COURT:  Okay.  So we are into late May?
 2                MS. JHA:  Well, Judge, I mean, obviously the
 3    State can call any witness they want.  I don't really
 4    have much of a legal basis to object to it, but Mr.
 5    Willis has been in custody for 17 months time.  We
 6    started this trial,  it's -- I don't think that this
 7    witness is going to be relevant to any of the issues
 8    that you need to decide in his case.  And it's just to
 9    prejudice the defense at this time.
10                MS. CHEVLIN:  Judge, I can leave it up to
11    you.  I don't know if -- do you want me to make an offer
12    of proof or not?
13                THE COURT:  Go right ahead.
14                MS. CHEVLIN:  Judge, this witness is on call
15    from the ISP forensic services where he is a forensic
16    scientist.  There were latex gloves recovered from the
17    defendant at some point during the course of the
18    investigation.
19                Those gloves were tested for GSR and they
20    came back positive.  Now, I understand that this case
21    did not involve the weapon actually being fired, but the
22    reason why I believe it's relevant, is I think it's
23    circumstantial evidence.
24                We expect other evidence is going to come
25    out of the case which is that the route that evening,
```

1    even in the hours prior to this actual incident, there

2    were multiple calls of shots being fired on that block.

3    That's consistent with the ballistics evidence.  In

4    addition, when the officers in this case are responding,

5    there was a description that we would argue is

6    consistent with the defendant.  And that on top of it,

7    he has these gloves.

8              THE COURT:  You said there is ballistics

9    evidence suggesting that a weapon had been fired in the

10   area?

11             MS. CHEVLIN:  Well, Judge, there is

12   ballistic evidence that there are multiple cases,

13   multiple --

14             THE COURT:  Recovered?

15             MS. CHEVLIN:  Casings recovered up and down

16   that street.

17             MS. JHA:  And you will hear that testimony

18   today.  That -- our position is this is irrelevant

19   testimony based on the State's proffer.  Mr. Willis is

20   not charged with firing a weapon.  Not one of the cases

21   -- counts in this case involves that.

22             THE COURT:  Yeah, the -- I noticed the

23   second partner --

24             MS. JHA:  And the --

25             THE COURT:  Wagner was the first officer

—24—

1    that chased?

2              MS. CHEVLIN:  Yeah.

3              THE COURT:  So it's the second partner that

4    says he saw latex gloves on the defendant?

5              MS. JHA:  And we have a stipulation with

6    respect to the impeachment that was on that, but

7    that's --

8              THE COURT:  Okay.  I'll reserve ruling on

9    the continuance --

10             MS. CHEVLIN:  Okay, Judge.

11             THE COURT:  Regarding that witness'

12   testimony. Okay.

13             MS. CHEVLIN:  Okay.  So before I rest, I

14   should just bring it back up?

15             THE COURT:  Right.

16             MS. CHEVLIN:  Okay.

17             THE COURT:  Are you ready?

18             MS. CHEVLIN:   I am.

19             Witness sworn.

20             MS. CHEVLIN:  May I proceed, Judge?

21             THE COURT:  Please.

22             MS. CHEVLIN:  Thank you.

23                     JAMES SHADER,

24   called as a witness on behalf of the People of the State

25   of Illinois, after having been first duly sworn, was

1   examined and testified as follows:

2                    DIRECT EXAMINATION

3                    BY MS. CHEVLIN:

4   BY MS. CHEVLIN:

5      Q.  Investigator Shader, if you could please

6   introduce yourself, giving your first and your last name

7   and your star number.

8      A.  Forensic investigator James Shader, S-H-A-D-E-R.

9   Star number is 9609.

10     Q.  Thank you, Investigator Shader.  How long have

11  you been with the Chicago Police Department?

12     A.  This July, I'll finish 40 years.

13     Q.  And how long have you specifically been a

14  forensic investigator?

15     A.  Either the end of '85 or beginning of '86.

16     Q.  And before that, what were your duties?

17     A.  I was an evidence technician from 1981 until

18  again either the end of '85 or beginning of '86 when I

19  became a forensic investigator.

20     Q.  I'd like to now turn your attention to the late

21  evening of September 22, of 2006.  Did you respond to

22  the location of 851 North Keystone?

23     A.  Yes, Ma'am, we did.

24     Q.  And upon arrival, who did you meet with?

25     A.  We met with the detectives and the supervisors

1    that were on the scene.

2        Q.   And was the scene secured already by the time

3    that you arrived?

4        A.   Yes, Ma'am it was.

5        Q.   And upon or -- what did you do after you met with

6    the detectives?

7        A.   First after speaking with the detectives and

8    supervisors, we learned where the police-involved

9    shooting -- a young man had been shot on the scene

10   there, and before we do anything, we do a walk-through

11   with the detective and with the supervisors and -- to

12   try and identify any evidence in that and this --

13             MS. JHA:   Objection, Judge, as to what he

14   would do.

15             THE COURT:   Tell us what did you on this

16   day.

17   BY MS. CHEVLIN:

18       Q.   Did you walk the scene with the detectives at

19   that point?

20       A.   Yes, we did.

21       Q.   While you were walking the scene with the

22   detectives, if you could describe generally what did you

23   see.

24       A.   Well, we were looking for any firearms evidence.

25   In this particular case, cartridge cases, fired bullets,

1    metal fragments, things of that nature because this was

2    a shooting.

3        Q.   Okay.  And what did you see?

4        A.   We found cartridge cases down the street, there

5    was a cartridge case that was in a yard, the front yard

6    of a home, there was a weapon that we recovered from an

7    officer at the scene and we took photographs and

8    videotaped the scene and surrounding areas.

9        Q.   Now, did you also note a squad, any unmarked

10   squad?

11       A.   Yes, Ma'am.

12       Q.   Where did you --

13       A.   There was an unmarked police vehicle in the alley

14   behind 841 North Keystone.

15       Q.   Now, you indicated that there were several

16   cartridge cases; was that correct?

17       A.   Yes, Ma'am, correct.

18       Q.   And when you say that they were located

19   throughout, on what street did you locate these items?

20       A.   There were cartridge cases in the street.  There

21   were 40-caliber cartridge cases and 9-millimeter

22   cartridge cases in the street, from approximately 857

23   North Keystone to approximately 841 North Keystone.

24       Q.   Did you also note any vehicles with any bullet

25   damage or anything of that nature?

1     A.   Yes, Ma'am, we did.

2     Q.   Could you tell us about that?

3     A.   There was a pickup truck that had a bullet hole

4  in the passenger side front window.  That particular

5  bullet went into the dashboard of that pickup truck.  It

6  was also a red Pontiac.  I believe it was a Grand Prix,

7  that had the rear window, the rear driver's door window,

8  was shot out and the bullet went into the interior

9  upholstery of that particular automobile.

10    Q.   Now, in addition to documenting the scene as you

11 observed it via photographs and video, what did you do

12 with the cartridge cases that you just testified about?

13    A.   After we photographed and videotaped the

14 cartridge case, we recovered the individual cartridge

15 cases and placed them in firearms envelopes.

16    Q.   Did you then go on to inventory those items?

17    A.   Yes, Ma'am, we did.

18    Q.   Now, I'd like to talk about the bullet cartridge

19 cases that you had observed and documented and

20 inventoried on the scene.  You mentioned that there were

21 40 caliber casings; is that correct?

22    A.   40-caliber and 9-millimeter cartridge cases.

23    Q.   The 40-caliber casings, how many did you --

24    A.   We recovered three.

25    Q.   Did you inventory those three together?

1      A.   Yes, we did.

2      Q.   Do you recall where you saw those three

3  40-caliber --

4      A.   Those were in the street --

5      Q.   Do you recall where you observed those 40-caliber

6  casings?

7      A.   They were in the street going from approximately

8  857 to approximately somewhere around 841 North

9  Keystone.

10     Q.   And did you inventory those under 10826622?

11     A.   Yes, Ma'am, we did.

12     Q.   Now, if you could also talk about the

13  9-millimeter casings that you found; how many in total

14  did you find?

15     A.   Well, we found three in the street.

16          THE COURT:  I'm sorry.  What are we talking

17  about?

18          MS. CHEVLIN:  Nine millimeter cases.

19          THE WITNESS: Nine millimeter cartridge

20  cases, Judge.  There were three in the street and there

21  was one in the front yard at 847 North Keystone.

22  BY MS. CHEVLIN:

23     Q.   If we could talk about the three that you found

24  in the street.

25     A.   Yes, Ma'am.

—30—

1     Q.   Did you inventory those under 10826624?

2     A.   Yes, Ma'am, we did.

3     Q.   And the -- do you recall who the manufacturer was

4 of those three 9 millimeter casings that you recovered

5 in the street?

6     A.   I would have to refer to my report.

7         MS. CHEVLIN: Judge, People's Exhibit Number

8 17. May I approach, Judge?

9         THE COURT:  Sure.

10 BY MS. CHEVLIN:

11     Q.   Showing you People's Exhibit Number 17.  Do you

12 recognize what that document is?

13     A.   Yes, Ma'am, I do.

14     Q.   What is that?

15     A.   It's the report that we wrote that particular

16 night and the next day.

17     Q.   Is that your crime scene processing report for

18 this investigation?

19     A.   Yes, it is, Ma'am.

20     Q.   If you could take a look at that and see if it

21 refreshed your recollection as to the manufacturer of

22 the three 9 millimeter casings that you recovered in the

23 street of North Keystone?

24     A.   Yes, Ma'am.  Two of them were RP 9 millimeter

25 Luger cartridge cases and one was S&B, 9-millimeter

1    Luger cartridge case.

2        Q.   Okay.  Now, you stated that there was also a

3    9-millimeter casing which was recovered in the grassy

4    area, apart from those three; is that correct?

5        A.   That was in the -- the front yard area at 847

6    North Keystone.

7        Q.   Okay.  And do you recall what the make or the

8    manufacturer was of that particular 9-millimeter casing

9    that was recovered?

10       A.   I believe it was WCC plus P, and marked 05.

11       Q.   Okay.  The single 9-millimeter casing that you

12   recovered in the grassy area of 847 North Keystone, did

13   you inventory that under 10826621?

14       A.   Yes, Ma'am, we did.

15       Q.   Now, were there any other cartridges or casings

16   that you inventoried during the course of this

17   investigation?

18       A.   Yes, Ma'am.

19       Q.   And do you recall what those were?

20       A.   We had six, 357 Magnum cartridge cases that were

21   in some clothing that the young man that had been shot

22   -- they were in his right-front pocket of his slacks,

23   his pants.

24            MS. JHA:  Objection as to -- if he doesn't

25   know where it came from.

—32—

```
 1                    THE COURT:  I can't hear you.

 2                    MS. JHA:  Oh, objection to what the word is,

 3     unless he recovered them.

 4                    THE COURT:  To what the word is?

 5                    MS. JHA:  Recovered.

 6                    THE COURT:  Objection to what?

 7                    MS. JHA:  He just testified to what the word

 8     is, were recovered from the pocket.

 9                    THE COURT:  Hold on.  Go back to the

10     officer's response.

11                    MS. JHA:  Unless he recovered them.

12                    (Whereupon, the record was read.)

13                    MS. JHA:  I would object to the speculation

14     of where it was recovered, unless he recovered it or

15     witnessed that.

16                    THE COURT:  Okay.  All right.  Rephrase the

17     question.

18     BY MS. CHEVLIN:

19        Q.   These 357 cartridges that you inventoried, who

20     did you get those from?

21        A.   There were two detectives in Area 4, Matias and

22     Garcia.

23        Q.   And as the inventorying officer, did you have to

24     fill out an inventory slip?

25        A.   Yes, ma'am, we did.
```

1     Q.  In the process of doing that, do you have to

2  learn where those items are recovered in order to

3  properly fill out the inventory slips?

4     A.  That's correct.  Yes, Ma'am.

5     Q.  Did you then have a conversation with Detective

6  Matias and Detective Garcia as to where these items came

7  from?

8     A.  Yes, I did.

9     Q.  And did you rely on that information in order to

10  properly fill out your inventory slip?

11     A.  Yes, we did.

12     Q.  And where did you learn those items came from

13  detective?

14          MS. JHA:  Objection, hearsay.

15          THE COURT:  Sustained.

16  BY MS. CHEVLIN:

17     Q.  Now, had these 357 cartridges that you

18  inventoried, did you do that under 10826628?

19     A.  Yes, Ma'am.

20     Q.  You stated you also recovered some weapon; is

21  that correct?

22     A.  Yes, Ma'am, we did.

23     Q.  Can you tell us about each of those weapons?

24     A.  One was a -- was recovered from one of the

25  officers involved in that.  It was a 357 Magnum --

1           MS. JHA:  Objection, unless foundation.

2           THE COURT:  Overruled.  He can answer.

3    BY MS. CHEVLIN:

4      Q.  Okay.  You were talking about a 357 --

5      A.  It was a 357 Magnum, six-shot revolver with a

6    four inch barrel and that -- it had mud all over it and

7    it also had some dirt and mud that was caked in the --

8           THE COURT:  No, wait.  I thought you said

9    this    was -- I thought you said recovered from the

10   officer.

11          THE WITNESS: The officer we got it from, one

12   of the officers that was involved in the shooting,

13   Judge.  Yes, sir.

14          MS. JHA:  That was the foundation I was

15   looking for.

16          THE COURT:  Okay.  All right.

17          MS. JHA:  What has happened to him, when it

18   was, all of that.

19          THE COURT:  Right.  I thought he was talking

20   about the officers.

21          MS. CHEVLIN:  I'm getting there; I haven't

22   gotten there yet.

23          THE COURT:  No.  The objection will be

24   sustained.

25   BY MS. CHEVLIN:

---35---

1 Q. You recovered -- I'm sorry. You inventoried a

2 357 revolver; is that correct?

3 A. Yes, Ma'am, correct.

4 Q. And who did you get that from?

5 A. Officer Trent Dranca -- Drancatello or something

6 along those lines.

7 Q. Is that Triantifillo?

8 A. That sounds more like it. Yes, ma'am.

9 Q. That's T-R-I-A-N-T-I-F-I-L-L-O for the record.

10 And where did you get -- where did he give that to you?

11 A. At the scene.

12 Q. Did you have an opportunity to inspect that?

13 A. Yes, we did.

14 Q. Tell me what you observed upon inspection of that

15 weapon?

16 A. Well, we weren't able to open up the cylinder

17 itself. The cylinder was jammed. But we could look

18 into the cylinder from the front.

19  MS. JHA: Objection, to the "we", your

20 Honor.

21 BY MS. CHEVLIN:

22 Q. What did you see?

23  THE COURT: Okay.

24  THE WITNESS: There were five live cartridges

25 in the weapon itself. We couldn't tell what was

—36—

1    underneath the hammer of the particular weapon.

2              MS. JHA:  Objection.

3              THE COURT:  Okay.  Talk about what you not

4    we.

5              THE WITNESS:  Well, we work as a team, your

6    Honor.

7              THE COURT:  Yeah, but you see, the other

8    party of your team isn't here and subject to

9    cross-examination so she only wants to know about what

10   you did.

11             THE WITNESS:  Okay.  I was unable to open up

12   the cylinder to see what was the -- in the weapon as far

13   as whether it was a live cartridge that was behind the

14   hammer itself, but there were five live cartridges that

15   that I could see.

16   BY MS. CHEVLIN:

17      Q.  And then, did you notice any coatings or anything

18   on the weapon that you received from Officer

19   Triantifillo?

20      A.  Yes, Ma'am.

21      Q.  What did you notice?

22      A.  There was mud on the -- on the butt of the

23   weapon, there was mud on the sides of the weapon and

24   there was some caked up mud that was on the barrel, in

25   the barrel itself of the weapon.

—37—

1    Q.   Now, did you inventory that under 10826609?

2    A.   Yes, Ma'am.

3    Q.   Were there any other weapons that you inventoried

4    or recovered?

5    A.   Yes, Ma'am.

6    Q.   What was that?

7    A.   In the presence of assistant deputy

8    superintendent in the Area 4, we recovered -- the

9    officer that was actually involved in the shooting, we

10   recovered his weapon in the presence of the ADS,

11   Assistant Deputy Superintendent.

12          MS. JHA:  Objection to the "we" who

13   recovered it.

14          THE COURT:  Okay.  You have to talk about

15   what you did.

16          THE WITNESS: I recovered the weapon in the

17   presence of the assistant deputy superintendent, in Area

18   4.

19   BY MS. CHEVLIN:

20   Q.   And who did you get that weapon from?

21   A.   There was Officer Waggoner.

22   Q.   Now, could you describe the weapon that you

23   received from Officer Waggoner?

24   A.   Was a semi-automatic Sig Sauer, it was a

25   9-millimeter, semi-automatic weapon, and there was one

1    in the chamber still, and there -- when we released the

2    magazine -- when I released the magazine there were 14

3    more live cartridges in the magazine itself.  For total

4    of 14 in the magazine, one in the chamber for a total of

5    15.

6        Q.  Now, when you say that there was a total of 15,

7    actually contained within the officer's weapon, how many

8    casings could it actually hold in total?

9        A.  Can hold 15 in the magazine, and you can also put

10    one in the chamber itself when you chamber one.

11        Q.  Okay.  So a total of 16?

12        A.  Sixteen in total, yes, Ma'am.

13        Q.  And did you inventory that item under 10826612?

14        A.  Yes, Ma'am, I did.

15        Q.  Now, you stated that you had the opportunity to

16    inspect the magazine, and whatever casings was inside

17    the cartridge, inside of the weapon of the officer; is

18    that right?

19        A.  Correct.  Yes, Ma'am.

20        Q.  Do you recall what the manufacturer was of

21    casings -- cartridges that were within the officer's

22    weapon?

23        A.  They were all WCC plus P-05.

24             MS. CHEVLIN: Judge, if I could just have one

25    moment.

—39—

1            THE COURT:  Sure.

2      MS. CHEVLIN:  Judge, let the record reflect I'm

3 showing Counsel People Exhibit 18 through 27

4 additionally, previously entered People's Exhibit 15, 5,

5 9, 13, 12, 4 and 1.

6            THE COURT:  Noted.

7            MS. CHEVLIN:  May I approach, Judge?

8            THE COURT:  Sure.

9 BY MS. CHEVLIN:

10    Q.  Showing you People's Exhibit Number 1.  Do you

11 recognize what that is a photograph of?

12    A.  Yes, Ma'am.  I do.

13    Q.  What is that a photograph of?

14    A.  That's the unmarked police vehicle that's parked

15 in the alley that particular night.  It's parked in the

16 alley behind 841 North Keystone.

17    Q.  Okay.  People's Exhibit Number 4?

18    A.  That's the garage at 839 North Keystone.  There

19 is a gangway here on the north side of that particular

20 garage that runs from the alley to the sidewalk area in

21 front of the house.

22    Q.  Okay.  People's Exhibit number 12?

23    A.  That's just a different perspective looking down

24 this gangway that runs from the alley to the sidewalk

25 area of the front of the house there at 839  West -- 839

1    North Keystone.

2        Q.   And there is some garbage cans that are shown to

3    the right of that gate; is that correct?

4        A.   Yes, Ma'am, correct.

5        Q.   Were those there or were they there when you went

6    to document the scene?

7        A.   Yes, Ma'am, they were.

8        Q.   People's Exhibit Number 13?

9        A.   That's just a showing the numbers of 839 on that

10   particular garage, 839 North Keystone.

11       Q.   People's Exhibit number 9?

12       A.   That's the front of the house at 839 North

13   Keystone and it's looking into the gangway -- that's the

14   gangway that runs from the alley to the front sidewalk

15   area, on the north side of 839 North Keystone.

16       Q.   People's Exhibit number 18?

17       A.   That's a view where I am looking from the north

18   side of 859, 857, I'm sorry, North Keystone.  I am

19   looking southbound.  This is marker number 1, it's a

20   cartridge case that's in a street there at approximately

21   857 North Keystone, North Keystone.

22       Q.   People's Exhibit Number 5?

23       A.   That's the front yard where there was a cartridge

24   case.  That's marker number two, the yellow marker is on

25   the inside of the front yard there at 847 North

—41—

1   Keystone.  The yellow marker is here just inside the

2   gate on the grassy area of the front lawn.

3       Q.   And that marker number 2, is that the single

4   9-millimeter that you found apart from the ones on the

5   street?

6       A.   Yes, Ma'am, correct.

7       Q.   People's Number 19?

8       A.   That's marker number 2.  It's a close-up of that

9   particular cartridge case inside the front yard area, at

10  847 North Keystone.

11      Q.   Number 20?

12      A.   This is the red Pontiac that's got the rear

13  driver's side window shot out and a bullet went through

14  the window and went into the interior of the upholstery.

15      Q.   And there also are some markers on the street; is

16  that correct?

17      A.   Yes, Ma'am.  There's markers down the street

18  going southbound.

19      Q.   And which -- do you remember what the numbers of

20  the markers are or what are the marker numbers that you

21  see there?

22      A.   Three, four, and the rest of them are just too

23  far away in the photograph.

24      Q.   Okay.  Here's a close-up, number 21.  What are

25  those?

1    A.   Okay, there is four and that looks like -- that

2    is three, three and four, by this red car.

3    Q.   Number, 22?

4    A.   That's markers 5, 6 and 7.  Those are cartridge

5    cases that are in the street there, again, near this red

6    car.

7    Q.   Okay.  People's Number 23?

8    A.   This is marker number 8.  It's on top of this red

9    Pontiac.  The rear driver's side window was shot out and

10    a bullet went into the interior of the upholstery in

11    that -- of this particular red car.

12    Q.   24?

13    A.   That's just a different perspective showing its

14    rear window that's shot out on the driver's side of the

15    red Pontiac that's parked there on -- adjacent to the

16    curb.

17    Q.   25?

18    A.   This is that red -- that -- I'm sorry.  The white

19    pickup truck that's got the passenger side window shot

20    out and a bullet went into the dashboard of that

21    particular vehicle.

22    Q.   26?

23    A.   That's marker number 9, and that's placed inside

24    on the dashboard and that's to show where the bullet

25    actually entered the dashboard of that particular

1    vehicle.

2        Q.   15?

3        A.   That's the weapon that we received from Officer

4    Trend --

5        Q.   Triantifillo?

6        A.   Triantifillo on that particular night.

7        Q.   And does it also note the -- the mud that was

8    kicked onto the gun?

9        A.   Yes, Ma'am.  There is mud on the handles here,

10   there is mud on the side of the weapon, mud on the

11   barrel and there was mud that was caked into the barrel

12   itself.

13       Q.   Number 27?

14       A.   That's looking down the barrel of the weapon and

15   that you can see the mud that's here in the barrel of

16   that and you can see some of the live cartridges that

17   are in the weapon itself in the cylinder.

18       Q.   Do all of these photographs truly and accurately

19   show how the scene, the ballistic evidence as well as

20   the weapon that was recovered from Officer Triantifillo,

21   as they appeared on 9/22 of '06, when you responded to

22   this investigation?

23       A.   Yes, Ma'am, they do.

24       Q.   Now, so in addition to --

25            MS. CHEVLIN:  Judge, may I have one moment?

—44—

1           (Short Pause.)

2  BY MS. CHEVLIN:

3    Q.  Were there any clothing items that you also

4  received during your assistance in this investigation?

5    A.  Yes, Ma'am, there were.

6    Q.  In particular, were there gloves?

7    A.  Yes, Ma'am, there were.

8    Q.  Who did you get those from?

9    A.  From the two detectives, Matias and Garcia at

10  Area 4.

11    Q.  And did you inventory those gloves along with

12  other clothing under 10826626?

13    A.  Yes, Ma'am, we did.

14    Q.  Now, do you recall what clothing you received

15  from the detectives for that inventory?

16    A.  There were blue jeans, the -- inside the right

17  pocket of the blue jeans were six 357 Magnum cartridges

18  in the right-front pocket.  There was two vinyl gloves

19  in the left-front pocket.

20       There was gym shoes, athletic shoes, there was

21  bloody blue jeans as I indicated and there was a bloody

22  shirt that was also recovered along with, as I recall,

23  underwear.

24    Q.  Okay.  Now, do you recall if there was any kind

25  of head coverings that were also inventoried?

1    A.   There was.   There was like a -- some people call

2    them do-rags, you wrap around your head.

3    Q.   Do you remember what color that was?

4    A.   It was black.

5    Q.   What about shirts if any that you recovered or

6    were given?

7    A.   There was a shirt in there, yes, Ma'am.

8    Q.   Do you recall what color that shirt was?

9    A.   Without referring to my report, I couldn't tell

10   you again, right now.

11   Q.   Judge, People's Exhibit Number 17 again.   Does

12   that refresh your recollection as to color of the shirt

13   that you received from the detectives?

14   A.   Yes, Ma'am.

15   Q.   What color?

16   A.   White T-shirt, there is also a black, sleeveless

17   undershirt, Fruit of the Loom.

18   Q.   Now, you testified earlier that there was blood

19   on the shirt; is that --

20   A.   Yes, Ma'am, correct.

21   Q.   Okay.   On the shirt or on the shorts?

22   A.   On the shirt and then on the jeans themselves.

23   Q.   Is that indicated on your report that there was

24   blood on the shirt?

25   A.   We have got "bloody" here on the report.

1    Q.   If I can take a look.   Okay.   On the jeans?

2    A.   Everything that we received at Area 4 was in a

3    hospital plastic --

4              MS. JHA:   Objection to the "we".

5              THE WITNESS: Everything that I received at

6    Area 4 was in a plastic bag that the detectives had

7    already gone through the clothing at the hospital.

8    Before I recover anything, I personally take everything

9    out of the plastic bag so I can see what I am going to

10   inventory.

11   BY MS. CHEVLIN:

12   Q.   Okay.

13   A.   (Continuing) -- what's in there.   We don't want

14   any weapons or any contraband or anything of that

15   nature.

16   Q.   So were they all contained in a single bag?

17   A.   Yes, Ma'am, they were.

18   Q.   When they were given to you?

19   A.   Correct.

20   Q.   When you say that they were blue jeans, does your

21   report indicate, or specify the jeans?

22             MS. JHA:   Objection to what his report

23   indicates.

24   BY MS. CHEVLIN:

25   Q.   How did --

1    A.  Blue jeans, I -- short of looking at my report --

2          THE COURT:  Wait a minute, hold on.  What's

3  the objection?

4          MS. JHA:  That's hearsay, what his report

5  indicates.  What he observed is one thing, what they

6  looked like is another thing.

7          THE COURT:  He has answered the question of

8  the pants that were recovered.  He has answered that.

9  BY MS. CHEVLIN:

10    Q.  Investigator Shader, isn't it true that your

11  report actually states it's a pair of black,

12  stone-washed jeans that you inventoried?

13          MS. JHA:  Objection, hearsay.

14          THE COURT:  No.  Overruled.

15          THE WITNESS: To me, blue jeans are blue

16  jeans.  Stone-washed -- I honestly don't know what the

17  difference is.  Blue jeans are blue jeans to me.

18  BY MS. CHEVLIN:

19    Q.  Okay.  But my question is, does your report

20  indicate --

21          THE COURT:  If the witness says -- testified

22  to one thing, but earlier written something else, what

23  do you call that?

24          MS. JHA:  Impeachment.

25          THE COURT:  Okay.  And then there is a

1   difference between impeachment and hearsay, right?

2          MS. JHA:  Correct.

3   BY MS. CHEVLIN:

4      Q.   But does your report actually specify black,

5   stone-washed jeans under that inventory?

6      A.   Yes, Ma'am.

7      Q.   Okay.

8          THE COURT:  If need be, we'll just close up

9   that loop.  Can you impeach your own witness?

10          MS. JHA:  Yeah.  Absolutely.

11          THE COURT:  Okay.

12   BY MS. CHEVLIN:

13      Q.   During the inventory processes, you kept all of

14   these items in your constant care, custody and control

15   until you actually inventoried and generated a unique

16   inventory number for these items?

17      A.   Yes, Ma'am.

18          MS. CHEVLIN: I am done.  I have nothing

19   further.  I would tender the witness.

20          MS. JHA:  May I please proceed, Your Honor?

21          THE COURT:  Please.

22                    CROSS EXAMINATION

23                    BY MS. JHA:

24      Q.   Officer Shader, you said when you arrived at the

25   scene that it had already been secured.  Can you

1   describe in more detail what you mean by "secured"?

2      A.   Streets were blocked off with police blue and

3   white vehicles.   They had the crime scene tape, the

4   yellow tape as well as the red tape at the security area

5   and that --

6      Q.   And approximately how many officers were -- would

7   you say were on the scene at that time?

8      A.   40, 50 maybe 60.   I -- I -- you know --

9      Q.   And you talked about certain items that were

10  recovered specifically cartridge casings, you also

11  described the markers that they were by.   Were those

12  markers already placed there when you arrived on the

13  scene or was that part of your process?

14     A.   No, Ma'am, it's my process.

15     Q.   And did you then place each and every marker down

16  at the location next to the relative casings that were

17  recovered?

18     A.   Yes, Ma'am, correct.

19     Q.   And in processing this scene, given that it was a

20  police shooting, you processed it pretty carefully?

21     A.   Yes, Ma'am, correct.

22     Q.   You looked everywhere you could for cartridge

23  casings?

24     A.   Yes, Ma'am.

25     Q.   For weapons?

1    A.  Yes, Ma'am.

2    Q.  And you made sure not only to document that by

3 taking photographs, but you also took a videotape of

4 everything that you saw out there?

5    A.  That's correct, yes, Ma'am.

6    Q.  And, you documented where precisely within the

7 scene, each cartridge casing was recovered from?

8    A.  Yes, Ma'am, correct.

9    Q.  And you documented each car that could have been

10 shattered by a bullet?

11    A.  That's correct.

12    Q.  You -- one of the exhibits you were shown,

13 People's Exhibit 15; now the one -- strike that.  Where

14 did you receive Officer Waggoner's weapon?

15    A.  At the scene itself.  Oh, Officer Waggoner's?

16    Q.  Correct.

17    A.  That was in Area 4 with the assistant deputy

18 superintendent right there.

19    Q.  Okay.  And where were you when you received the

20 weapon from Officer Triantifillo?

21    A.  On the scene.

22    Q.  And when Officer -- Officer Triantifillo handed

23 you that weapon?

24    A.  That's correct.  Yes, Ma'am.

25    Q.  And that was the one item of evidence that you

1   did not document at its found location on the scene?

2     A.   We received it from the officer.

3     Q.   Correct.  And if I can show you again People's

4   Exhibit Number 14, is this the weapon that was handed to

5   you by Officer Triantifillo?

6     A.   Yes, Ma'am, it is.

7     Q.   And that weapon is photographed on a paper bag?

8     A.   That's correct.

9     Q.   And that was photographed in the police station?

10    A.   No.

11    Q.   Where was it photographed?

12    A.   That was photographed -- this metal -- on our

13   trucks now we have this ribbing, this metal ribbing.

14   Okay, we placed the bag, the deputy wanted to see what

15   kind of a weapon it was before we photographed it and we

16   photographed it on the paper bag.  This is a foot area

17   to get into our trucks.

18    Q.   Okay.  So it would be safe for me to say,

19   Officer, that you did not photograph the weapon at the

20   location where it was recovered?

21    A.   At the scene.

22    Q.   Well, Officer Shader, you did not photograph that

23   weapon, at 851 North Keystone in the yard?

24    A.   I didn't find it in the yard, Ma'am.

25    Q.   You did --

1          THE COURT:  Okay.  So answer her question.

2  Did you photograph that weapon in the yard of 851 North

3  Keystone?

4          THE WITNESS: No, we did not, Your Honor, we

5  received it --

6          THE COURT:  I'm with you.  I understand.

7          THE WITNESS:  -- from the officer.  Okay.

8          THE COURT:  But just -- okay.

9  BY MS. JHA:

10    Q.  You photographed the weapon after it was handed

11  to you by an officer on your vehicle?

12    A.  That's correct.

13    Q.  There were no other photographs of that

14  particular weapon taken at that location aside from the

15  ones that --

16    A.  Looking down the barrel too.

17    Q.  Correct.  And I'd have the two that she's showing

18  you, this one and the other one?

19    A.  Okay.

20    Q.  Is that correct?

21    A.  That's correct, yeah.

22          MS. JHA:  Just a moment, Your Honor.

23  BY MS. JHA:

24    Q.  Officer Shader, when you received the bag with

25  the clothing items in that, where was that?

—53—

1      A.   At Area 4.

2      Q.   And who tendered that to you?

3      A.   It was two detectives, Garcia and Matias.

4      Q.   Okay.  And do you recall which one of those

5   detectives tendered you the bag?

6      A.   They were together, Ma'am.

7      Q.   Okay.  With respect to the -- you testified that

8   there were certain items recovered from the pocket of

9   the pants that you received?

10     A.   That's correct.  Yes, Ma'am.

11     Q.   Specifically, that being gloves and bullets?

12     A.   That's correct.  Yes, Ma'am.

13     Q.   And were those in fact in the pants when you

14   received them?

15     A.   Yes, Ma'am, they were.

16          MS. JHA:  I have nothing further.

17          THE COURT:  Read back the last question.

18          (Whereupon, the record was read.)

19          THE COURT:  State.

20          MS. CHEVLIN:  Judge, I have nothing further.

21          THE COURT:  Thank you, sir.

22          THE WITNESS:  Thank you, Your Honor.

23          THE COURT:  Oh, no.  Let me ask you,

24   Officer.  Let me ask you a couple questions, please.

25          Sir, do you know if a 40-caliber projectile

```
1   can be fired from the 357 that was recovered?

2           THE WITNESS:  No, sir.

3           THE COURT:  No, you don't know or no, can't

4   be.

5           THE WITNESS:  It cannot be fired.

6           THE COURT:  Okay.  Can a 9-millimeter

7   projectile be fired from that recovered weapon?

8           THE WITNESS: The 357 Magnum.

9           THE COURT:  Yes.

10          THE WITNESS: No, sir.

11          THE COURT:  State?

12          MS. CHEVLIN:  I have nothing based on that,

13  Judge.

14          MS. JHA:  No, Judge.

15          THE COURT:  Thank you, sir.

16          THE WITNESS:  Thank you, your Honor.

17          MS. JHA:  Your Honor, I don't know if we --

18  Judge Linn, Victor is supposed to be on trial in Judge

19  Linn's courtroom as well, ask that he check in at three

20  o'clock.  I just thought we would be done.  Can we maybe

21  break for five minutes so they can indicate that he is

22  still on trial here?

23          THE COURT:  Do we have any other witnesses?

24          MS. CHEVLIN:  One, Judge, yes.

25          THE COURT:  Get that witness.
```

1                   CHRIS MATIAS,

2    called as a witness on behalf of the People of the State

3    of Illinois, after having been first duly sworn, was

4    examined and testified as follows:

5                   DIRECT EXAMINATION

6                   BY MS. CHEVLIN:

7       Q.   State your name and star number for the record,

8    please.

9       A.   My name is Detective Chris Matias.  Star number

10   20315.

11             THE COURT:  Chris, first name?

12             THE WITNESS:  Yes.

13             THE COURT:  Thank you.

14   BY MS. CHEVLIN:

15      Q.   Detective Matias, how long have you been with the

16   Chicago Police Department?

17      A.   Fourteen years.

18      Q.   And how long have you been a detective?

19      A.   Five.

20      Q.   I'd like to now turn your attention to September

21   22nd, 2006.  Did you respond to the vicinity of 853

22   North Keystone to assist in the investigation of a

23   police involved shooting?

24      A.   Yes, I did.

25      Q.   Who did you respond there with?

1      A.   With my partner, Detective David Garcia.

2      Q.   And during the course of your assistance, did you

3   enter an ambulance located on the scene?

4      A.   Correct.

5      Q.   Do you see anyone in court today that you

6   observed within the ambulance at that location?

7      A.   Yes, I do.

8      Q.   Could you please identify that person by an

9   article of clothing that he or she is wearing?

10     A.   The defendant seated to my left wearing the tan,

11  Cook County shirt and pants.

12          MS. CHEVLIN: Your Honor, if the record would

13  reflect in court identification of the defendant.

14          THE COURT:  It shall.

15  BY MS. CHEVLIN:

16     Q.   And when you encountered the defendant, was there

17  anybody else inside the ambulance?

18     A.   There was a uniformed police officer, I believe

19  his name was Lesch.

20     Q.   And that's L-E-S-C-H for the record.  And were

21  there any other personnel?

22     A.   There were the ambulance personnel, well, one of

23  them was in there.  The other one was in the driver's

24  seat.

25     Q.   And when you met with the defendant, how did you

1    introduce yourself?

2        A.   I told him that I was a Chicago police detective,

3    and I advised him that he was under arrest.

4        Q.   Now -- after -- did you then relocate to the

5    hospital along with the defendant?

6        A.   Yes, I had a conversation with him in the

7    ambulance.

8              MR. EBRING:  Objection; unresponsive,

9    narrative.

10             THE COURT:  All right.  Listen to the

11   question.  Repeat the question.

12   BY MS. CHEVLIN:

13       Q.   After you met with the defendant, did you go with

14   him anywhere?

15       A.   Yes, I did.

16       Q.   Where did you go?

17       A.   To Mount Sinai Hospital.

18       Q.   And did you ride along with the defendant and

19   Officer Lesch in the ambulance?

20       A.   Yes, I did.

21       Q.   When you got to Mount Sinai Hospital, what if

22   anything did you receive?

23       A.   I received his -- a bag with his clothing in it.

24             MR. EBRING:   Objection; foundation.

25   BY MS. CHEVLIN:

—58—

1    Q.   When you say his --

2             THE COURT:   Sustained.

3    BY MS. CHEVLIN:

4    Q.   Whose clothing did you receive?

5    A.   The defendant.

6             MR. EBRING:   Objection; foundation.

7             THE COURT:   Sustained.

8    BY MS. CHEVLIN:

9    Q.   Well, when you saw the defendant, did you see

10   what he was wearing?

11   A.   Yes, I did.

12   Q.   Okay.  Now, the clothing that you say you

13   received that was the defendant's, was it the same

14   clothing that you saw him in when you first saw him in

15   the ambulance?

16   A.   Yes.

17            MR. EBRING:   Objection; foundation.

18            THE COURT:   Sustained.

19   BY MS. CHEVLIN:

20   Q.   What clothing did you see the defendant in when

21   you saw him in the hospital?  I mean, in the ambulance.

22   A.   In the ambulance, he had a pair of pants, shirt,

23   he had a pair of shoes on.

24   Q.   And, then you went with him in that same clothing

25   to Mount Sinai Hospital; is that correct?

1     A.   Correct.

2     Q.   When you got to Mount Sinai Hospital, what if

3   anything did you receive?

4     A.   I received --

5               MR. EBRING:   Objection; foundation.

6               THE COURT:   No.   He can answer that.

7               THE WITNESS:  I received the bag --

8               THE COURT:   Well, who did you receive the

9   bag from?

10              MS. CHEVLIN:   All right, Judge, I haven't

11  gotten to the question yet.

12              THE COURT:   Well, that's part of the

13  foundation.

14  BY MS. CHEVLIN:

15    Q.   Okay.   Who did you receive the clothing from?

16    A.   From emergency room personnel.

17    Q.   And this emergency personnel, when they handed

18  you this bag of clothing, did you have an opportunity to

19  look at it?

20    A.   Yes.

21    Q.   And when you inspected that clothing, what did

22  you observe?

23    A.   Items that were on the defendant -- that I had

24  seen on the defendant.

25    Q.   Was it the same clothing that you had just seen

1   the defendant wearing?

2       A.   Yes.

3       Q.   When you went to the hospital, or went to the

4   hospital in the ambulance?

5       A.   Yes.

6       Q.   Now, this clothing that you had an opportunity to

7   inspect, what if anything did that inspection reveal

8               MR. EBRING:   Objection; foundation.

9               THE COURT:   Overruled.

10              THE WITNESS: As I checked his clothing, I

11  discovered a pair of Latex gloves in his left-front

12  pocket.  I also found a six, live 357 cartridges in his

13  right-front pocket.

14      Q.   When you observed these items in the clothing,

15  what if anything did you do?

16      A.   Well, I -- I didn't do anything with it.  I left

17  and maintained possession of the bags.

18      Q.   Okay.  So did you leave the items where you could

19  observe them --

20              MR. EBRING:   Objection; leading.

21              THE COURT:   Read back the question.  I don't

22  know.  I'm having a problem hearing.

23              MS. CHEVLIN:   Okay, Judge.

24              THE COURT:   Did you get the last question,

25  Ms. Court Reporter?

1          THE COURT REPORTER:  She kind of trailed off

2     at the end, sir.

3          MS. CHEVLIN:  I'll repeat it.

4     BY MS. CHEVLIN:

5       Q.  Now, this bag of clothing you had an opportunity

6     to inspect it, correct?

7       A.  Correct.

8       Q.  And you just noted or testified to both

9     cartridges as well as gloves that you saw contained in

10    the defendant's pants?

11      A.  Correct.

12      Q.  When you saw this --

13          MR. EBRING:  I'm going to object to the

14    conclusion statement that these are the defendant's

15    pants.

16          THE COURT:  Yes, you should.  Sustained.

17    BY MS. CHEVLIN:

18      Q.  Now, the clothing that you saw these items

19    contained in, where had you seen those pants before?

20      A.  On the defendant in the ambulance.

21      Q.  And this clothing that you saw that had these

22    items, did you note any blood on that clothing that you

23    were inspecting?

24      A.  Yes, I did.

25      Q.  Where did you see blood?

1    A.   It was on the -- I'm not sure which leg, but was

2  like around the thigh area.

3    Q.   Now, when you saw these items and the clothing,

4  what did you do with that clothing bag?

5    A.   I kept them in my possession, relocated back to

6  Area 4.

7    Q.   And had you maintained those items in your

8  constant care, custody and control until you got back to

9  Area 4?

10   A.   Yes, I did.

11   Q.   And what did you do with the bag and its contents

12  of clothing once you got to Area 4?

13   A.   I turned them over to the it crime lab personnel

14  at Area 4.

15   Q.   Would that be forensic investigator Shader.

16          MR. EBRING:   Objection; leading.

17          THE COURT:   It's all right.   The answer will

18  stand.

19  BY MS. CHEVLIN:

20   Q.   Do you recall who the investigator was that you

21  turned those items over to?

22   A.   Yes, yes, I do.

23   Q.   Who was that?

24   A.   It was Shader.

25          MS. CHEVLIN:   Judge, if I could have one

1    moment?

2                    (Short Pause.)

3                    Judge, I have nothing further.  I would

4                    tender the witness.

5                    THE COURT:  Victor.

6                            CROSS EXAMINATION

7                            BY MR. EBRING:

8    Q.   Thank you, Judge.  Detective, when you -- you

9    said that you received a bag with clothing in it; is

10   that correct?

11   A.   Correct.

12   Q.   That was at the hospital?

13   A.   Yes.

14   Q.   And you looked through that bag at the hospital?

15   A.   Yes.

16   Q.   You -- did you take the items out of the bag when

17   you received those items, to inspect them?

18   A.   Yes.

19   Q.   You took the pants out of the bag?

20   A.   Yes.

21   Q.   And you reached into the pocket of the pants; is

22   that right?

23   A.   That's correct.

24   Q.   And the left pant pocket you pulled out a pair of

25   latex gloves that you just testified about?

1      A.   Yes.

2      Q.   From the right pocket you pulled out six

3  cartridges that you described as 357 Magnum cartridges?

4      A.   They're 357s.  I am not sure if they're Magnums.

5      Q.   They're 357-calliber cartridges?

6      A.   Yes.

7      Q.   You held those with your own hands; is that

8  right?

9           MS. CHEVLIN:  I'm sorry.  I didn't hear the

10  question.

11          MR. EBRING:  You held those with your own

12  hand?

13          THE COURT:  You held those with your own

14  hand.

15          THE WITNESS: I had gloves on, but yes.

16  BY MS. CHEVLIN:

17     Q.   Okay.  And then you put those items back into the

18  pockets?

19     A.   Yes.

20     Q.   Did you ever ask that the gloves be submitted for

21  fingerprint analysis?

22     A.   No, I did not.

23     Q.   Did you ever make a request to have the bullets

24  that you found in the pants submitted for fingerprint

25  analysis?

—65—

1    A.   I did not.

2    Q.   Are you aware if those, either of those two items

3 were submitted by anyone for fingerprint analysis?

4    A.   I am not aware of that.

5    Q.   You said that when you saw my client in the

6 ambulance, he was still fully clothed; is that right?

7    A.   Yes, I mean, he had -- his shirt was open.

8    Q.   Were his pants still on his legs?

9    A.   Yes.

10    Q.   During the ride to the hospital, was he receiving

11 any treatment that you could observe from any ambulance

12 personnel?

13    A.   They were monitoring him.  I mean, actively

14 receiving any type of aid, no.

15    Q.   Did you see whether or not they took a look at

16 him in the ambulance for any sign of injury?

17         MS. CHEVLIN:  Objection.  Well, what other

18 officer or what other personnel maybe looked at.

19         THE COURT:  Is that -- that's an objection

20 recognized in law?

21         MS. CHEVLIN:  Irrelevant, Judge.

22         THE COURT:  What is the relevance?

23         MR. EBRING:   Judge, the relevance is --

24         THE COURT:  Well, I'll reserve ruling.  Go

25 ahead.

—66—

```
 1              THE WITNESS:  I'm sorry.  Can you --
 2    BY MR. EBRING:
 3      Q.  Did you see anybody in the ambulance take a close
 4    look at Mr. Willis?
 5              MS. CHEVLIN:  Objection.
 6              THE COURT:  Same thing?
 7              MS. CHEVLIN:  Yes, Judge.
 8              THE COURT:  I am going to reserve ruling.
 9              THE WITNESS:  I -- I mean, he was being
10    treated.  I mean --
11    BY MR. EBRING:
12      Q.  What part of him was being treated?
13      A.  Well, his -- well, they weren't actually actively
14    working on his gunshot wound.  He had some monitors
15    attached to him, to his chest.
16      Q.  Do you see any kind of a covering on the wound
17    that he had?
18      A.  Yes.  There was -- I believe there was a bandage
19    on there.  Not a Band-Aid, but like a gauze pad.
20      Q.  And that was on the wounded area in his thigh or
21    buttock area; is that right?
22      A.  That's correct.
23              MR. EBRING:  One second, Judge.
24              THE COURT:  Okay.
25    BY MR. EBRING:
```

1    Q.  And in the ambulance, was Mr. Willis ever

2    handcuffed?

3    A.  I -- no, I don't believe he was.

4    Q.  You didn't see him --

5    A.  I didn't -- no, I didn't see him with handcuffs.

6    I didn't handcuff him.

7         MR. EBRING:  Thank you, Judge, nothing

8    further.

9         THE COURT:  Redirect.

10        MS. CHEVLIN:  No, Judge.

11        THE COURT:  I will leave it in.  The

12   objection is overruled.

13        MR. EBRING:  Thank you, sir.

14        MS. CHEVLIN:  We have a stipulation with

15   respect to testimony of Kimberly Hood Ryan, R-Y-A-N, she

16   would testify that she's a forensic scientist employed

17   by the Illinois State Police Crime Lab, and qualified as

18   an expert in the field of firearm identification and

19   fingerprint -- I'm sorry latent fingerprint

20   identification.

21        THE COURT:  Which one, latent fingerprint?

22        MS. CHEVLIN:  Fingerprint identification.

23        THE COURT:  Okay.

24        MS. CHEVLIN:  Sorry, Judge.  She would

25   testify that she received the following inventories.

1   Under inventory number 10826609, she received Exhibit 4,

2   which was one revolver and six live cartridges.

3          She also received inventory number 10826628

4   Exhibit 5, which was six live cartridges, inventory

5   number 10826624 which were Exhibits 6 through 8, 6 was

6   one discharged cartridge case, 7 was one discharged

7   cartridge case and number 8 was one discharged cartridge

8   case.

9          Inventory Number 10826622, which contained

10  exhibit 9, one discharged cartridge case, number 10 one

11  discharged cartridge case and number 11, one discharged

12  cartridge case.  And that she subjected all of these

13  items to tests commonly accepted in the field of latent

14  fingerprint identification.

15         She formed an expert opinion within a

16  reasonable degree of scientific certainty, and Exhibits

17  4 through 11 you see no latent impression suitable for

18  comparison.  So stipulated?

19         MS. JHA:  So stipulated.

20         MS. CHEVLIN:  There would also be the

21  testimony from Fred Tomasek, T-O-M-A-S-E-K.  He would

22  testify that he is a forensic scientist employed by the

23  Illinois State Police Crime Lab, and qualified to

24  testify as an expert in the field of ballistic evidence,

25  as well as firearms identification.

1    He would testify that he received Inventory

2    Number 10826609, which contained Exhibit 4, that item

3    was a Smith and Wesson, model 19-4, S and W 357 Magnum

4    revolver.  When he had the opportunity to inspect that

5    weapon, he found that it was found to be inoperable as

6    received.

7         THE COURT:  Inoperable?

8         MS. CHEVLIN:  Inoperable as he received it.

9         THE COURT:  Okay.

10        MS. CHEVLIN:  He also received inventory

11   number 10826628 Exhibit Number 5, which was one

12   Winchester and 5 Remington Peter, 357 Magnum, unfired

13   cartridges.

14        In that he had the opportunity to inspect

15   those cartridges for caliber and type.  Inventory number

16   10826624, under that inventory there was Exhibit Number

17   6, which is one Sellier, S-E-L-L-I-E-R, and Bellott,

18   B-E-L-L-O-T-T, 9-millimeter Luger fired cartridge

19   cases -- case -- cartridge case.

20        He also received Exhibit Number 7, under

21   that same inventory, which is one Remington Peter

22   9-millimeter Luger fired cartridge case.  And Exhibit

23   number 8, which was one Remington Peter 9-millimeter

24   Luger fired cartridge case.  Upon inspection of those

25   items, he performed an inspection and formed an expert

1   opinion within a reasonable degree of scientific

2   certainty, that Exhibits Number 6 and 7, 9-millimeter

3   Luger fired cartridge casings were fired from the same

4   firearm.  They were not fired in the same firearms as

5   Exhibits 8 or 9 through 11.

6           With respect to Number 8, he formed an

7   expert opinion within a reasonable degree of scientific

8   certainty.  It's -- Exhibit 8 was not fired in the same

9   firearm as Exhibits 9 through 11.  Under inventory

10   number 10826622, he received Exhibit Number 9, which is

11   one Winchester 40 S and W fired cartridge case.  He

12   received Exhibit Number 10, which was one Winchester 40

13   S and W fired cartridge case and Number 11, one

14   Winchester 40 S and W fired cartridge case and after

15   performing inspection, your Honor, those exhibits to a

16   reasonable degree of scientific certainty, he formed an

17   expert opinion that Exhibits 9, 10 and 11 were fired in

18   the same firearm.

19           He also formed an expert opinion within a

20   reasonable degree of scientific certainty, that Exhibit

21   6 through 11 were not fired from Exhibit 1, of case

22   number C06043229, inventory number 10826612.

23           THE COURT:  That's the handgun?

24           MS. CHEVLIN:  That is the officer's handgun,

25   Judge.

1          THE COURT:  Okay.

2          MS. CHEVLIN:  And that also, Exhibits 6

3     through 11 were not fired in -- from Exhibit 4 of the

4     same case number, inventoried under 10826609, which is

5     the 357 revolver recovered by Officer Triantifillo, from

6     the defendant.

7          There was also another situation with

8     respect to Mr. Tomasek with the same qualifications that

9     he also received and examined Inventory Number 10826612,

10    and this is the officer's handgun.  Exhibit Number 1,

11    Sig Sauer, S-I-G  S-A-U-E-R, Model P, 226, which is a

12    9-millimeter Luger, semi-automatic pistol, serial

13    number, U568292.  He found that to be examined or he

14    examined it and found it to be in firing condition.  It

15    was test fired, Exhibit Number 2, 15 Western Cartridge

16    Company 9-millimeter Luger plus P unfired cartridges.

17          And Number 3, was one magazine and he formed

18    an expert opinion within a reasonable degree of

19    scientific certainty, that all of the unfired cartridges

20    in Exhibit 2, were examined for caliber and type.

21          And that Exhibit Number 3 was used to test

22    fire Exhibit Number 1.  He also received inventory

23    number 10826621, which was 12, under exhibit 12, one

24    Western Cartridge Company 9-millimeter Luger, plus P,

25    fired cartridge case.

1          And he formed an expert opinion within a
2   reasonable degree of scientific certainty, that that
3   single 9-millimeter Luger cartridge case under Exhibit
4   12, was fired from the officer's gun, under Exhibit
5   Number 1, the Sig Sauer, Model 226.
6          Your Honor, there would also be a
7   stipulation that all of these items that each the three
8   situations that there was a proper chain of custody
9   maintained at all times, with respect to the lab
10  personnel, he received these items, handled them and
11  then repackaged them for inventory.
12          MS. JHA:  So stipulated.
13          MS. CHEVLIN:  Your Honor, at this time, we
14  also have two additional stipulations, Judge.  There
15  would be a stipulation that Detective Mar retrieved the
16  original 911 call which was made that dealt with the
17  blocks of 840 through 850 North Keystone, that included
18  the hours, at least four hours preceding this particular
19  incident.  Then prior to 9:00 in the evening on 9/22/06.
20          There would be a stipulation that an
21  inspection of 911 calls which were made that there were
22  at least six different calls of shots being fired in the
23  vicinity of 840 North Keystone, which were in between
24  the hours of 9:00 and 10:00 o'clock.  Hours before the
25  actual incident in question.

1          Judge, just for clarification, the

2     stipulation is that there were --

3          THE COURT:  From five to nine?

4          MS. CHEVLIN:  Yes.  That there were several

5     calls which were made not necessarily by different

6     people, but there were calls received by 911 of shots

7     being fired.

8          MS. JHA:  So stipulated that there were

9     calls being received to 911 not necessarily from

10    different people, but there were at least six calls of

11    shots fired.

12         MS. CHEVLIN:  Judge, there would also be a

13    further stipulation that upon response to the scene on

14    9/22/06, for this investigation that there was a canvass

15    that was conducted of individuals that the detectives

16    and officers came in contact with, the canvass revealed

17    the following:  There would also be a stipulation that

18    the canvass that the citizens were able to come in

19    contact with, revealed the following and is not

20    conclusive:  That there were six, seven individuals on

21    scene who related to the officers and detectives that

22    they heard a single gunshot at approximately 11:30,

23    which is our incident, and then saw officers respond to

24    a person lying on the ground.

25              That canvass also revealed, at least eight

1   other people who testified that they heard shots being

2   fired in between the hours of 9:00 and 10:00, couple

3   hours before this particular incident.

4           MS. JHA:  So stipulated.

5           THE COURT:  Who reported, not testified.

6   Who reported.

7           MS. CHEVLIN:  Who just reported to the

8   officer during canvass.

9           THE COURT:  Right.  Okay.  Anything else?

10          MS. CHEVLIN:  Judge, at this time, I would

11  ask to revisit the -- your ruling on --

12          THE COURT:  Motion?

13          MS. CHEVLIN:  Yes.

14          THE COURT:  Motion for Continuance is

15  denied.

16          MS. CHEVLIN:  Your Honor, then based on

17  that, the State would admit into evidence People's

18  Exhibit -- I'm sorry, Judge, I can't remember what

19  number I left off at.  One through 27 with the exception

20  of People's Exhibit Number 17, which is Investigator

21  Shader's crime scene processing report.  We ask that

22  those photographs be admitted into evidence.

23          THE COURT:  Any objection?

24          MS. JHA:  No objection.

25          THE COURT:  People's 1 through 27, excluding

1    17, will be received into evidence, identification marks

2    shall be stricken.

3              MS. CHEVLIN:  Judge, also there -- I also

4    would submit into evidence, certified conviction of

5    defendant.

6              I would also admit into evidence certified

7    copies of conviction of the defendant's following cases

8    02CR269065, which is a conviction for unlawful use of a

9    weapon by a felon.  In case number 98CR126270, which is

10   a conviction for manufacturing and delivery of a

11   controlled substance.  935CR23365, possession of a

12   controlled substance with intent to deliver.  As well as

13   93CR27690, which is unlawful use of a weapon by a felon.

14             If I can have one moment, Judge.  With that,

15   State would rest.

16             THE COURT:  All right.

17             MS. JHA:  Your Honor, I will proceed

18   initially.  Your Honor, we'd make a motion for a

19   directed finding and I have no argument.

20             THE COURT:  Respectfully denied.

21             MS. JHA:  Your Honor, initially, we will

22   also be proceeding by way of stipulation.  It's

23   stipulated by and between the parties that if called to

24   testify, Dr. Orellana, O-R-E-L-L-A-N-A, who would be

25   qualified as an expert in the field of emergency

1    medicine.

2            Dr. Orellana would testify that he was

3    working as a physician at Mount Sinai Hospital on

4    September 22nd into September 23rd, 2006.  That Dr.

5    Orellana treated Antoine Willis, who he would identify

6    in open court as the defendant.

7            Dr. Orellana would testify that Antoine

8    Willis was treated for a grave gunshot wound to his left

9    hip.  So stipulated?

10            MS. CHEVLIN:  So stipulated.

11            MS. JHA:  Also Your Honor, if called to

12    testify, Detective March, star number 20563 would

13    testify that his report indicates that Officer Waggoner

14    and Triantifillo stated that they did not recall Willis

15    wearing gloves at any time during this incident.  So

16    stipulated?

17            MS. CHEVLIN:  So stipulated.

18            MS. JHA:  If I can have a moment, Your

19    Honor?

20            THE COURT:  Sure.  Really think that

21    stipulation only goes to Triantifillo.  First guy

22    said --

23            MS. JHA:  Correct.  Right.

24            THE COURT:  Excuse me?

25            MS. JHA:  That's just to perfect our

1    impeachment.

2            THE COURT:  As I was saying, I think the

3    impeachment is only to Triantifillo.  Waggoner, if my

4    notes and recollection -- I am really now going from my

5    recollection, he says he didn't recall seeing gloves.

6            MS. JHA:  That's correct, Judge.  The

7    impeachment was misdirected towards Officer

8    Triantifillo.

9            THE COURT:  Okay.

10           MS. JHA:  Your Honor --

11           THE COURT:  So as to the stipulation as to

12   what Waggoner and Triantifillo told March, it should

13   really just be to Triantifillo.

14           MS. CHEVLIN:  Yes, Judge.

15           MS. JHA:  Yes, Judge.

16           THE COURT:  Okay.

17           MS. JHA:  Your Honor, I have had several

18   opportunities to speak with my client including today

19   and on numerous other occasions regarding what our

20   defenses will be.  It's at this time, that I believe

21   that we are in agreement that we will not be calling

22   witnesses on his behalf, nor is he choosing to testify

23   on his own behalf.

24           THE COURT:  Mr. Willis, have you had an

25   opportunity to discuss the testimony as it's been

—78—

1    offered so far with your attorneys?

2              DEFENDANT WILLIS: Yes.

3              THE COURT:  Have you had an opportunity to

4    discuss their impressions of the way this testimony has

5    come in?

6              DEFENDANT WILLIS: Yes.

7              THE COURT:  Have you had an opportunity to

8    ask questions and participate in your defense of this

9    case?

10             DEFENDANT WILLIS: Yes.

11             THE COURT:  Have you discussed your

12   exclusive right to testify on your own behalf with your

13   attorneys?

14             DEFENDANT WILLIS: No.

15             THE COURT:  Okay.  Take that opportunity

16   now. Did you understand my question?

17             DEFENDANT WILLIS: I understand it now.  No,

18   I didn't understand it.

19             THE COURT:  Did I put it badly?  You have

20   the right to determine if you will testify on your own

21   behalf.  Do you understand that?

22             DEFENDANT WILLIS: Yes.

23             THE COURT:  I'm not suggesting that you

24   disregard the advice of counsel, but you need to know

25   that the choice to testify is yours and yours alone.  Do

1    you understand that?

2            DEFENDANT WILLIS: Yes.

3            THE COURT:  Have you discussed that right

4    with your attorneys?

5            DEFENDANT WILLIS:  No.

6            THE COURT:  Okay.  Do you want to testify?

7            DEFENDANT WILLIS: No.

8            THE COURT:  Did your attorneys at any time

9    tell you you have the right to testify?

10           DEFENDANT WILLIS: Yes.

11           THE COURT:  Did they at any time tell you

12   you have the right not to testify?

13           DEFENDANT WILLIS: No.

14           THE COURT:  Okay.  You've had an opportunity

15   to talk to your counsel, do you understand that the

16   decision to testify or not testify on your behalf, is

17   yours and yours alone?  Do you understand that?

18           DEFENDANT WILLIS: Yes, sir, I do.

19           THE COURT:  Do you want some time to

20   consider whether you want to testify or not testify?

21           DEFENDANT WILLIS: No, I don't.

22           THE COURT:  Are you prepared to make that

23   choice now?

24           DEFENDANT WILLIS:  Yes.

25           THE COURT:  Sir, do you want to testify

1    today?

2                  DEFENDANT WILLIS: No, sir.

3                  THE COURT:  This is the only opportunity you

4    will have to testify.  Do you understand that?

5                  DEFENDANT WILLIS: Yes.

6                  THE COURT:  Okay.  All right.  With that,

7    the defense rests?

8                  MS. JHA:  Your Honor, yes, we just ask that

9    Defense Exhibits 2 and 3 be admitted into evidence.

10                 THE COURT:  Any objection?

11                 MS. CHEVLIN:  No, Judge.

12                 THE COURT:  They'll be received into

13   evidence.  Somebody just want to bring me all the

14   exhibits?

15                 MS. CHEVLIN:  Sure, Judge.

16                 THE COURT: Okay.  Closing arguments, please.

17                 MS. CHEVLIN: Yes, Judge.

18                       CLOSING ARGUMENTS

19                    BY MS. CHEVLIN:

20                 Your Honor, what you heard is that on the

21   date of September 22, 2006, Officer Wagner and Officer

22   Triantifillo, responded to the vicinity of 839 North

23   Keystone because they received a call of a man with a

24   gun.

25                 Now, when they received that call, there was

1    a description that was given of an African-American male

2    who was wearing a white T-shirt, dark or dark colored

3    pants or jeans, that he had some kind of black covering

4    on his head.  I believe the initial call was maybe a

5    black baseball cap.

6              And then when they arrived on the scene,

7    they parked their car in the alley right about 841 North

8    Keystone and then proceeded up the gangway of 839 North

9    Keystone, which was the location that was called in.

10             Your Honor, as they went down that gangway,

11   they went towards the front and as they got to the mouth

12   of the gangway, what they see is there is a couple of

13   people on the porch and they also, at the same time, see

14   the defendant.  They see the defendant is on the

15   sidewalk in front of that location, he's standing there

16   with a female.  Officer Waggoner remembers that that

17   female had on a red shirt.  Officer Triantifillo

18   described it was a maroon shirt.  Nevertheless, the

19   defendant's standing in front of the location with a

20   female.  As soon as they got to the mouth of the

21   gangway, these officers hit their flashlights, they

22   announced they're officers, they were both yelling at

23   the same time, "Police, police," notifying all the

24   individuals on the street of their presence and of their

25   office.

—82—

1      And as they are announcing their office and

2  coming out of that gangway, what the officers see from

3  approximately ten to twelve feet away, Officer Waggoner,

4  and ten to fifteen feet away, Officer Triantifillo, is

5  they see this defendant reach into his waistband and

6  remove what they see is a large revolver, large handgun,

7  retrieved from his waistband.

8      And the officer saw this defendant with that

9  large caliber revolver in his right-hand, again from

10  approximately ten to fifteen feet away.  Now, in the

11  mean time, Officer Coleman and Officer Granado were also

12  were on route, responding to this location from the

13  district.          The same amount of time, 45 minutes

14  or so, they also --  Officer Coleman saw this defendant

15  on that same sidewalk talking to a female. And what

16  would draw his attention to the defendant, and there is

17  also the fact that he sees Officer Wagner and

18  Triantifillo coming towards him out of that same

19  gangway, guns drawn, announcing their office, and the

20  defendant fleeing northbound on Keystone.

21      Now the Officers Waggoner and Triantifillo

22  repeatedly ordered the defendant to drop his weapon and

23  they pursue this defendant as he flees northbound with

24  that weapon.  And you have heard from both Officer

25  Waggoner and Triantifillo, who testified that as the

1  defendant's fleeing northbound on that -- onto Keystone,

2  at approximately 847, there the officers are

3  approximately at 847, the defendant is now a little bit

4  ahead of them at approximately 851.

5          The defendant is turning towards Officer

6  Waggoner and Officer Triantifillo.  And he raises his

7  handgun as they described it over his left shoulder with

8  his right hand holding that weapon towards Officer

9  Waggoner and Officer Triantifillo, and at this point,

10  approximately 30 feet away or so from the defendant.

11          And Your Honor, when Officer Waggoner faces

12  the end of the defendant's handgun, from approximately

13  30 feet away, Officer Waggoner, in fear at this point,

14  he is in fear not for his own safety, but for citizens

15  on the block as well as his partner Officer

16  Triantifillo, and he fires a single safety shot at the

17  defendant while he is standing at approximately 847

18  North Keystone.

19          He fires that shot with his 9-millimeter

20  semi-automatic duty weapon. When he fired that shot, he

21  inflicted a graze wound to the defendant's left hip, and

22  it's only then that the defendant let go of his weapon.

23          When he was shot with the officer's weapon,

24  the defendant, as the officers testified, put his weapon

25  -- drops from his hand, it hits a fence and then falls

1    into the grassy area.

2          That weapon is immediately recovered by

3    Officer Triantifillo.  The defendant attempts a few more

4    steps but eventually stumbles and is apprehended by

5    Officer Coleman, Officer Granado as well as Officer

6    Waggoner, at approximately 853 North Keystone.

7          Your Honor, you also heard that assisting

8    units assigned, they also arrived to protect and canvass

9    the scene.  And what that canvass revealed as you heard

10    through the stipulations was that there were multiple

11    shots being fired earlier that day.

12          And also, you heard from Detective Matias.

13    He testified that when he arrived to assist in this

14    investigation, he came upon the defendant.  It was at

15    that time receiving treatment by the EMS personnel on

16    the scene, that he also, subsequently recovered from the

17    hospital personnel the clothing that he observed the

18    defendant had in the hospital.

19          When he inspected that clothing, what he

20    found were six, 357 live cartridges, within the right

21    pants pocket of the defendant's pants, that these pants

22    are bloody, consistent with the same clothing that he

23    saw the defendant in earlier.

24          And also that there were a pair of Latex

25    gloves which were in the left-front pocket of the

1    defendant's clothing.  Your Honor, you also heard about

2    the ballistic evidence --

3              THE COURT:  Actually, I don't know that

4    Matias talke about the latex gloves.  I know the

5    evidence technician did.

6              MS. CHEVLIN:  He did, sir.  He said that he

7    found them in the left front pocket.

8              THE COURT:  Okay.

9              MS. CHEVLIN:  And then he also kept those

10   items in his constant care, custody and control and

11   subsequently, handed them over to Investigator Shader at

12   Area 4 for proper inventory.

13             Your Honor, you heard all the firearms

14   evidence which was recovered from the scene and

15   documented by Investigator Shader.  You also heard the

16   stipulation as to what the lab results were for the

17   firearms evidence that was recovered.  And basically,

18   Judge, what it all boils down to, is that all of the

19   other casings that are recovered aside from a single

20   9-millimeter cartridge casing, that was found in the

21   back area of 847 North Keystone, they're unrelated to

22   this particular case.

23             But when you look also at that 9-millimeter

24   casing, which was discharged by Officer Waggoner, who

25   fired the safety shot, you have, again, the consistency

1   of that cartridge casing, that single cartridge casing

2   was of the same manufacturer, as that time of his

3   remaining 15 cartridges contained within his duty

4   weapon.

5          So what you have, Judge, is that that single

6   9-millimeter cartridge casing which was shown by more

7   than two, in the photograph depicted is the officer's

8   safety shot that was fired at the defendant.  Again,

9   with that manufacturer being WCC plus P, plus 05, that

10  was also consistent with the testimony of Investigator

11  Shader as to his inspection of the officer's duty

12  weapon.

13         You also have the testimony, Judge, of

14  again, Officer Coleman, who testified that he observed

15  this defendant, again, at the same time that the

16  officers were emerging from the location.

17         They observed this defendant in the same

18  area that the officers said he first encountered the

19  defendant, in that he saw him three -- he saw this

20  defendant with this same handgun which he believed to be

21  a handgun that the defendant was retrieving from his

22  waist as he fled northbound on Keystone.

23         When he testified as saw -- when he had

24  sight of the defendant that he did see him running and

25  turning and holding that weapon in his waist until the

1    defendant was actually apprehended.

2           And then he testifies to the fact that

3    because they moved ahead of the defendant in an attempt

4    to cut off his escape route, he does in fact lose sight

5    of the defendant for a little while, but nonetheless

6    sees the defendant with the handgun, hears the shot

7    fired, and then sees Officer Waggoner with the

8    defendant.  And at that point, they go to assist and

9    they arrest this defendant.  Your Honor based on --

10          THE COURT:  Well, my recollection of his --

11   of the redirect is such that the officer says he lost

12   sight of the suspect momentarily and really didn't know

13   which way the man turned.

14          MS. CHEVLIN:  But he -- right.  But he was

15   not -- but his eyes were not on the defendant, that's

16   correct.  So it was a period, that I think he testified

17   that --

18          THE COURT:  I think that negated his

19   testimony.  It just made him appear, to me, to be -- he

20   first testified that although his back was -- the

21   suspect or you could say the defendant -- the

22   defendant's back was to the officer.  Or let me put it a

23   little more appropriately:  The officer's vantage point

24   of the fleeing suspect, was the rear of that suspect.

25          And that while the suspect was running,

1    according to the officer, he observed the suspect remove

2    from his waistband a shiny object he made this

3    observation while the suspect was turning to his right.

4              On redirect, the officer now says that there

5    was a point in time when he momentarily lost sight of

6    the suspect and he didn't know which way the suspect

7    turned.  Is that correct?

8              MS. CHEVLIN:  Well, Judge, I think he --

9    what he testified was that as he goes to pass him up,

10   that's when he loses sight of the defendant, and to cut

11   off the escape route and at that -- during that

12   particular period of time, when he passes up the

13   defendant and doesn't have sight of him, he doesn't know

14   which way if at all he may have turned his body.

15             THE COURT:  So the suspect turned twice?

16             MS. CHEVLIN:  Well, Judge you offered --

17   well, now, are you asking from whose perspective?

18             THE COURT:  Well, is there a reasonable

19   inference, from Officer Coleman's testimony, or is it

20   the State's suggestion that this person turned twice and

21   one of those two times, Coleman couldn't tell which

22   direction the suspect turned?

23             MS. CHEVLIN:  Yes, Judge.  Yes, because,

24   again, as Officer Coleman testified as he is -- well, he

25   actually sees the defendant.

1          THE COURT:  So the first he saw him turn, he
2     turned to the right?
3          MS. CHEVLIN:  I believe he testified that
4     that's what he did, right.
5          THE COURT:  And the second time, he
6     turned --
7          MS. CHEVLIN:  He didn't know --
8          THE COURT:  Right.
9          MS. CHEVLIN:  -- whether or not he did turn
10    at all or --
11         THE COURT:  Right.
12         MS. CHEVLIN:  -- which way, if any, he may
13    have turned.
14         THE COURT:  And so Waggoner and the other
15    officers, see him testify -- the point is, that was a
16    bad question to try to rehabilitate the guy by pointing
17    at nothing.  It's of no value.
18         MS. CHEVLIN:  Well, your Honor --
19         THE COURT:  It caused him -- it left him to
20    be a liar.
21         MS. CHEVLIN:  Your Honor, respectfully, the
22    reason why that was brought up on redirect, was because
23    Officer Triantifillo and Officer Waggoner testified that
24    when the defendant is actually --
25         THE COURT:  Oh, I know.

1          MS. CHEVLIN:  -- pointing the weapon at

2    him --

3          THE COURT:  It's over his left shoulder.

4          MS. CHEVLIN:  Pointing the weapon at them,

5    it's over the defendant's left shoulder.

6          THE COURT:  Oh, I know why you did it.

7    Yeah, I know that.  And Coleman's testimony was

8    inconsistent with that.  And so now, you brought him

9    back to say, Oh, well, I don't really know which way he

10   turned.  Now, I hear you saying, Well, he turned twice.

11         MS. CHEVLIN:  Your Honor, I think there's a

12   --

13         THE COURT:  And guess what?  If he turned

14   twice, then Waggoner and the other gentleman missed one

15   turn.

16         MS. CHEVLIN:  But, your Honor, I don't

17   believe so, respectfully, because --

18         THE COURT:  Okay.

19         MS. CHEVLIN:  -- then, Officer Waggoner --

20         THE COURT:  Well, they didn't testify about

21   two turns.

22         MS. CHEVLIN:  When Officer Waggoner and

23   Triantifillo testified, and it is in the transcript, as

24   the defendant flees, he is turning towards them.

25   There's a difference between him running and looking

1   over his shoulder versus actually turning over his --

2   turning to his left, and pointing the weapon at them.

3           THE COURT:  Okay.

4           MS. CHEVLIN:  They see him retrieve the

5   weapon, and he flees, and he is looking -- and he's

6   running, fleeing, he's going northbound on Keystone.

7           THE COURT:  Yeah.

8           MS. CHEVLIN:  But I think when they specify

9   to where they draw it out is when the defendant is

10  actually turning the weapon upon them, which causes

11  Officer Waggoner to fire his safety shot.  At that

12  point, that's when he's turning left.

13          And it is consistent, Judge, also what

14  Officer Coleman is saying that they -- the next thing

15  they know, is that they hear a gunshot.  They don't see

16  when, who or how that gunshot is fired.  I mean, your

17  Honor, if you look even at Officer Waggoner's

18  testimony --

19          THE COURT:  On Page 14?

20          MS. CHEVLIN:  Well, on 13, Judge, he's

21  talking about the different view he had of the defendant

22  --

23          THE COURT:  Okay.

24          MS. CHEVLIN:  -- even though the

25  defendant --

1          THE COURT:  Tell me about where he's

2   running, turning, and all of that.

3          MS. CHEVLIN:  Well, your Honor, what he says

4   is, when asked after --

5          THE COURT:  Which page are we on?

6          MS. CHEVLIN:  I'm on 13, Judge.

7          THE COURT:  Okay.

8          MS. CHEVLIN:  "After the defendant fled

9   northbound -- well, actually, after the defendant pulled

10  out the revolver, what view of the defendants do you

11  have?

12          Answer:  I hit his right side, his rear, and

13  then his right side."  That in itself shows that this

14  defendant is -- he's not just walking straight.  He --

15  this officer's getting different views of this defendant

16  because he is moving.  He's not walking straight forward

17  as he is fleeing northbound --

18          THE COURT:  I'm sorry.  I -- my transcript

19  failed to suggest anywhere where he turned.  That's the

20  vantage point that the officer had.  Where did -- where

21  does it say he turned?

22          MS. CHEVLIN:  Your Honor, I think from him

23  saying, I had his right side, his rear, and then his

24  right side, shows that he's moving; that he's not

25  stationary.

—93—

1          THE COURT: Well, I'm looking at her rear on

2  her right side, my court clerk. She's sitting there

3  like a potted plant. What kind of plant would you be?

4          COURT CLERK: I don't know.

5          THE COURT: Okay. Bad question. Bad

6  question. You just led the guy to -- Officer, are you

7  sure or -- no, I'm really not sure. Bad question.

8          MS. CHEVLIN: And I think based on, again,

9  the testimony that you have heard from these officers,

10  and from the ballistic evidence and from all the

11  evidence that was either stipulated to or just

12  documented in this photograph or in the stipulations

13  that were presented to your Honor, the State has been

14  able to show that this defendant was proved guilty

15  beyond a reasonable doubt of all the charges that are

16  before you.

17          You've heard from the officers, Waggoner and

18  Triantifillo went through -- what they observed from

19  this defendant when they responded to this call, as well

20  as Officer Coleman, who again, responded on his own with

21  his partner and observed a portion of this incident and

22  was consistent with the testimony of Officers Waggoner

23  and Triantifillo which you heard throughout this trial.

24          And, your Honor, based on that, we would ask

25  that you find the defendant guilty.

1          THE COURT:  Okay.  Defense.

2              CLOSING ARGUMENTS

3              BY MS. JHA:

4          Your Honor, I can't imagine the mindset of

5   these police officers when they approach 839 North

6   Keystone that evening.  There had been calls of shots

7   fired all night long.  I'm sure that wasn't the first

8   that they had heard of them.

9          They came there, they were dressed in their

10  battle dress uniforms.  Their guns were drawn as they

11  came up the alley.  They were expecting to find a man

12  with a gun.  They were expecting a dangerous situation.

13  And clearly, there was one as you can see from all the

14  casings that were recovered from the scene.  This was

15  definitely a hot area.  But sometimes, your Honor, all a

16  cowboy sees are the cows.

17         And these officers, when they came out

18  there, with (sic) that alley with their guns drawn

19  expecting a weapon, maybe Waggoner thinks he saw one,

20  and he fired.  He fired and he shot Antoine Willis.

21         And when they approached Antoine Willis and

22  Antoine Willis was lying there on the ground, I submit

23  to you, they needed to get a gun.  And they needed to

24  get bullets.  Because they shot an unarmed man on the

25  streets of Chicago that night.  And that put them in a

1     tough situation and a tough spot.

2             And if you look at the testimony of these

3     officers, in line with the physical evidence in this

4     case, you can see that their testimony cannot possibly

5     be true.

6             Officers Waggoner and Triantifillo, I think,

7     somewhat consistent with each other, are saying that

8     Antoine Willis is allegedly running northbound, away

9     from them. And that he turns to his left, and over his

10    right shoulder, is pointing what they testified to was a

11    weapon at these officers.

12            THE COURT: Over -- he turns to his left?

13            MS. JHA: Turns to his left and with his

14    right arm is allegedly pointing --

15            THE COURT: Oh, with his right arm. I

16    thought --

17            MS. JHA: Right.

18            THE COURT: -- you said over his left

19    shoulder. Okay.

20            MS. JHA: Now, the officer testified the one

21    thing, the exact angle that Antoine Willis was at, we

22    don't know. But what was made clear is that he was not

23    facing him directly, and he was not directly running

24    away from him.

25            You heard a stipulation today that Antoine

1    Willis has a grazed gunshot wound to his left hip, which

2    means that the physical evidence directly contradicts

3    the testimony of both those officers, with respect to

4    his wounds.

5         Maybe he -- he's running away or he's

6    running towards them according to his gunshot wound, but

7    he is definitely not turning to the left, raising a

8    weapon.

9         The physical evidence is contradicted in

10   other ways as well, your Honor.  Let's talk about this

11   gun that was recovered.  You have pictures of the gun,

12   it is caked in mud.  Witnesses have testified to it.

13   They talked about the condition of the clothing that was

14   allegedly recovered from Mr. Willis.

15        There's been no testimony, whatsoever, that

16   there was any dirt on his clothing, from that weapon

17   having supposedly been in his pants.

18        THE COURT:  Oh, I thought -- okay.  There is

19   an explanation for the mud.

20        MS. JHA:  Well, your Honor, I'm submitting

21   that there's no mud.  There was no testimony of any mud,

22   on Mr. Willis' clothing that would corroborate the mud

23   --

24        THE COURT:  Okay.

25        MS. JHA:  -- that was on the gun.

1          THE COURT:  Okay.

2          MS. JHA:  I would also submit that if Mr.

3    Willis had allegedly just tossed a weapon and it had

4    landed on the ground and it had been immediately

5    recovered, that that weapon would not be caked in mud,

6    and jammed into the barrel of that gun.  That it would

7    not appear that way, because according to the officers'

8    testimony, supposedly it's recovered seconds later.

9    It's not that it was laying out there on the dirt.

10          And why, your Honor, don't you see any

11   documentation of the gun at the scene.  You heard that

12   there were 40 to 50 officers that came and that

13   responded.  The scene was secured.  They took the

14   trouble to document each --

15          THE COURT:  Who said that, there were 40 to

16   50?

17          MS. JHA:  The investigator when he got

18   there.  The -- Shader that testified.  That when he got

19   there -- but as your Honor knows also, several officers

20   responded to this scene.

21          There were several officers that were

22   responding to the call of shots fired and eventually --

23          THE COURT:  You know how many I know?  I

24   mean, let's not speak in general terms.  What does the

25   evidence say about how many we know responded?

1           MS. JHA:  Four.

2           THE COURT:  Okay.

3           MS. JHA:  Initially.

4           THE COURT:  Right.

5           MS. JHA:  And several others after that.

6   There is no --

7           THE COURT:  We don't know when after that,

8   right?

9           MS. JHA:  I don't know offhand.  I don't

10  know offhand from --

11          THE COURT:  Right.  Because it's not in

12  evidence.

13          MS. JHA:  The -- regardless, your Honor,

14  there is no reason why they had to disturb the scene as

15  far as where this weapon was recovered.

16          They have carefully documented each and

17  every item that was recovered.  They photographed it.

18  They have put markers on it.  They did a video.  The

19  only item of evidence that was not documented on the

20  scene was the most critical piece of evidence in this

21  case.  And that's the weapon that was supposedly in

22  Antoine Willis' hand.  That's the only thing that's not

23  documented on the scene.

24          Furthermore, I think the purpose of Officer

25  Coleman's testimony today, and I think you sort of

1    alluded to it during Ms. Chevlin's argument, he

2    impeached the testimony of Officer Waggoner and Officer

3    Triantifillo, who have him turning to his left and

4    raising a weapon, and he's got him turning to his right.

5           Officer Waggoner, patted Antoine Willis down

6    before he was taken away by the ambulance.  He testified

7    that he didn't go in his pockets, but he patted Antoine

8    Willis down.

9           And I submit to you that if there were six

10   bullets -- this isn't just one getting lost in there,

11   but one, two, three, four, five, six bullets in his

12   pocket, that they would have been recovered right there

13   and then.

14          There is no fingerprint evidence in this

15   case.  There were no latent prints that were suitable

16   for comparison.  You that from the physical evidence.

17   And Antoine did not match the description in this case

18   of the person with the gun.

19          He had on black jeans, he had on a black

20   do-rag.  The description was of a man in a black hat,

21   with blue jeans, and a white T-shirt.

22          Also, your Honor, you haven't heard from any

23   civilian witnesses.  We don't know where this female is.

24   The firearm evidence, the casing, it just shows that it

25   wasn't fired from either weapon in this case.  I don't

1    really think it adds or takes away everything.

2             What you have here, your Honor, is the

3    physical evidence contradicting the testimony of the

4    officers.  And it's the testimony of officers -- it's

5    only -- the testimony of the officers, is the only thing

6    that puts a gun in Antoine Willis' hand.  And if you

7    cannot trust the testimony of those officers, and you

8    can't based on the physical evidence and you can't based

9    on the impeachment, you must have reasonable doubt that

10   Antoine Willis ever possessed a gun on that evening.

11            There is motive here, it might even be

12   understandable, why Officer Waggoner fired his weapon,

13   but the motive is that the Chicago Police Department

14   cannot afford politically to take a hit of shooting an

15   unarmed man.  Your Honor, on all counts but specifically

16   the State hasn't proved up a 90 conviction.  I'm not

17   sure which count that is offhand, but on all counts, the

18   bottom line is, is that you should not believe beyond a

19   reasonable doubt that Antoine Willis was in possession

20   of a firearm; that he was in possession of any bullets

21   or any ammunition, and we're asking that you find

22   Antoine Willis not guilty on each and every count.

23            THE COURT:  Lorna.

24            MS. CHEVLIN:  If I can have one moment,

25   Judge.

—101—

```
 1                    FINAL CLOSING ARGUMENTS

 2                       BY MS. CHEVLIN:

 3              Just a couple of things.  First of all, with

 4    respect to the consistency of Officer Coleman and how he

 5    was indeed consistent with what Officer Coleman -- or

 6    Waggoner and Triantifillo had testified to, and I would

 7    point your Honor to the transcript of Officer Waggoner,

 8    page 46, where Officer Waggoner does testify to the fact

 9    that this defendant did turn to his right when he first

10    starts to flee to go northbound.

11              And he is fleeing from the officers as

12    they're going -- emerging from the gangway and he sees

13    the defendant, which is entirely consistent with what

14    Officer --

15              THE COURT:  Where are we?  Okay.

16              MS. CHEVLIN:  Just Officer Waggoner, page

17    46.

18              THE COURT:  Okay.  Go on.

19              MS. CHEVLIN:  Which is entirely consistent

20    with when Officer Coleman also saw this defendant as he

21    started to flee, he started turning toward his right.

22    We point your Honor to line number 18, you say that he,

23    well, you shout this and he turned to his left.

24              Answer:  He turns to his right.

25              THE COURT:  And runs.
```

1          MS. CHEVLIN: Yes, Judge. And it is --

2          THE COURT: He's not turning. He didn't

3 turn to his right while he's running. That's what

4 Coleman's talking about. He turns to his right, which

5 is northbound, and runs.

6          MS. CHEVLIN: But what Officer Coleman is

7 saying is that when he gets there and there -- it's all

8 happening at the same time, he's turning towards these

9 officers as he is fleeing. And that's exactly what

10 Officer Waggoner and Triantifillo are testifying to.

11          THE COURT: I wouldn't say one more word

12 about it, but -- go ahead.

13          MS. CHEVLIN: Your Honor, also note that

14 when he describes Officer Triantifillo also testifying

15 about how when he sees this offender with the weapon,

16 the defendant is going northbound and he has a right

17 side profile of the defendant, which is also consistent

18 with what Officer Coleman said. That, again, this is on

19 page 75 with Officer Triantifillo. In which direction

20 was he turning when you allegedly saw this weapon? And

21 this is also the time that he is fleeing.

22          Answer: He turned northbound and then I had

23 a side -- a right-side profile of him. Pulled the

24 weapon, he turned and as he was turning, he pointed the

25 weapon and proceeded to run northbound. So your Honor,

1    these are all in one -- within seconds of him --

2         THE COURT:  Lorna, trust me, I got it.  I

3    got it.  And I'm not going to be fooled.  I got it.

4         MS. CHEVLIN:  Your Honor, what counsel wants

5    you to believe is that this is just some huge conspiracy

6    by all the officers ranging from Officer Waggoner,

7    Officer Triantifillo and Detective Matias, which he

8    arrives to  assist and accompanying the defendant to the

9    hospital, that they are coming up with guns, looking for

10   -- somehow coming up with a gun to plant on the

11   defendant, they are somehow coming up with bullets to

12   shove into his pocket.

13        It is ridiculous, your Honor.  There was no

14   reason, there is no evidence to believe that any of

15   these officers engaged in any kind of misconduct,

16   because that's what they want you to believe, they want

17   you to believe that these off -- every single one of

18   these officers, when everyone there responded, were

19   there simply to pin this case on this defendant.

20        It simply defies not only common sense, but

21   it defies the ballistic evidence that you have before

22   you.  And, your Honor, respect to the defendant's graze

23   wound on his left hip, again, that's consistent.  As the

24   defendant is turning to his left, and firing that -- or

25   showing that weapon towards Officer Waggoner, that's why

1    he has a graze wound on his left side. So his injury's

2    actually consistent with what the officers testified as

3    to when he fired the safety shot.

4          The fact that this gun, Judge, is caked in

5    mud, that is also consistent with what the officers

6    stated happened after they fired that safety shot; that

7    it bounced off the fence and ended in the grassy area.

8          So what now? Are they also then rubbing mud

9    on this weapon to engage in this huge conspiracy that

10    the defense wants you to believe that these officers are

11    doing.

12          And I believe when Officer Waggoner

13    testified as to when he was able to apprehend the

14    defendant, that what he does at that time is to search

15    for weapons. He is not looking for anything other than

16    additional weapons on this defendant, which is

17    consistent with the fact that they did not at that time

18    recover the additional bullets, which are found in his

19    pants.

20          Your Honor, again, you have as you have

21    (sic) consistent, credible testimony from these

22    officers, from Officer Coleman, who corroborates what

23    Officer Waggoner and Triantifillo stated, how the events

24    unfolded on this night in question.

25          Your Honor, again, you have the ballistic

—105—

1    support, what the officer's state as to where, when and

2    how these events unfolded throughout that evening before

3    the defendant was apprehended.  Your Honor, based on all

4    of the testimony, all the exhibits that you have, the

5    fact that the officers whether it be Coleman or

6    Triantifillo or Waggoner are also able to note on the

7    photographs where they observed this defendant during

8    the response.

9              They're all consistent in their testimony.

10   Your Honor, based on that, we would ask that you find

11   the defendant guilty.

12             THE COURT:  Okay.  Thank you both.  I heard

13   a whole lot of gobbledygook that was of no consequence.

14   I heard about holding a flashlight between the left and

15   right, third and fourth philangyon the posterior of the

16   turtle's butt and it's not cute.  It's not cute at all.

17   You'd lose anybody.  It's of no value.  Strike that.  It

18   has -- it only gets this result.  That's the value of

19   it.

20             What is a BDU?  You don't know what that

21   means?  And then, on the cross-examination, it gets

22   better because you know what the officer said?  They

23   tell me to put it on and I wear it.

24             And we're going to beat Coleman over the

25   head.  Classic examples of just talking about going way

—106—

1 out for a little bitty point in each case.  This

2 flashlight stuff had no value.  Just to piss people off.

3 That's all it would do.  I think this was a no-brainer.

4 I might be missing it.

5   There is a conspiracy of at least four

6 police officers.  Waggoner and his partner, Coleman,

7 who, if he is going to be in a conspiracy, kind of

8 screwed it up, and Matias who says he recovered these

9 six bullets.

10   So somewhere along the line, not only do the

11 police come up with a handgun, but they got six extra

12 bullets to put in the man's pocket.  Was the projectile

13 recovered from the Pontiac or the truck?

14   MS. CHEVLIN:  Judge, I don't believe that

15 they were able to.

16   THE COURT:  I don't remember any testimony

17 about projectiles being recovered from the Pontiac or

18 the truck.

19   MS. CHEVLIN: They were unable to recover

20 them, Judge.

21   THE COURT:  And so, when we suggested -- the

22 only thing that was not accounted for, their handgun,

23 that's not exactly right.  There were some other things

24 that weren't accounted for.  That, being these other two

25 projectiles.

1     For some reason, Mr. Willis starts to run or

2  maybe he wasn't running, maybe the police just walked up

3  and shot him.  As I recall, looking at these officers, I

4  don't recall any saliva drooling from their lips.  Their

5  eyes appear to be normal, their demeanor was normal.

6     They didn't seem to be raving lunatics.  So

7  now we have either they shot Mr. Willis while he is

8  running, for no apparent reason, or maybe they shot him

9  when he was walking.  They did nothing to these other

10  two guys.  Didn't even lock them up.  As we closed the

11  loop on this conspiracy, I say these other two guys, I'm

12  making reference to the two people who were supposed to

13  be on the porch.

14     I believe that it is possible to suffer the

15  wound that Mr. Willis experienced according to the

16  stipulation, while effectuating the motion that two of

17  the three officers say they saw him perform.  This whole

18  thing about Coleman, seeing the officers turn -- seeing

19  Mr. Willis turn to his right is impeachment.  But it all

20  has a relative value.

21     And the proof is proof beyond a reasonable

22  doubt; not all doubt.  Now he is giving testimony as

23  part of this cover-up in the conspiracy, a year and a

24  half later, and he says right instead of left.

25     I was surprised I did not hear in rebuttal,

1    well, don't you think you could have told a better lie

2    than that?  But we didn't hear that.  Valid question.

3              There may have been a conspiracy.  But I

4    don't see it.  Defendant is charged with an arm -- being

5    armed -- with the offense of armed, habitual criminal.

6    He has, according to the stipulation, been convicted of

7    unlawful use of a weapon by a felon and delivery of a

8    controlled substance --

9              MS. JHA:  That wasn't a stipulation, that

10   was --

11             THE COURT:  I'm sorry.  I'm sorry.  That is

12   a matter of his certified conviction.  Thank you.

13   Delivery is an offense greater than a Class 3.  I

14   believe that those two convictions alone or together

15   with this Court's finding that he did, in fact, possess

16   the handgun is sufficient to find him guilty of that

17   count.

18             He's charged with aggravated, unlawful use

19   of a weapon; count 2 there is a finding of guilty; count

20   3 -- finding of guilty as to Count 3; finding of guilty

21   as to counts 4, 5, 6, --

22             MS. CHEVLIN:  Five through twenty-one was

23   nolled.

24             THE COURT:  I'm sorry.  Thank you.

25             Count 22 alleges unlawful use of a weapon by

—109—

1    a felon; finding of guilty.  That's on the 02 case.

2    Count 23 alleges unlawful use of a weapon by a felon

3    pursuant to a '98 conviction; finding of guilty.  Count

4    24 is based on a '95 conviction, finding of guilty.

5    Count 25, based on a '93 conviction, finding of guilty.

6            MS. CHEVLIN:  Your Honor, I did not submit a

7    certified for the --

8            THE COURT:  For '90?  There is a finding of

9    not guilty as to count 26.  As to count 27, there is a

10   finding of guilty alleging aggravated assault.  Count 28

11   is finding of not guilty.  Bond is revoked, presentence

12   investigation shall be ordered.

13           MS. JHA:  I'll prepare the presentence

14   investigation.  We need a date within 30 days for me to

15   file my Motion for New Trial.

16           THE COURT:  You name it.  Take back your

17   exhibits.  What date do you want?

18           MS. JHA:  Just do the 30th, April 30th?

19           THE COURT:  Okay.  21 through 26.

20           MS. JHA:  April 30?

21           THE COURT:  Okay. Matter is continued until

22   April 30th, for presentence investigation shall be

23   ordered.  Bond is revoked.

24           (Whereupon, the above-entitled cause was

25           continued to the 30th day of April, 2008.)

```
1   STATE OF ILLINOIS  )

2                      )

3   COUNTY OF C O O K  )

4

5

6              I, LADONNA GRAY, an Official Court Reporter

7   for the Circuit Court of Cook County, do hereby certify

8   that I reported in shorthand the proceedings had at the

9   hearing of the above-entitled cause; that I thereafter

10  caused the foregoing to be transcribed into typewriting,

11  which I hereby certify to be a true and accurate

12  transcript of the proceedings before the Honorable

13  MARCUS R. SALONE, Judge of said court.

14

15

16                          _____
                            Official Court Reporter
17                          License No. 084-1558

18

19

20  Dated this 16th

21  of February, 2009.

22

23

24

25
```

—111—