# Exhibit D

1    STATE OF ILLINOIS )
                       )   SS.
2    COUNTY OF C O O K )

3            IN THE CIRCUIT COURT OF COOK COUNTY
4              COUNTY DEPARTMENT - CRIMINAL DIVISION

     THE PEOPLE OF THE      )
5    STATE OF ILLINOIS      )
                            )
6        VS                 )
                            )   Indictment No.  06 23138
7                           )
                            )   Charge:  Armed Habitual
8    ANTOINE WILLIS         )            Criminal
                            )
9

10                 REPORT OF PROCEEDINGS

11       BE IT REMEMBERED that on the 17th day of July

12   A.D., 2008, this cause came on for hearing before the

13   Honorable MARCUS R. SALONE, Judge of said court.

14       APPEARANCES:

15           HON. RICHARD A. DEVINE,
             State's Attorney of Cook County, by:
16           MS. LORNA AMADO CHEVLIN,
             Assistant State's Attorney,
17               appeared on behalf of the People;

18           HON. EDWIN A. BURNETTE,
             Public Defender of Cook County, by:
19           MS. LAKSHMI JHA,
             Assistant Public Defender,
20               appeared on behalf of the Defendant.

21

22

23   Brenda D. Hayes, CSR, 084-001226
     Official Court Reporter
24   2650 S. California Ave.
     Chicago, Illinois  60608

                          1

1

I N D E X

2

Date of Hearing: 7-17-08

3

Page Numbers: 1 - 23

4

PROCEEDINGS

5

| | Page | DX | CX | RDX | RCX | FRDX | FRCX |
|---|---|---|---|---|---|---|---|

6

Motion For New
Trial         3

7

8

9

Sentencing   20

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

2

1           THE CLERK:  Antoine Willis.

2           THE COURT:  Okay.  Who is next?

3           MS. JHA:  Judge, before you is Antoine Willis.

4   I believe Miss Chevlin is here on this case.

5             Your Honor, I'm asking leave to file an

6   amended motion for a new trial.  I'm resting on the

7   written motion.  I also, Judge, have prepared -- There

8   were a lot of amendments to the Presentence Investigation

9   Report.  In going over it with Antoine I wrote on mine

10   and prepared copies for both you and the State.  I'd ask

11   that this be made part of the court file and I'm

12   tendering you a copy of that.  If you want me to read the

13   amendments into the record I can, they're quite

14   voluminous though.

15           THE COURT:  What was the day of testimony?

16           MS. JHA:  There were several dates of

17   testimony.  The trial began on --

18           THE DEFENDANT:  Good morning, Judge.

19           THE COURT:  Good morning, sir.  How are you?

20           THE DEFENDANT:  I'm all right.

21           THE COURT:  Good.

22           MS. JHA:  I believe it began on February 25th,

23   your Honor.  Conviction was on March 31st of 2008.  I

24   believe there were only two days of trial.  It was an

1    entered and continued bench trial.

2            THE COURT:  Okay.  Lorna.

3            MS. AMADO CHEVLIN:  Judge, there is one

4    amendment I would also like to make as well.  On Page 3

5    of the report that we have at the bottom it is the

6    defendant's gun conviction, which is U.U.W. by a felon.

7    The case number is actually 93 CR 2769001.

8            THE COURT:  Okay.  Any objection?

9            MS. JHA:  No objection, Judge.  We agree that

10   the conviction listed is not one of Antoine's.

11           THE COURT:  Anything else?

12           MS. JHA:  No, unless you want me to put the

13   amendments that I made to the Presentence Investigation

14   on the record or if you're just willing to make --

15           THE COURT:  Yeah.  Go right ahead.

16           MS. JHA:  You want me to put them all on?

17           THE COURT:  Yes.  How many are there?

18           MS. JHA:  There's a lot.  If you look on the

19   back, including there's paragraphs that are amended.

20               Starting on Page 1, your Honor, under my

21   client's date of birth, striking 1982 and adding 1973.

22   Under the defense attorney striking the name S. Goldberg

23   and putting L. J-h-a.

24               Page 2, under the Section Gang

                          4

1　Involvement, adding the word previous before the word

2　Black Gangster.  The State has made the appropriate

3　amendment to Page 3 on the '93 conviction.

4　　　　　　　On Page 5 under Social History, striking

5　the language next to father, Leroy Kelly, incarcerated in

6　IDOC.  He's not.  Paragraph 2 under the Social History,

7　line two striking the word mother, replacing it with the

8　word girlfriend.  Striking the address 242 Marshall in

9　Bellwood and replacing it with 1337 North Kildare in

10　Chicago, Illinois.  Striking the language he will be

11　returned to this address upon release from incarceration.

12　　　　　　　Under the section, also on Page 5, Marital

13　Status, the first line -- the first two lines should

14　remain the same, striking from the word children until

15　the end of the paragraph and replacing it with the

16　following:  He paid child support for Dimitri Willis, age

17　six, withdrawn from his paycheck from 2004 to 2006.  He

18　resided with his girlfriend and his second son,

19　Lawrence Willis, eleven years old, until his arrest.  He

20　also provides support for his third son, Antoine Willis.

21　　　　　　　The next paragraph, prior to his

22　incarceration he saw Antoine every week.  Since his

23　incarceration on this case he's maintained contact with

24　his children via telephone, mail and the occasional

5

1   visit.  Demi tri lives with his mother in Mississippi.

2                    Further on Page 5 under Education,

3   line two, striking the word Crane and replacing it with

4   George Collins.  A sentence starting on line six, going

5   into line seven, striking the sentence beginning with he

6   and ending with experience, adding before that after the

7   word IDOC, also while in custody of the Illinois

8   Department of Corrections Antoine took several courses

9   from McMurray College in Jacksonville, Illinois and

10  Redlight College in Big Muddy, Antoine earned a

11  certificate in custodial maintenance and completed course

12  work in blueprint reading, carpentry and masonry.

13  Antoine would like to study real estate and computers in

14  the future.

15                   Under Employment, Page 6, just adding at

16  line three after the word Illinois, Antoine also had

17  previous work experience at McDonald's as a cook and

18  dishwasher.

19                   Alcohol and Drug Usage, also on Page 6,

20  striking the last line of that paragraph, replacing it

21  with he denied ever experimenting with any elicit drugs.

22                   Companions And Community Involvement, line

23  one, striking the words has been, replacing it with was,

24  and at the end of that sentence after the word gang, from

1   about 1989 to 1996.

2          Finally, Judge on Page 7 under the

3   summary, striking the second line, replacing it with

4   after dropping out of high school he earned his GED and a

5   certificate in custodial maintenance in the Illinois

6   Department of Corrections.  Striking the sentence

7   beginning on line three, beginning with he and ending

8   with the word children, striking the word alcohol or from

9   line six and inserting on line seven the word former

10  before the word member of the Black Gangster Street Gang.

11  And with all of that those are amendments to the report.

12          I believe I did put the State on notice

13  that there would be significant amendments to the social

14  history as it's based on a self-report from my client.  I

15  believe she had no objection to those amendments being

16  considered.

17          MS. AMADO CHEVLIN:  That's fine.

18          THE COURT:  Okay.  It will be received as

19  amended.  And with that we're ready to proceed?

20          MS. JHA:  Yes, we are.

21          THE COURT:  Go right ahead.  I'm sorry, State.

22          MS. JHA:  Judge, if you want to rule on my

23  Motion For New Trial before we proceed to sentencing.

24          THE COURT:  I thought we had already.

7

1    MS. JHA:  I don't know that you had ruled.

2    THE COURT:  Do you care to elaborate?

3    MS. JHA:  No, Judge.

4    THE COURT:  Response.

5    MS. AMADO CHEVLIN:  Your Honor, we would rest

6  on the testimony you heard from all the officers, as well

7  as the forensic evidence that you heard throughout the

8  trial, it was consistent with the testimony of the

9  officers.  Additionally the detectives also noted the

10  fact that there had been multiple, multiple shootings

11  which had been occurring throughout that day, both before

12  and after -- prior to the incident in question.  We

13  believe that the evidence certainly proved this defendant

14  guilty beyond a reasonable doubt and that your finding in

15  this case was sound.

16    THE COURT:  All right.  Tell me the

17  significance of this dirt which you say was caked on the

18  weapon.

19    MS. JHA:  Judge, during the trial

20  you did see photographs of the weapon.

21  Officer Triantafillo recovered from the scene a weapon

22  that he had stated that Mr. Willis had allegedly held,

23  dropped, and he recovered just seconds later.  The weapon

24  as it appeared to me it looked as if it had been

1  completely caked in dirt, almost buried in the ground,

2  certainly not one that had been recently dropped at that

3  location.

4           I believe that the testimony of

5  Officer Triantafillo was contradicted by the physical

6  evidence on that particular point, as well as the injury

7  of Antoine Willis in that he received a gunshot wound, it

8  was a graze wound to his left hip and that did contradict

9  both Officer Triantafillo and Officer Wagner's assessment

10  that Mr. Willis had been turned -- had initially been

11  running, according to their testimony, with his back

12  facing, that he turned to his left side and allegedly

13  raised a weapon in his right arm.  We believe that that

14  testimony is inconsistent with the injury that Mr. Willis

15  received in this case.  Those are the bases of our Motion

16  For New Trial was those contradictions.

17           THE COURT:  Do you have a photograph?

18           MS. AMADO CHEVLIN:  That's what I'm looking

19  for.  Your Honor, while I'm looking for the photograph of

20  the gun --

21           THE COURT:  I think it was No. 14.

22           MS. AMADO CHEVLIN:  Judge, showing you People's

23  Exhibit 15.  Let me see if I can find 14.  Here's 14,

24  Judge.

9

1          Your Honor, if you remember from the

2   testimony I think the officers testified that the

3   defendant had dropped this weapon.  I don't recall

4   exactly what the testimony was as far as where it was

5   dropped but I do know it was dropped in a grassy area

6   presumably with mud in the area.  I don't think that is

7   certainly anything to detract from the testimony that the

8   officer gave as to what happened on that day.

9          MS. JHA:  I have a transcript, Judge, if you

10  need it.

11         MS. AMADO CHEVLIN:  And, your Honor,

12  additionally if you look at the scene photographs it was

13  raining.  All the scene photographs show it's wet

14  pavement, this was dropped in a muddy area.

15         THE COURT:  Let's talk this through, Lakshmi.

16  So what about this caked dirt, I mean so what, what are

17  you saying?

18         MS. JHA:  There's no testimony -- There was no

19  testimony to indicate that there was any dirt on the

20  clothing of Antoine Willis, that there was any dirt on

21  his hands on the area that he supposedly removed it from.

22  He then -- The weapon that they're saying they recovered,

23  and I believe there is a significant amount of dirt both

24  on the handle, as well as on the barrel of that weapon,

1    does not look like something that was freshly dropped and

2    recovered.  It looks like something -- It's our argument

3    that had -- well basically that it's not freshly dropped

4    and recovered in that area.  You should have a much

5    cleaner weapon.

6           THE COURT:  So if this accumulation of dirt,

7    mud or however you choose to term it is from some time

8    other than the date this defendant was taken into custody

9    then what?

10          MS. JHA:  Well, Judge, the fact is not only

11   with respect to the weapon, the physical evidence in this

12   case contradicts the testimony of the officer.  I'm sure

13   you recall our theory of the case is that it was after --

14   and we acknowledge this was a tense situation for the

15   officer, but when he was in fear for his safety he

16   discharged his weapon hitting Antoine Willis at which

17   point it was our argument that they needed to have a

18   weapon and thus produced one and put that in the hands of

19   Antoine Willis.

20          THE COURT:  So they chose one that they had

21   been carrying around with dirt on it?

22          MS. JHA:  Judge, I have absolutely no knowledge

23   where that weapon came from.

24          THE COURT:  Do you know what it would take to

                              11

1    keep that dirt intact because it's going to fall off.

2    When it gets old it's going to fall off.

3          MS. JHA:  I make no argument as to where that

4    weapon may have come from.  We maintain that

5    Antoine Willis never was armed with a firearm.  The

6    physical evidence again contradicts the testimony.  There

7    was no fingerprints that were available for comparison

8    with respect to that weapon.  The officers got themselves

9    in a situation where they needed Mr. Willis to be armed

10   with a firearm because it's a very serious thing when

11   Chicago police officers shoot an unarmed citizen.

12          THE COURT:  Right.  Right.  So their dropped

13   gun of choice was a four inch .357 handgun, complete with

14   dirt.  Let's get back to carrying around a drop gun with

15   dirt on it.  How did they maintain the dirt on that gun?

16          MS. JHA:  Judge, I don't know whether it

17   was --

18          THE COURT:  Well, if you espouse a theory can

19   you kind of advance it or no?

20          MS. JHA:  Judge, I don't know whether it was

21   carried around, whether it came from somewhere else in

22   the area.  There's no question that there was shooting

23   going on in that area.

24          THE COURT:  Okay.

12

1          MS. JHA:  There were multiple --

2          THE COURT:  Okay.  So now there's this gun that

3  just happens to be laying around.

4          MS. JHA:  I don't know where the gun came from,

5  Judge.  I don't know where it came from.

6          THE COURT:  I know where it came from.

7          MS. JHA:  We know where he says it was

8  recovered and you don't even have photographs of where

9  that gun was recovered.  You have photographs of a gun

10  that was photographed in the police station.  You have

11  extensive coverage in this case, both video, which I

12  don't believe you viewed, but you heard about video that

13  was shot, photographs that were taken documenting every

14  inch of the scene, documenting every shell casing most of

15  which were not -- none of which were related to this case

16  with the exception of Officer Wagner's extensive

17  documentation of what the physical evidence was, yet you

18  have a picture of a gun in a paper bag in a police

19  station and that is a key piece of evidence in this case

20  because that's the reason that the officers gave as their

21  justification for shooting my client.

22          THE COURT:  So the officers are not carrying

23  this weapon around, they found it somewhere in the

24  immediate area?

13

1           MS. JHA:  Judge, it could have been found in

2     the area, they could have had the weapon.  I would have

3     no idea where that weapon came from.  It is our position

4     that it did not come from Antoine Willis.  Antoine Willis

5     did not have a firearm.  He was shot mistakenly by the

6     Chicago police officers.  Where this firearm came from I

7     don't know.

8           What we do know and what your Honor knows

9     as well is that it was not documented at the scene.  You

10    are able to observe the physical appearance of the weapon

11    and you're able to weigh the physical evidence, all of

12    it, as it came in in this case against the testimony of

13    the Chicago police officers.

14          THE COURT:  How many civilians, according to

15    the testimony, were out there at the time that this whole

16    encounter began?

17          MS. AMADO CHEVLIN:  At least four.

18          MS. JHA:  I believe that would be correct.  The

19    officers, I believe, testified that they came through the

20    back alley of 839 North Keystone, that he had come up,

21    that there were a couple people on the porch that was the

22    focus of the calls that they had received in the area.

23    Antoine, according to the officer's testimony, was

24    allegedly standing at the end of 839 and I think a little

                                14

1   bit to the right supposedly talking to a female.

2            THE COURT:  Right.

3            MS. JHA:  Who disappeared from the scene.  How

4   many other people were out there I don't know.

5            THE COURT:  Okay.  Well, it appears that the

6   weapon in People's 14 and 15 also has sustained scuff

7   marks to the bottom portion of the grip.  This motion is

8   respectfully denied.

9                    Aggravation, State.

10           MS. AMADO CHEVLIN:  Yes.  Your Honor, if you

11  recall from this case you heard the testimony from the

12  officers who related this incident to you were

13  Officer Wagner, I'd like you to reconsider again the fact

14  that he testified to the fact that he and his partner

15  were chasing the defendant, he turned around several

16  times and pointed the gun at these officers causing them

17  to fire their own duty weapon into the defendant's hip.

18           Your Honor, you have before you the

19  defendant's criminal history.  He has lived a life of

20  crime, one which is dedicated it appears to both drug

21  dealing as well as carrying his gun around.  It stems all

22  the way back as far as his adult history to 1990 where in

23  that case he was convicted of possession of stolen motor

24  vehicle.

                              15

1            Your Honor, you also have, if you recall,

2   to consider in your aggravation that when the defendant

3   was apprehended he had a pair of latex gloves in his

4   pocket which were recovered.  He also had six additional

5   live .357 caliber cartridges in his pocket.  We also had

6   the testimony that the officers were responding initially

7   to a call of shots being fired or a person with a gun

8   when they came upon the defendant and coupled with the

9   fact that the defendant's gloves, which were recovered

10   from him, did come back positive for GSR.

11            Your Honor, you have the defendant's

12   testimony --

13            THE COURT:  Somebody put that on him.

14            MS. AMADO CHEVLIN:  Regardless, Judge, you have

15   the testimony from the officers who testified to what

16   they experienced that night at the hands of the defendant

17   and you have the defendant's criminal history.  He is --

18   In Count One he is charged with an armed habitual

19   criminal, that is a Class X, he is certainly extendible

20   and is Class X mandatory by virtue of his background

21   alone.

22            Your Honor, we would ask that you consider

23   a sentence in excess of the minimum involved again in

24   light of the history of the defendant, as well as the

1    facts you heard throughout this case.

2              Your Honor, I would just also note there

3    appears to have been many arguments, conjecture, as to

4    where this gun came from.  You had the evidence that the

5    trier of fact was to consider in finding this defendant

6    guilty and we ask that you sentence the defendant

7    accordingly.

8              THE COURT:  Miss Jha.

9              MS. JHA:  Thank you, Judge.

10             With respect to the facts that the State

11   argued, there was no gunshot residue that was put into

12   evidence per your ruling otherwise my arguments are the

13   same as they relate to the facts.

14             Antoine, your Honor, he is thirty-five

15   years old as he stands here before you.  He does have a

16   close-knit family.  He has three siblings.  He was raised

17   by his mother, who is present in court and standing over

18   there, on the west side of Chicago.  His mother has

19   consistently maintained employment in providing for all

20   of her children.

21             Prior to Antoine's arrest in 2000 he was

22   living with his girlfriend, Donita Brown, his son,

23   Lawrence, who is eleven years old, and her daughter from

24   another relationship.  He does have two other children,

17

1    one of whom resides in Mississippi who he supported

2    through his most recent employment at Chicago Medicar.

3    He also has another son, Antoine, who he does visit with

4    or did visit with before his incarceration on a weekly

5    basis.

6              Although Antoine did drop out of high

7    school he has since done his best to better himself from

8    there.  He earned his GED in 2000.  He also while he was

9    in the Illinois Department of Corrections instead of

10   wasting his time tried to better himself there taking

11   several courses and receiving a certificate in custodial

12   maintenance.  He does have work experience.  He has a

13   work history.  He has worked at McDonald's.  Before his

14   arrest in this case he was employed by Chicago Medicar as

15   a driver.  He does have future ambitions.  He would like

16   to study real estate and computers in the future.

17             Antoine respects your Honor's ruling,

18   although he does maintain his innocence in this case.  I

19   think you've seen by his behavior in court, this case was

20   pending for some time before it came to trial, he's kind,

21   he's a respectful person.  He does have ambitions in

22   life.  He certainly is not a throw-away of the system.

23   Antoine has spent no more than -- his most significant

24   sentence was seven years in the Illinois Department of

18

1    Corrections.  This case is a case that carries

2    eighty-five percent and I'd like to remind your Honor of

3    that.

4              I'd also like to remind the court Antoine

5    has suffered physically from this case and has paid a

6    physical price for whatever it is that happened on that

7    evening.  As you know Officer Wagner did shoot Antoine.

8    He has had to suffer through the pain of that gunshot

9    wound injury, as well as the inadequate care that he's

10   received during his incarceration here.  I think that

11   that was a significant price that he has paid with his

12   physical health already.

13             Your Honor, I'm asking, especially in

14   light of the time, the eighty-five percent in this case,

15   I'm asking that your Honor impose a minimum sentence for

16   Mr. Willis.

17             THE COURT:  Mr. Willis, would you care to say

18   anything, sir?

19             THE DEFENDANT:  Yes, your Honor.  I been

20   detained here at Cook County for twenty months and I've

21   been staying out of trouble.  I haven't picked up no

22   jailhouse cases and I found the Lord while I was here and

23   I humbled myself and I was a productive citizen before

24   this altercation took place.

1    THE COURT:  The Lord lives in County Jail.

2    THE DEFENDANT:  He allowed the situation to

3    happen in order to get closer to him.

4    THE COURT:  That's where everybody finds him.

5    THE DEFENDANT:  And I'm asking you to have

6    leniency on me in this situation and I'm asking

7    fifty percent if possible.

8    THE COURT:  Anything you want to say, mother?

9    UNIDENTIFIED PERSON:  No.

10    THE COURT:  That's no?

11    UNIDENTIFIED PERSON:  No.

12    THE COURT:  Come on, you can say it.  I can

13    stand it, whatever you want to say.  It's not going to

14    change it.  It's in the mix now.  I know exactly what I'm

15    going to do.  You get a free shot.  Okay.

16    This is what it's worth, I have reviewed

17    the defendant's Presentence Investigation, that in

18    consideration of the charges before the defendant, the

19    court sentences you, sir, to six years in the Illinois

20    Department of Corrections.  You'll be given credit for --

21    MS. JHA:  I'm calculating it right now, Judge.

22    THE COURT:  Since the day of your arrest you've

23    been in custody?

24    THE DEFENDANT:  Yes.

20

1          MS. JHA:  Yes.  I believe it's 664.

2          THE COURT:  September 22nd?

3          THE DEFENDANT:  Yes.

4          THE COURT:  That would be two years minus 60

5 days.

6          MS. JHA:  Okay.

7          THE COURT:  364, 304.

8          MS. AMADO CHEVLIN:  Judge I also have an

9 impound order for the photographs.

10         THE COURT:  668, minus two months is 304.

11         MS. JHA:  Okay.  668 is fine.  I was off by 4.

12         THE COURT:  I'm a product of the public school

13 system, we tend to do things the simple way.

14         MS. JHA:  I'm a disgrace to my heritage when it

15 comes to math, so --

16         THE COURT:  I'm not getting into that.

17         Sir, you'll be given credit for 668 days,

18 that time in fact having been served.

19         You have 30 days from today to appeal the

20 sentence.  To do that properly you must set forth in

21 writing the reasons for your post-trial motions.  Issues

22 not reduced to writing cannot be argued later on.

23         If you need a copy of these proceedings

24 but cannot afford one let me know that, we'll give you

1    one free of cost.  If you need counsel to assist you in
2    the preparation of post-trial motions but cannot afford
3    an attorney let me know that, I'll appoint an attorney to
4    represent you.  Any questions, sir?

5              THE DEFENDANT:  No questions.  Just can I hug
6    my mother?

7              THE COURT:  No.  You can't have any physical
8    contact with her.  You can go back there and talk to her.
9    You can't touch her.

10             THE DEFENDANT:  All right.

11

12                            (Which were all the
13                             proceedings in the
14                             above-entitled matter.)

15

16

17

18

19

20

21

22

23

24

1  STATE OF ILLINOIS )
                     )  SS:
2  COUNTY OF C O O K )

3

4           IN THE CIRCUIT COURT OF COOK COUNTY
             COUNTY DEPARTMENT-CRIMINAL DIVISION
5

6           I, BRENDA D. HAYES, Official Court Reporter for

7  the Circuit Court of Cook County, Cook Judicial Circuit

8  of Illinois, do hereby certify that I reported

9  stenographically the proceedings had on the hearing in

10 the above entitled cause; that I thereafter transcribed

11 said hearing into typewriting, which I hereby certify to

12 be a true and accurate transcript of the proceedings had

13 before the Honorable MARCUS R. SALONE, Judge of said

14 court.

15

16

17

18

19                    _____

20                    OFFICIAL COURT REPORTER

21

22

23

24

                          23